**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 27, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

HOBBY LOBBY STORES, INC.;
MARDEL, INC.; DAVID GREEN;
BARBARA GREEN; MART GREEN;
STEVE GREEN; DARSEE LETT,

       Plaintiffs-Appellants,

    v.

KATHLEEN SEBELIUS, in her
official capacity as Secretary of the
United States Department of Health
and Human Services; UNITED
STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES;
HILDA SOLIS, Secretary of the
United States Department of Labor;
UNITED STATES DEPARTMENT
OF LABOR; TIMOTHY GEITHNER,
Secretary of the United States
Department of Treasury; UNITED
STATES DEPARTMENT OF THE
TREASURY,

       Defendants-Appellees.
_____

EMERITUS PROFESSOR OF LAW
CHARLES E. RICE; PROFESSOR OF
LAW BRADLEY P. JACOB; TEXAS
CENTER FOR DEFENSE OF LIFE;
NATIONAL LEGAL FOUNDATION;
LIBERTY, LIFE AND LAW
FOUNDATION; AMERICAN
CENTER FOR LAW AND JUSTICE;

No. 12-6294

BREAST CANCER PREVENTION INSTITUTE; BIOETHICS DEFENSE FUND; LIFE LEGAL DEFENSE FOUNDATION; THE RIGHT REVEREND W. THOMAS FRERKING, OSB; MISSOURI ROUNDTABLE FOR LIFE; ARCHDIOCESE OF OKLAHOMA CITY; EAGLE FORUM; SANFORD C. COATS; SENATOR DANIEL COATS; SENATOR THAD COCHRAN; SENATOR MIKE CRAPO; SENATOR CHARLES GRASSLEY; SENATOR ORRIN G. HATCH, Senator; SENATOR JAMES M. INHOFE; SENATOR MITCH MCCONNELL; SENATOR PAT ROBERTS; SENATOR RICHARD SHELBY; CONGRESSMAN LAMAR SMITH; ASSOCIATION OF GOSPEL RESCUE MISSIONS; PRISON FELLOWSHIP MINISTRIES; ASSOCIATION OF CHRISTIAN SCHOOLS INTERNATIONAL; NATIONAL ASSOCIATION OF EVANGELICALS; ETHICS & RELIGIOUS LIBERTY COMMISSION OF THE SOUTHERN BAPTIST CONVENTION; INSTITUTIONAL RELIGIOUS FREEDOM ALLIANCE; CHRISTIAN LEGAL SOCIETY; ASSOCIATION OF AMERICAN PHYSICIANS & SURGEONS; AMERICAN ASSOCIATION OF PRO-LIFE OBSTETRICIANS AND GYNECOLOGISTS; CHRISTIAN MEDICAL ASSOCIATION; CATHOLIC MEDICAL ASSOCIATION; NATIONAL CATHOLIC BIOETHICS CENTER;

PHYSICIANS FOR LIFE; NATIONAL ASSOCIATION OF PRO LIFE NURSES; UNITED STATES JUSTICE FOUNDATION; CONGRESSMAN FRANK WOLF; STATE OF OKLAHOMA; WYWATCH FAMILY ACTION, INC.; THE C12 GROUP; PHYSICIANS FOR REPRODUCTIVE HEALTH; THE AMERICAN COLLEGE OF OBSTETRICIANS AND GYNECOLOGISTS; THE AMERICAN SOCIETY FOR EMERGENCY CONTRACEPTION; ASSOCIATION OF REPRODUCTIVE HEALTH PROFESSIONALS; AMERICAN SOCIETY FOR REPRODUCTIVE MEDICINE; SOCIETY FOR ADOLESCENT HEALTH AND MEDICINE; AMERICAN MEDICAL WOMEN'S ASSOCIATION; NATIONAL ASSOCIATION OF NURSE PRACTITIONERS IN WOMEN'S HEALTH; JAMES TRUSSELL; SUSAN F. WOOD; DON DOWNING; KATHLEEN BESINQUE; AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE; UNION FOR REFORM JUDAISM; CENTRAL CONFERENCE OF AMERICAN RABBIS; WOMEN OF REFORM JUDAISM; HINDU AMERICAN FOUNDATION; NATIONAL WOMEN'S LAW CENTER; AMERICAN ASSOCIATION OF UNIVERSITY WOMEN; AMERICAN

-3-

FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES (AFSCME); BLACK WOMEN'S HEALTH IMPERATIVE; BOULDER NOW; COLORADO ORGANIZATION FOR LATINA OPPORTUNITY AND REPRODUCTIVE RIGHTS (COLOR); GENDER IMPACTS POLICY, a project of the Center of Southwest Culture; IBIS REPRODUCTIVE HEALTH; LAW STUDENTS FOR REPRODUCTIVE JUSTICE; MERGERWATCH; NARAL PRO-CHOICE AMERICA; NARAL PRO-CHOICE COLORADO; NARAL PRO-CHOICE WYOMING; NATIONAL ORGANIZATION FOR WOMEN FOUNDATION; NATIONAL ORGANIZATION FOR WOMEN-SANTA FE CHAPTER (SANTA FE NOW); NATIONAL PARTNERSHIP FOR WOMEN AND FAMILIES; NEW MEXICO-NATIONAL ORGANIZATION FOR WOMEN (NMNOW); PLANNED PARENTHOOD OF ARKANSAS & EASTERN OKLAHOMA, INC., d/b/a Planned Parenthood of Heartland-Oklahoma; PLANNED PARENTHOOD ASSOCIATION OF UTAH; PLANNED PARENTHOOD OF KANSAS & MID-MISSOURI; PLANNED PARENTHOOD OF THE ROCKY MOUNTAINS, INC.; POPULATION CONNECTION;

-4-

RAISING WOMEN'S VOICES FOR THE HEALTH CARE WE NEED; SERVICE EMPLOYEES INTERNATIONAL UNION; SOUTHWEST WOMEN'S LAW CENTER; UTAH HEALTH POLICY PROJECT; CENTER FOR REPRODUCTIVE RIGHTS; AMERICAN PUBLIC HEALTH ASSOCIATION; GUTTMACHER INSTITUTE; NATIONAL FAMILY PLANNING & REPRODUCTIVE HEALTH ASSOCIATION; NATIONAL LATINA INSTITUTE FOR REPRODUCTIVE HEALTH; NATIONAL WOMEN'S HEALTH NETWORK; R. ALTA CHARO, Professor; REPRODUCTIVE HEALTH TECHNOLOGIES PROJECT; AMERICAN CIVIL LIBERTIES UNION; AMERICAN CIVIL LIBERTIES UNION OF OKLAHOMA; ANTI-DEFAMATION LEAGUE; CATHOLICS FOR CHOICE; HADASSAH, THE WOMEN'S ZIONIST ORGANIZATION OF AMERICA, INC.; INTERFAITH ALLIANCE FOUNDATION; NATIONAL COALITION OF AMERICAN NUNS; NATIONAL COUNCIL OF JEWISH WOMEN; RELIGIOUS COALITION FOR REPRODUCTIVE CHOICE; UNITARIAN UNIVERSALIST ASSOCIATION; UNITARIAN UNIVERSALIST WOMEN'S FEDERATION; NATIONAL HEALTH LAW PROGRAM; MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATIONAL FUND, INC.; ASIAN PACIFIC

-5-

AMERICAN LEGAL CENTER;
FORWARD TOGETHER;
NATIONAL HISPANIC MEDICAL
ASSOCIATION; IPAS; SEXUALITY
INFORMATION AND
EDUCATIONAL COUNCIL OF THE
U.S.; CAMPAIGN TO END AIDS;
HIV LAW PROJECT; NATIONAL
WOMEN AND AIDS COLLECTIVE;
HOUSING WORKS,

      Amici Curiae.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. NO. 5:12-CV-01000-HE)**

---

S. Kyle Duncan (Luke W. Goodrich, Mark L. Rienzi, Eric S. Baxter, Lori H. Windham, and Adèle Auxier Keim with him on the brief) The Becket Fund for Religious Liberty, Washington, D.C., for Appellants.

Alisa B. Klein, Appellate Staff Attorney (Stuart F. Delery, Principal Deputy Assistant Attorney General, Sanford C. Coats, United States Attorney, Beth S. Brinkmann, Deputy Assistant Attorney General, and Mark B. Stern, Appellate Staff Attorney, with her on the brief) Civil Division, United States Department of Justice, Washington, D.C., for Appellees.

---

Before **BRISCOE**, Chief Judge, **KELLY, LUCERO, HARTZ, TYMKOVICH, GORSUCH, MATHESON**, and **BACHARACH**, Circuit Judges.[*]

---

[*] The Honorable Jerome A. Holmes is recused in this matter.

**TYMKOVICH**, Circuit Judge.

This case requires us to determine whether the Religious Freedom Restoration Act and the Free Exercise Clause protect the plaintiffs—two companies and their owners who run their businesses to reflect their religious values. The companies are Hobby Lobby, a craft store chain, and Mardel, a Christian bookstore chain. Their owners, the Greens, run both companies as closely held family businesses and operate them according to a set of Christian principles. They contend regulations implementing the 2010 Patient Protection and Affordable Care Act force them to violate their sincerely held religious beliefs. In particular, the plaintiffs brought an action challenging a regulation that requires them, beginning July 1, 2013, to provide certain contraceptive services as a part of their employer-sponsored health care plan. Among these services are drugs and devices that the plaintiffs believe to be abortifacients, the use of which is contrary to their faith.

We hold that Hobby Lobby and Mardel are entitled to bring claims under RFRA, have established a likelihood of success that their rights under this statute are substantially burdened by the contraceptive-coverage requirement, and have established an irreparable harm. But we remand the case to the district court for further proceedings on two of the remaining factors governing the grant or denial of a preliminary injunction.

More specifically, the court rules as follows:

As to jurisdictional matters, the court unanimously holds that Hobby Lobby and Mardel have Article III standing to sue and that the Anti-Injunction Act does not apply to this case. Three judges (Kelly, Tymkovich, and Gorsuch, JJ.) would also find that the Anti-Injunction Act is not jurisdictional and the government has forfeited reliance on this statute. These three judges would also hold that the Greens have standing to bring RFRA and Free Exercise claims and that a preliminary injunction should be granted on their RFRA claim. A fourth judge (Matheson, J.) would hold that the Greens have standing and would remand for further consideration of their request for a preliminary injunction on their RFRA claim.

Concerning the merits, a majority of five judges (Kelly, Hartz, Tymkovich, Gorsuch, and Bacharach, JJ.) holds that the district court erred in concluding Hobby Lobby and Mardel had not demonstrated a likelihood of success on their RFRA claim. Three judges (Briscoe, C.J., and Lucero and Matheson, JJ.) disagree and would affirm the district court on this question.

A majority of five judges (Kelly, Hartz, Tymkovich, Gorsuch, and Bacharach, JJ.) further holds that Hobby Lobby and Mardel satisfy the irreparable harm prong of the preliminary injunction standard. A four-judge plurality (Kelly, Hartz, Tymkovich, Gorsuch, JJ.) would resolve the other two preliminary injunction factors (balance of equities and public interest) in Hobby Lobby and

Mardel's favor and remand with instructions to enter a preliminary injunction, but the court lacks a majority to do so. Instead, the court remands to the district court for further evaluation of the two remaining preliminary injunction factors.[1]

One judge (Matheson, J.) reaches the merits of the plaintiffs' constitutional claim under the Free Exercise Clause, concluding that it does not entitle the plaintiffs to preliminary injunctive relief.[2]

Accordingly, for the reasons set forth below and exercising jurisdiction under 28 U.S.C. § 1292(a)(1), we reverse the district court's denial of the plaintiffs' motion for a preliminary injunction and remand with instructions that the district court address the remaining two preliminary injunction factors and then assess whether to grant or deny the plaintiffs' motion.

---

[1] The en banc court joins as follows:
(1) All judges join Part III; (2) Judges Kelly, Hartz, Tymkovich, Gorsuch, and Bacharach join Parts I, II, III, IV, and V; (3) Judges Kelly, Hartz, Tymkovich, and Gorsuch join Part VI in full, and Judge Bacharach joins as to Section VI(B)(1) only; (4) Judge Hartz separately concurs; (5) Judge Gorsuch separately concurs, joined by Judges Kelly and Tymkovich; (6) Judge Bacharach concurs in part; (7) Chief Judge Briscoe concurs and dissents in part, joined by Judge Lucero; and (8) Judge Matheson concurs and dissents in part.

[2] Because the district court will be reviewing the RFRA claim, the majority declines at this stage to reach the constitutional question of whether Hobby Lobby and Mardel are likely to succeed on their Free Exercise claim. *See, e.g.*, *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.").

# I. Background & Procedural History

## A. The Plaintiffs

The plaintiffs in this case are David and Barbara Green, their three children (Steve Green, Mart Green, and Darsee Lett), and the businesses they collectively own and operate: Hobby Lobby Stores, Inc. and Mardel, Inc. David Green is the founder of Hobby Lobby, an arts and crafts chain with over 500 stores and about 13,000 full-time employees. Hobby Lobby is a closely held family business organized as an S-corp. Steve Green is president of Hobby Lobby, and his siblings occupy various positions on the Hobby Lobby board. Mart Green is the founder and CEO of Mardel, an affiliated chain of thirty-five Christian bookstores with just under 400 employees, also run on a for-profit basis.

As owners and operators of both Hobby Lobby and Mardel, the Greens have organized their businesses with express religious principles in mind. For example, Hobby Lobby's statement of purpose recites the Greens' commitment to "[h]onoring the Lord in all we do by operating the company in a manner consistent with Biblical principles." JA 22–23a. Similarly, Mardel, which sells exclusively Christian books and materials, describes itself as "a faith-based company dedicated to renewing minds and transforming lives through the products we sell and the ministries we support." JA 25a.

Furthermore, the Greens allow their faith to guide business decisions for

both companies.  For example, Hobby Lobby and Mardel stores are not open on Sundays; Hobby Lobby buys hundreds of full-page newspaper ads inviting people to "know Jesus as Lord and Savior," JA 24a; and Hobby Lobby refuses to engage in business activities that facilitate or promote alcohol use.

The Greens operate Hobby Lobby and Mardel through a management trust (of which each Green is a trustee), and that trust is likewise governed by religious principles.  The trust exists "to honor God with all that has been entrusted" to the Greens and to "use the Green family assets to create, support, and leverage the efforts of Christian ministries."  JA 21a.  The trustees must sign "a Trust Commitment," which among other things requires them to affirm the Green family statement of faith and to "regularly seek to maintain a close intimate walk with the Lord Jesus Christ by regularly investing time in His Word and prayer." *Id*.

As is particularly relevant to this case, one aspect of the Greens' religious commitment is a belief that human life begins when sperm fertilizes an egg.  In addition, the Greens believe it is immoral for them to facilitate any act that causes the death of a human embryo.

### B.  *The Contraceptive-Coverage Requirement*

Under the Patient Protection and Affordable Care Act (ACA), employment-based group health plans covered by the Employee Retirement Income Security Act (ERISA) must provide certain types of preventive health

services.  *See* 42 U.S.C. § 300gg-13; 29 U.S.C. § 1185d.  One provision mandates coverage, without cost-sharing by plan participants or beneficiaries, of "preventive care and screenings" for women "as provided for in comprehensive guidelines supported by the Health Resources and Services Administration [HRSA]."  42 U.S.C. § 300gg-13(a)(4).  HRSA is an agency within the Department of Health and Human Services (HHS).

When the ACA was enacted, there were no HRSA guidelines related to preventive care and screening for women.  As a result, HHS asked the Institute of Medicine (an arm of the National Academy of Sciences) to develop recommendations to help implement these requirements.  In response, the Institute issued a report recommending, among other things, that the guidelines require coverage for "'[a]ll Food and Drug Administration [FDA] approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity,' as prescribed by a provider."  77 Fed. Reg. 8725, 8725 (Feb. 15, 2012).

HRSA and HHS adopted this recommendation, meaning that employment-based group health plans covered by ERISA now must include FDA-approved contraceptive methods.  The FDA has approved twenty such methods, ranging from oral contraceptives to surgical sterilization.  Four of the twenty approved methods—two types of intrauterine devices (IUDs) and the emergency contraceptives commonly known as Plan B and Ella—can function by preventing

the implantation of a fertilized egg.  The remaining methods function by preventing fertilization.[3]

### C.  *Exemptions from the Contraceptive-Coverage Requirement*

A number of entities are partially or fully exempted from the contraceptive-coverage requirement.

*First*, HHS "may establish exemptions" for "group health plans established or maintained by religious employers and health insurance coverage provided in connection with group health plans established or maintained by religious employers with respect to any requirement to cover contraceptive services . . . ." 45 C.F.R. § 147.130(a)(1)(iv)(A).

---

[3] There is an ongoing medical debate as to whether some of the contraceptive methods relevant to this case act by preventing *implantation* or *fertilization*.  *Compare, e.g.*, Physicians for Reproductive Health et al. Amicus Br. at 12–13, *with* Ass'n of Am. Physicians & Surgeons et al. Amicus Br. at 12 & n.21.  This is relevant because Hobby Lobby and Mardel object to forms of contraception that prevent uterine implantation, but they do not object to those that prevent conception.  For purposes of this appeal, however, there is no material dispute.  Both the government and the medical amici supporting the government concede that at least some of the contraceptive methods to which the plaintiffs object have the potential to prevent uterine implantation.  *See, e.g.*, Aple. Br. at 9 n.6 (noting that one of the three ways emergency contraceptive pills function is by "inhibiting implantation" (quoting 62 Fed. Reg. 8610, 8611 (Feb. 25, 1997))); Physicians for Reproductive Health et al. Amicus Br. at 16 (noting that some studies suggest the copper present in IUDs "can also alter molecules present in the endometrial lining," which causes "alteration of the endometrial lining [that] *prevents* . . . implantation" (emphasis added)).  Some of our colleagues suggest this debate extends only to intrauterine devices, not Plan B and Ella.  *See* Briscoe Op. at 3.  Whatever the merits of this argument, we need not wade into scientific waters here, given the above-noted agreement that some of the challenged devices function in a manner that Hobby Lobby and Mardel find morally problematic.

HHS regulations currently define a "religious employer" as an organization that: (1) has the inculcation of religious values as its purpose; (2) primarily employs persons who share its religious tenets; (3) primarily serves persons who share its religious tenets; and (4) is a non-profit organization described in a provision of the Internal Revenue Code that refers to churches, their integrated auxiliaries, conventions or associations of churches, and to the exclusively religious activities of any religious order. *See* 45 C.F.R. § 147.130(a)(1)(iv)(B).

This definition of religious employer might change, however, as the federal agencies responsible for implementing the preventive services portion of the ACA have proposed a new rule that would eliminate the first three requirements above and clarify that the exemption is available to all non-profit organizations falling within the scope of a certain Internal Revenue Code provision. *See* 78 Fed. Reg. 8456, 8461 (Feb. 6, 2013).

*Second*, the government has proposed an accommodation for certain other non-profit organizations, including religious institutions of higher education, that have maintained religious objections to contraceptive coverage yet will not fall within the amended definition of a religious employer. Many of these organizations are currently subject to a temporary "safe harbor" provision that temporarily exempts them from having to cover contraceptive services. The government has proposed to route the contraceptive coverage for these organizations through a middleman insurer or insurance plan administrator,

allowing the organizations to avoid directly providing contraceptive coverage. *See id.* at 8458–68.

*Third*, if a business does not make certain significant changes to its health plans after the ACA's effective date, those plans are considered "grandfathered" and are exempt from the contraceptive-coverage requirement. *See* 42 U.S.C. § 18011(a)(2). Grandfathered plans may remain so indefinitely.

*Fourth*, businesses with fewer than fifty employees are not required to participate in employer-sponsored health plans. *See, e.g.*, 26 U.S.C. § 4980H. To the extent these businesses do not offer a health plan, they do not have to comply with any aspect of the shared responsibility health coverage requirements, including the contraceptive-coverage requirement. At the same time, the government asserts that if an otherwise exempt small business offers a health plan, it must comply with the contraceptive-coverage requirement. *See* Aple. Br. at 39 (citing 42 U.S.C. § 300gg-13).

Relying on information released by the White House and HHS, the plaintiffs estimate that at least 50 million people, and perhaps over a 100 million, are covered by exempt health plans. JA 80a. The government argues that the number of grandfathered health plans will decline over time, that grandfathered plans may already cover the objected-to contraceptives, and that financial incentives exist to push small businesses into the health insurance market, in which case they would have to comply with the contraceptive-coverage

-15-

requirement. At the same time, the government has not offered contrary estimates of individuals covered by exempt health plans.

No exemption, proposed or otherwise, would extend to for-profit organizations like Hobby Lobby or Mardel. And the various government agencies responsible for implementing the exceptions to the contraceptive-coverage requirement have announced that no proposed exemption will extend to for-profit entities under any circumstances because of what the government considers an important distinction, discussed further below, between for-profit and non-profit status.

## D. The Expected Effect of the Contraceptive-Coverage Requirement

The Greens run the Hobby Lobby health plan, a self-insured plan, which provides insurance to both Hobby Lobby and Mardel employees. Hobby Lobby and Mardel cannot qualify for the "grandfathered" status exemption because they elected not to maintain grandfathered status prior to the date that the contraceptive-coverage requirement was proposed.

Nevertheless, the Greens object to providing coverage for any FDA-approved contraceptives that would prevent implantation of a fertilized egg. Because the Greens believe that human life begins at conception, they also believe that they would be facilitating harms against human beings if the Hobby Lobby health plan provided coverage for the four FDA-approved contraceptive methods that prevent uterine implantation (Ella, Plan B, and the two IUDs). The

-16-

government does not dispute the sincerity of this belief.

The Greens present no objection to providing coverage for the sixteen remaining contraceptive methods. In other words, the Greens are willing to cover, without cost-sharing, the majority of FDA-approved contraceptive methods, from the original birth control pill to surgical sterilization. But if Hobby Lobby or Mardel employees wish to obtain Ella, Plan B, or IUDs, the Greens object to being forced to provide such coverage.

According to the plaintiffs, the corporations' deadline to comply with the contraceptive-coverage requirement is July 1, 2013. If the Hobby Lobby health plan does not cover all twenty contraceptive methods by that date, the businesses will be exposed to immediate tax penalties, potential regulatory action, and possible private lawsuits. *See, e.g.*, 26 U.S.C. §§ 4980D, 4980H; 29 U.S.C. §§ 1132, 1185d.

The most immediate consequence for Hobby Lobby and Mardel would come in the form of regulatory taxes: $100 per day for each "individual to whom such failure relates." 26 U.S.C. § 4980D(b)(1). The plaintiffs assert that because more than 13,000 individuals are insured under the Hobby Lobby plan (which includes Mardel), this fine would total at least $1.3 million per day, or almost $475 million per year. This assumes that "individual" means each individual insured under Hobby Lobby's plan. If the corporations instead drop employee health insurance altogether, they will face penalties of $26 million per year. *See*

-17-

*id.* § 4980H.

### E.  *Procedural History*

The plaintiffs filed suit on September 12, 2012, challenging the contraceptive-coverage requirement under RFRA, the Free Exercise Clause of the First Amendment, and the Administrative Procedure Act.  The plaintiffs simultaneously moved for a preliminary injunction on the basis of their RFRA and Free Exercise claims.  The district court denied that motion.  *See Hobby Lobby Stores, Inc. v. Sebelius*, 870 F. Supp. 2d 1278 (W.D. Okla. 2012).

The plaintiffs then appealed the denial of the preliminary injunction and moved for injunctive relief pending appeal.  A two-judge panel denied relief pending appeal, adopting substantially the same reasoning as the district court. *See Hobby Lobby Stores, Inc. v. Sebelius*, No. 12-6294, 2012 WL 6930302 (10th Cir. Dec. 20, 2012).  The plaintiffs then sought emergency relief under the All Writs Act from the Supreme Court, which also denied relief.  *See Hobby Lobby Stores, Inc. v. Sebelius*, 133 S. Ct. 641 (2012) (Sotomayor, J., in chambers).

The plaintiffs subsequently moved for initial en banc consideration of this appeal, citing the exceptional importance of the questions presented.  We granted that motion.  And given Hobby Lobby and Mardel's July 1 deadline for complying with the contraceptive-coverage requirement, we granted the plaintiffs' motion to expedite consideration of this appeal.

## II.  The Religious Freedom Restoration Act

Hobby Lobby and Mardel's central claims here arise under the Religious Freedom Restoration Act.  A plaintiff makes a prima facie case under RFRA by showing that the government substantially burdens a sincere religious exercise. *Kikumura v. Hurley*, 242 F.3d 950, 960 (10th Cir. 2001).  The burden then shifts to the government to show that the "compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 420 (2006) (quoting 42 U.S.C. § 2000bb-1(b)).  This burden-shifting approach applies even at the preliminary injunction stage.  *Id*. at 429.

The principal questions we must resolve here include: (1) whether Hobby Lobby and Mardel are "persons" exercising religion for purposes of RFRA; (2) if so, whether the corporations' religious exercise is substantially burdened; and (3) if there is a substantial burden, whether the government can demonstrate a narrowly tailored compelling government interest.

## III.  Subject-Matter Jurisdiction

Before turning to the preliminary injunction standard, we must resolve two issues that bear on our subject-matter jurisdiction—standing and the Anti-Injunction Act.

## A. *Standing*

We begin by examining whether Hobby Lobby and Mardel have standing to sue in federal court. Article III of the Constitution limits federal judicial power to "Cases" and "Controversies." A party that cannot present a case or controversy within the meaning of Article III does not have standing to sue in federal court. And whenever standing is unclear, we must consider it *sua sponte* to ensure there is an Article III case or controversy before us. *See New Eng. Health Care Emp. Pension Fund v. Woodruff*, 512 F.3d 1283, 1288 (10th Cir. 2008).

Under the familiar three-part test for establishing Article III standing, a plaintiff must show an injury that is "[1] concrete, particularized, and actual or imminent; [2] fairly traceable to the challenged action; and [3] redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (internal quotation marks omitted).

We conclude that Hobby Lobby and Mardel have Article III standing. Both companies face an imminent loss of money, traceable to the contraceptive-coverage requirement. Both would receive redress if a court holds the contraceptive-coverage requirement unenforceable as to them. Both therefore have Article III standing.[4]

---

[4] The plaintiffs also contend that the Greens, as owners of Hobby Lobby and Mardel, have standing in their own right to bring the claims at issue here. But there is no dispute that relief as to Hobby Lobby and Mardel would satisfy the Greens. Because we conclude RFRA protects Hobby Lobby and Mardel, the

(continued...)

-20-

## B.  *The Anti-Injunction Act*

A second possible impediment to our subject-matter jurisdiction is the

Anti-Injunction Act (AIA).  *See* 26 U.S.C. § 7421.  Although the plaintiffs and

the government agree that the AIA does not apply here, "subject-matter

jurisdiction, because it involves a court's power to hear a case, can never be

forfeited or waived."  *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) (internal

quotation marks omitted).  We therefore have an independent duty to determine

whether the AIA strips us of subject-matter jurisdiction.  *Id.*

The AIA dictates, with statutory exceptions inapplicable to this case, that

"no suit for the purpose of restraining the assessment or collection of any tax

shall be maintained in any court by any person, whether or not such person is the

person against whom such tax was assessed."  26 U.S.C. § 7421(a).  As the

Supreme Court recently noted, the AIA "protects the Government's ability to

collect a consistent stream of revenue, by barring litigation to enjoin or otherwise

obstruct the collection of taxes."  *NFIB v. Sebelius*, 132 S. Ct. 2566, 2582 (2012).

In this case, the corporations' challenge relates to the government's

authority under 26 U.S.C. § 4980D, which imposes a "tax" on any employer that

_____

[4](...continued)
majority opinion does not reach whether the Greens may likewise bring RFRA
claims based on regulations applying to the companies they own.  Four judges
would nonetheless conclude the Greens have standing and write separately on this
question.  *See* Gorsuch Op. (joined by Kelly and Tymkovich, JJ.), *infra*; Matheson
Op., *infra*.

-21-

does not meet the ACA's health insurance requirements, including the contraceptive-coverage requirement. *Id*. § 4980D(a). As noted above, the "tax" is set at $100 "for each day in the noncompliance period with respect to each individual to whom such failure relates." *Id*. § 4980D(b)(1). If an employer fails to provide health insurance, the employer is subject to a tax under § 4980H. And, as the Supreme Court recently instructed, when Congress uses the term "tax," it is a strong indication that Congress intends the AIA to apply. *NFIB*, 132 S. Ct. at 2582 (2012).

Still, the AIA does not apply to every lawsuit "tangentially related to taxes," *Cohen v. United States*, 650 F.3d 717, 727 (D.C. Cir. 2011) (en banc), and the corporations' suit is not challenging the IRS's ability to collect taxes. Rather, they seek to enjoin the enforcement of one HHS regulation, 45 C.F.R. § 147.130, which requires Hobby Lobby and Mardel to provide their employees with health plans that include "preventive care . . . provided for in [the] . . . [HRSA] guidelines," *id.* § 147.130(a)(1)(iv), which in turn "require coverage, without cost sharing, for '[a]ll [FDA-]approved contraceptive methods,'" 77 Fed. Reg. at 8726 (Feb. 15, 2012). In other words, Hobby Lobby and Mardel are not seeking to enjoin the collection of taxes or the execution of any IRS regulation; they are seeking to enjoin the enforcement, by whatever method, of one HHS regulation that they claim violates their RFRA rights.

Indeed, a regulatory tax is just one of many collateral consequences that can result from a failure to comply with the contraceptive-coverage requirement. *See, e.g.*, 29 U.S.C. § 1132(a)(5) (authorizing the Secretary of Labor to enforce the contraceptive-coverage requirement against non-compliant insurers); 42 U.S.C. § 300gg-22(a)(2) (authorizing the Secretary of HHS to exact penalties against non-compliant insurers in states where the state government does not enforce the health insurance requirements).

And just as the AIA does not apply to any suit against the individual mandate, which is enforced by the IRS, *see NFIB*, 132 S. Ct. at 2584, so too does the AIA not apply to any suit against the contraceptive-coverage requirement, even though it also may be enforced by the IRS. The statutory scheme makes clear that the tax at issue here is no more than a penalty for violating regulations related to health care and employer-provided insurance, *see, e.g.*, 42 U.S.C. § 300gg-22(b)(2)(C)(i) (calculating the maximum "penalty" that the Secretary of HHS can impose on non-compliant insurers in the same way that 26 U.S.C. § 4980D(b)(1) calculates the "tax" for non-compliant employers, namely "$100 for each day for each individual with respect to which such a failure occurs"), and the AIA does not apply to "the exaction of a purely regulatory tax," *Robertson v. United States*, 582 F.2d 1126, 1127 (7th Cir. 1978).

Both sides agree that the AIA should not apply for essentially these same reasons. We are convinced by this reasoning and proceed to resolve the merits of the RFRA claim.

## IV. Preliminary Injunction Standard

As noted above, the district court denied Hobby Lobby and Mardel's request for preliminary injunctive relief. We review the denial of a preliminary injunction for abuse of discretion. *Little v. Jones*, 607 F.3d 1245, 1250 (10th Cir. 2010). A district court abuses its discretion by denying a preliminary injunction based on an error of law. *Westar Energy, Inc. v. Lake*, 552 F.3d 1215, 1224 (10th Cir. 2009).

Under the traditional four-prong test for a preliminary injunction, the party moving for an injunction must show: (1) a likelihood of success on the merits; (2) a likely threat of irreparable harm to the movant; (3) the harm alleged by the movant outweighs any harm to the non-moving party; and (4) an injunction is in the public interest. *See, e.g.*, *Winter v. NRDC*, 555 U.S. 7, 20 (2008).

Hobby Lobby and Mardel urge that we apply a relaxed standard under which it can meet its burden for a preliminary injunction by showing the second, third, and fourth factors "tip strongly in [its] favor," and then satisfy the first factor "by showing that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." *Okla. ex rel. Okla. Tax Comm'n v. Int'l*

*Registration Plan, Inc.*, 455 F.3d 1107, 1113 (10th Cir. 2006). But we need not resolve whether this relaxed standard would apply here, given that a majority of the court holds that Hobby Lobby and Mardel have satisfied the likelihood-of-success prong under the traditional standard.

The district court ruled that the corporations failed the likelihood-of-success element because even closely held family businesses like Hobby Lobby and Mardel are not protected by RFRA.

We disagree with this conclusion and determine that the contraceptive-coverage requirement substantially burdens Hobby Lobby and Mardel's rights under RFRA. And at this stage, the government has not shown a narrowly tailored compelling interest to justify this burden.

## V. Merits

### A. Hobby Lobby and Mardel Are "Persons Exercising Religion" Under RFRA

RFRA provides, as a general rule, that the "Government shall not substantially burden a *person's* exercise of religion." 42 U.S.C. § 2000bb-1(a) (emphasis added). The parties dispute whether for-profit corporations, such as Hobby Lobby and Mardel, are persons exercising religion for purposes of RFRA. We thus turn to the question of whether Hobby Lobby, as a family owned business furthering its religious mission, and Mardel, as a Christian bookstore, can take advantage of RFRA's protections.

The government makes two arguments for why this is not the case. First, it cites to civil rights statutes and labor laws that create an exemption for religious organizations. It then references case law suggesting that non-profit status is an objective criterion for determining whether an entity is a religious organization for purposes of these civil rights statutes and labor laws. The government therefore argues that, as a matter of statutory interpretation, RFRA should be read to carry forward the supposedly preexisting distinction between non-profit, religious corporations and for-profit, secular corporations. Second, the government asserts that the for-profit/non-profit distinction is rooted in the Free Exercise Clause. It suggests Congress did not intend RFRA to expand the scope of the Free Exercise Clause. The government therefore concludes RFRA does not extend to for-profit corporations.

We reject both of these arguments. First, we hold as a matter of statutory interpretation that Congress did not exclude for-profit corporations from RFRA's protections. Such corporations can be "persons" exercising religion for purposes of the statute.[5] Second, as a matter of constitutional law, Free Exercise rights may extend to some for-profit organizations.

---

[5] We recognize there is at least tentative disagreement among the courts of appeal on this question. *Compare, e.g.*, *Grote v. Sebelius*, 708 F.3d 850, 855–56 (7th Cir. 2013) (corporation is a "person" for purposes of RFRA), *with Conestoga Wood Specialities Corp. v. Sec'y of U.S. Dep't of Health & Human Servs.*, No. 13-1144, 2013 WL 1277419, at *2 (3d Cir. Feb. 8, 2013) (corporation is not a "person" under RFRA).

### 1. Statutory Interpretation

#### a. The Dictionary Act

We begin with the statutory text.  RFRA contains no special definition of "person."  Thus, our first resource in determining what Congress meant by "person" in RFRA is the Dictionary Act, which instructs: "In determining the meaning of any Act of Congress, unless the context indicates otherwise * * * the word[] 'person' . . . include[s] corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." 1 U.S.C. § 1.  Thus, we could end the matter here since the plain language of the text encompasses "corporations," including ones like Hobby Lobby and Mardel.

In addition, the Supreme Court has affirmed the RFRA rights of corporate claimants, notwithstanding the claimants' decision to use the corporate form.  *See O Centro Espirita Beneficente Uniao do Vegetal v. Ashcroft*, 389 F.3d 973, 973 (10th Cir. 2004) (en banc) (affirming a RFRA claim brought by "a New Mexico corporation on its own behalf"), *aff'd*, 546 U.S. 418 (2006).[6]

---

[6] We further note that RFRA defines religious exercise by cross-reference to the Religious Land Use and Institutionalized Persons Act (RLUIPA).  *See* 42 U.S.C. § 2000bb-2(4) ("the term 'exercise of religion' means religious exercise, as defined in section 2000cc-5 of this title").  According to the relevant portion of RLUIPA, "'religious exercise' includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  *Id*. § 2000cc-5(7)(A). RLUIPA further notes that both "person[s]" and "entit[ies]" can exercise the religious rights it grants.  *Id*. § 2000cc-5(7)(B).  RLUIPA therefore provides further support that RFRA, to which it is linked, encompasses both natural persons and anything that qualifies as an "entity"— which of course would

(continued...)

-27-

### b. Other Statutes

Given that no one disputes at least some types of corporate entities can bring RFRA claims, the next question is whether Congress intended to exclude for-profit corporations, as opposed to non-profit corporations, from RFRA's scope. Notably, neither the Dictionary Act nor RFRA explicitly distinguishes between for-profit and non-profit corporations; the Dictionary Act merely instructs that the term "persons" includes corporations.

At the same time, we acknowledge the Dictionary Act definition does not apply if "the context indicates otherwise." 1 U.S.C. § 1. Generally, "context" here "means the text of the Act of Congress surrounding the word at issue, or the text of other related congressional Acts." *Rowland v. Cal. Men's Colony*, 506 U.S. 194, 199 (1993). The government contends that RFRA's "context" points to exemptions for religious employers in other statutes, and in particular it directs us to the religious exemptions contained in Title VII, the Americans with Disabilities Act (ADA), and the National Labor Relations Act (NLRA). But rather than providing contextual support for excluding for-profit corporations from RFRA, we think these exemptions show that Congress knows how to craft a corporate religious exemption, but chose not to do so in RFRA.

---

[6](...continued)
encompass corporations. And this definition likewise does not distinguish between for-profit and non-profit status or between religious and secular entities.

Under Title VII, for example, the prohibition on discrimination on the basis of religion does not apply to an employer that is "a religious corporation, association, educational institution, or society." 42 U.S.C. §2000e-1(a). The ADA contains similar language. *See id.* § 12113(d)(1), (2). The government also notes that the Supreme Court has construed the NLRA to remove the National Labor Relations Board's jurisdiction over schools operated by churches. *See NLRB v. Catholic Bishop*, 440 U.S. 490 (1979).[7]

The government argues that in enacting RFRA against the backdrop of these statutes, Congress "carried forward [a] distinction between non-profit, religious organizations and for-profit, secular companies.'" Aple. Br. at 16. In short, the government believes Congress used "person" in RFRA as extreme shorthand for something like "natural person or 'religious organization' as that term was used in exemptions for religious organizations as set forth in Title VII, the ADA, and the NLRA."

This reading strikes us as strained. Indeed, the exemptions present in Title VII, the ADA, and the NLRA suggest the opposite inference from what the

---

[7] *Catholic Bishop* turned on constitutional avoidance, not on statutory text or congressional intent. *See id.* at 507 ("in the absence of a clear expression of Congress'[s] intent to bring teachers in church-operated schools within the jurisdiction of the Board, we decline to construe the Act in a manner that could in turn call upon the Court to resolve difficult and sensitive questions arising out of the guarantees of the First Amendment Religion Clauses"). But for present purposes we will accept the government's characterization of *Catholic Bishop* as "context" for RFRA.

government draws. Rather than implying that similar narrowing constructions should be imported into statutes that do not contain such language, they imply Congress is quite capable of narrowing the scope of a statutory entitlement or affording a type of statutory exemption when it wants to. The corollary to this rule, of course, is that when the exemptions are not present, it is not that they are "carried forward" but rather that they do not apply. *Cf. Chickasaw Nation v. United States*, 208 F.3d 871, 880 (10th Cir. 2000) (holding, in light of the fact that Congress had created a number of other tax exemptions for Indian tribes, "[i]f Congress wishes to exempt Indian tribes from excise taxes that otherwise might be reasonably construed as applying to them, it should do so explicitly"), *aff'd*, 534 U.S. 84 (2001).

In addition, Congress knows how to ensure that a prior-enacted statute restricts the meaning of a later-enacted statute. RFRA is just such a statute, restricting later-enacted federal statutes unless those statutes specifically exempt themselves. *See* 42 U.S.C. § 2000bb-3(b). Congress put nothing similar in Title VII, the ADA, or the NLRA.

### c. Case Law

The government nonetheless points to *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327 (1987), for the idea that the for-profit/non-profit distinction was well-established in

Congress's mind before it enacted RFRA. We disagree with the government's interpretation of *Amos*.

*Amos* involved employees of non-profit and arguably non-religious businesses run by the Mormon Church. These businesses had fired certain Mormon employees who did not follow church behavioral standards, and the employees sued under Title VII. The Church moved to dismiss based on Title VII's exemption for "religious corporation[s]," 42 U.S.C. §2000e-1(a)—the same exemption on which the government bases its argument that Congress intended to limit RFRA to non-profit entities.

The plaintiffs countered "that if construed to allow religious employers to discriminate on religious grounds in hiring for *nonreligious* jobs, [the exemption] violates the Establishment Clause." *Amos*, 483 U.S. at 331 (emphasis added). The district court agreed, reasoning in part that Title VII's exemption unlawfully advanced religion because it could "permit churches with financial resources impermissibly to extend their influence and propagate their faith by entering the commercial, profit-making world." *Id*. at 337.

The Supreme Court reversed. It concluded this particular part of the district court's reasoning was incorrect because it assumed the existence of for-profit activities yet none of the Mormon businesses at issue operated on a for-profit basis. The Court never reached the question of how for-profit activity might have changed its analysis. *Id*.

Two *Amos* concurrences raised concerns about religion-sponsored for-profit activity more explicitly. But both concurrences were careful not to categorically exclude such activity from Title VII's exemption. *See id.* at 345 n.6 (Brennan, J., concurring) (emphasizing that the non-profit distinction was important but also noting "[i]t is . . . conceivable that some for-profit activities could have a religious character"); *id.* at 349 (O'Connor, J., concurring) (noting that the question "remains open" whether "activities conducted by religious organizations solely as profit-making enterprises" would qualify as religious).

From these references to non-profit status in *Amos*, the government concludes that the for-profit/non-profit distinction matters a great deal. But we do not see what the government sees in *Amos*. *Amos* was about whether Title VII's religious exemption violates the Establishment Clause. The *Amos* majority rendered no opinion on how for-profit activity might affect that question. At best, then, *Amos* leaves open the question of whether for-profit status matters for Title VII's religious employer exemption. We do not see how it provides the "context" that would render the Dictionary Act's definition of "person" inappropriate in RFRA.

Nor do the other post-RFRA circuit cases on which the government relies provide more guidance. The government cites *Spencer v. World Vision, Inc.*, 633 F.3d 723 (9th Cir. 2010) (per curiam), and *University of Great Falls v. NLRB*, 278 F.3d 1335 (D.C. Cir. 2002). The question in *Spencer* was whether a faith-based

humanitarian organization could receive the same Title VII exemption at issue in *Amos*. In a fractured opinion, the court concluded the organization was eligible, in part because it did not engage in for-profit business activity. But *Spencer* established no categorical rule regarding for-profit entities. Judge O'Scannlain, in explaining why he agreed to make non-profit status a relevant consideration, nonetheless noted that *Amos* left open the potential effect of for-profit status. *Id.* at 734 & n.13 (O'Scannlain, J., concurring).

The D.C. Circuit's *Great Falls* decision comes to essentially the same place, concluding that for-profit status can be one relevant factor among others when it comes to certain religious exemptions. In that case, the University of Great Falls contended that it was exempt from NLRB jurisdiction under both *Catholic Bishop* and RFRA. The D.C. Circuit adopted a three-factor test for the NLRB to use "to determine whether it has jurisdiction [over a school claiming the *Catholic Bishop* exemption] without delving into matters of religious doctrine or motive, and without coercing an educational institution into altering its religious mission to meet regulatory demands." *Great Falls*, 278 F.3d at 1345. Among the three factors was whether the institution "is organized as a nonprofit." *Id.* at 1343 (internal quotation marks omitted).

But *Great Falls* did not say that *only* non-profits can qualify for the *Catholic Bishop* exemption. *See id.* ("non-profit institutions have a more compelling claim to a *Catholic Bishop* exemption than for-profit businesses").

Moreover, the opinion made clear that its analysis did not settle anything as to RFRA: "a ruling that an entity is not exempt from [NLRB] jurisdiction under *Catholic Bishop* may not foreclose a [RFRA] claim that requiring that entity to engage in collective bargaining would 'substantially burden' its 'exercise of religion.'" *Id.* at 1347.

To the extent the government believes *Spencer* and *Great Falls* form part of what "Congress carried forward" when enacting RFRA, Aple. Br. at 16, *Spencer* and *Great Falls*, of course, post-date RFRA. Congress therefore could not have carried them forward into RFRA. And to the extent the government sees *Spencer* and *Great Falls* as following principles laid down in *Amos*—which pre-dates RFRA—we disagree. *Amos* decides nothing about for-profit entities' religious rights. In short, none of these cases say anything about what Congress intended in RFRA.[8]

In conclusion, the government has given us no persuasive reason to think that Congress meant "person" in RFRA to mean anything other than its default meaning in the Dictionary Act—which includes corporations regardless of their

---

[8] We also note that even the dissent in *Grote v. Sebelius*, 708 F.3d 850 (7th Cir. 2013), would not establish a categorical rule against for-profit religious exercise. *Grote* involved a car parts business, but the dissent opined that "there do exist some corporate entities which are organized expressly to pursue religious ends, and I think it fair to assume that such entities may have cognizable religious liberties independent of the people who animate them, even if they are profit-seeking." *Id.* at 856 (Rovner, J., dissenting).

profit-making status.[9]

## 2. Free Exercise

The government further argues that the "[t]he distinction between non-profit, religious organizations and for-profit, secular companies is rooted in the text of the First Amendment," Aple. Br. at 12 (internal quotation marks omitted). It claims this understanding of the First Amendment informed what Congress intended by "person" in RFRA. Undoubtedly, Congress's understanding of the First Amendment informed its drafting of RFRA, but we see no basis for concluding that such an understanding included a for-profit/non-profit distinction.

## a. RFRA's Purpose

RFRA was Congress's attempt to legislatively overrule *Employment Division v. Smith*, 494 U.S. 872 (1990). *Smith* had abrogated much of the Supreme Court's earlier jurisprudence regarding whether a neutral law of general

---

[9] The dissents suggest we have improperly placed the burden of persuasion on the government rather than the plaintiffs in our assessment of whether Hobby Lobby and Mardel are persons exercising religion for purposes of RFRA. *See* Briscoe Op. at 10-11 & n.3; Matheson Op. at 4–11. The question of the allocation of a burden for satisfying the preliminary injunction factors—which we agree rests with the plaintiffs—and the force of the legal arguments advanced by both sides are two different things. The default presumption is that the Dictionary Act applies. *Rowland*, 506 U.S. at 200. Regardless of who bears the overall burden of persuasion, we do not think it is the plaintiffs' duty to prove a negative—*i.e.*, to offer up all possible "context[s]" that might "indicate otherwise," 1 U.S.C. § 1—and then refute them. In our adversarial system, arguments for otherwise-indicating context naturally come from the party opposing the Dictionary Act's definition. The government's arguments in this regard do not convince us.

application nonetheless impermissibly burdened a person's Free Exercise rights. The pre-*Smith* test exempted such a person from the law's constraints unless the government could show a compelling need to apply the law to the person. *Id*. at 882–84. *Smith* eliminated that test on the theory that the Constitution permits burdening Free Exercise if that burden results from a neutral law of general application. *Id*. at 878–80.

Congress responded to *Smith* by enacting RFRA, which re-imposed a stricter standard on both the states and the federal government. The Supreme Court held that Congress could not constitutionally apply RFRA to the states, *City of Boerne v. Flores*, 521 U.S. 507, 532 (1997), but RFRA still constrains the federal government, *Kikumura*, 242 F.3d at 959.

Congress, through RFRA, intended to bring Free Exercise jurisprudence back to the test established before *Smith*. There is no indication Congress meant to alter any other aspect of pre-*Smith* jurisprudence—including jurisprudence regarding who can bring Free Exercise claims. We therefore turn to that jurisprudence.

### b. Corporate and For-Profit Free Exercise Rights

It is beyond question that associations—not just individuals—have Free Exercise rights: "An individual's freedom to speak, *to worship*, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort

toward those ends were not also guaranteed." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984) (emphasis added). Therefore, courts have "recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and *the exercise of religion*. The Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties." *Id.* at 618 (emphasis added); *see also Citizens United v. FEC*, 558 U.S. 310, 342–43 (2010) ("First Amendment protection extends to corporations . . . [, and the Court] has thus rejected the argument that . . . corporations or other associations should be treated differently under the First Amendment simply because such associations are not natural persons." (internal quotation marks omitted)).

Accordingly, the Free Exercise Clause is *not* a "'purely personal' guarantee[] . . . unavailable to corporations and other organizations because the 'historic function' of the particular [constitutional] guarantee has been limited to the protection of individuals." *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 778 n.14 (1978). As should be obvious, the Free Exercise Clause at least extends to associations like churches—including those that incorporate. *See, e.g.*, *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 525 (1993) (holding that a "not-for-profit corporation organized under Florida law" prevailed on its Free Exercise claim); *see also Terrett v. Taylor*, 13 U.S. (9 Cranch) 43, 49 (1815) (Story, J.) ("[The] legislature may . . . enable all sects to accomplish the

great objects of religion by giving them corporate rights for the manag[e]ment of their property, and the regulation of their temporal as well as spiritual concerns.").

In addition, the Supreme Court has settled that *individuals* have Free Exercise rights with respect to their *for-profit businesses*. *See, e.g.*, *United States v. Lee*, 455 U.S. 252 (1982) (considering a Free Exercise claim of an Amish employer); *Braunfeld v. Brown*, 366 U.S. 599 (1961) (plurality opinion) (considering a Free Exercise claim by Jewish merchants operating for-profit).

In short, individuals may incorporate for religious purposes and keep their Free Exercise rights, and unincorporated individuals may pursue profit while keeping their Free Exercise rights. With these propositions, the government does not seem to disagree. The problem for the government, it appears, is when individuals incorporate *and* fail to satisfy Internal Revenue Code § 501(c)(3). At that point, Free Exercise rights somehow disappear.

This position is not "rooted in the text of the First Amendment," Aple. Br. at 12, and therefore could not have informed Congress's intent when enacting RFRA. As an initial matter, the debates in Congress surrounding the adoption of the First Amendment demonstrate an intent to protect a range of conduct broader than the mere right to believe whatever one chooses. Indeed, at the time of the amendment's inception in Congress, a competing formulation for the "free exercise of religion" was "rights of conscience." *See* Michael W. McConnell, *The*

*Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L.

Rev. 1409, 1488 (1990) [hereinafter McConnell, *The Origins*]; *see also*

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 132 S. Ct. 694,

702 (2012) (citing McConnell, *The Origins*, *supra*).  As compared to *exercise*,

which "strongly connoted action" in the language of the day, "conscience"

suggested mere thoughts, opinions, or internal convictions.  McConnell, *The*

*Origins*, *supra* at 1489.  Congress chose *exercise*, indicating that, as the Supreme

Court has frequently held, the protections of the Religion Clauses extend beyond

the walls of a church, synagogue, or mosque to religiously motivated *conduct*, as

well as religious belief.  *Id.* at 1488–89.

The distinction gains force here because religious conduct includes

religious expression, which can be communicated by individuals and for-profit

corporations alike.  *See Smith*, 494 U.S. at 877–78 (1990); *see also* Lee Strang,

*The Meaning of "Religion" in the First Amendment*, 40 Duq. L. Rev. 181, 234

(2002) (stating that the shift from "conscience" to "religion" "connote[d] a

'community of believers' and allow[ed] for protection of the 'corporate or

institutional aspect of religious belief'" (footnote omitted)); McConnell, *The*

*Origins*, *supra* at 1490 (stating that an "important difference between the terms

'conscience' and 'religion' is that 'conscience' emphasizes individual judgment,

while 'religion' also encompasses the corporate or institutional aspects of

religious belief" (footnote omitted)).  For example, the Supreme Court has stated

-39-

that the exercise of religion includes "proselytizing." *Smith*, 494 U.S. at 877. And, as discussed above, Hobby Lobby and Mardel—two for-profit corporations —proselytize by purchasing hundreds of newspaper ads to "know Jesus as Lord and Savior." JA 24a. Because Hobby Lobby and Mardel express themselves for religious purposes, the First Amendment logic of *Citizens United*, 558 U.S. at 342–55, where the Supreme Court has recognized a First Amendment right of for-profit corporations to express themselves for political purposes, applies as well. We see no reason the Supreme Court would recognize constitutional protection for a corporation's political expression but not its religious expression.

We also believe that a constitutional distinction would conflict with the Supreme Court's Free Exercise precedent. First, we cannot see why an individual operating for-profit retains Free Exercise protections but an individual who incorporates—even as the sole shareholder—does not, even though he engages in the exact same activities as before. This cannot be about the protections of the corporate form, such as limited liability and tax rates. Religious associations can incorporate, gain those protections, and nonetheless retain their Free Exercise rights.

Moreover, when the Supreme Court squarely addressed for-profit individuals' Free Exercise rights in *Lee* and *Braunfeld*, its analysis did not turn on the individuals' unincorporated status. Nor did the Court suggest that the Free Exercise right would have disappeared, using a more modern formulation, in a

general or limited partnership, sole professional corporation, LLC, S-corp, or closely held family business like we have here.[10]

In addition, sincerely religious persons could find a connection between the exercise of religion and the pursuit of profit. Would an incorporated kosher butcher really have no claim to challenge a regulation mandating non-kosher butchering practices? The kosher butcher, of course, might directly serve a religious community—as Mardel, a Christian bookstore, does here. But we see no reason why one must orient one's business toward a religious community to preserve Free Exercise protections. A religious individual may enter the for-profit realm intending to demonstrate to the marketplace that a corporation can succeed financially while adhering to religious values. As a court, we do not see how we can distinguish this form of evangelism from any other.

We are also troubled—as we believe Congress would be—by the notion that Free Exercise rights turn on Congress's definition of "non-profit." What if Congress eliminates the for-profit/non-profit distinction in tax law? Do for-profit corporations then *gain* Free Exercise rights? Or do non-profits *lose* Free Exercise rights? Or what if Congress, believing that large organizations are less likely to have a true non-profit motive, declares that non-profit entities may not have more

---

[10] To the extent the government believes the for-profit/non-profit distinction derives from the nature of business versus religion, we note that the varieties of corporate form do not mirror such a bright-line rule. *See, e.g.*, Cal. Corp. Code §§ 14600–31 (establishing "benefit corporations" that may pursue profits while balancing social welfare goals).

than 1,000 employees?  Would a church with more than 1,000 employees lose its Free Exercise rights?  Or consider a church that, for whatever reason, loses its 501(c)(3) status.  Does it thereby lose Free Exercise rights?

To hypotheticals like these, the government cites to the Supreme Court's recent *Hosanna-Tabor* decision, where the Court recognized a ministerial exception that foreclosed review of the propriety of the decision of a "church" (understood in a broad sense that includes all religions) to hire or retain a "minister" (with the same broad meaning).  In recognizing this ministerial exception, the Court found the exception precluded a claim brought under the Americans with Disabilities Act by a former employee of a school run by a denomination of the Lutheran church.  The Court reiterated the uncontroversial proposition that "the text of the First Amendment . . . gives special solicitude to the rights of religious organizations." *Hosanna-Tabor*, 132 S. Ct. at 706.  From this language, the government draws a narrow application of the Free Exercise Clause.

We do not share this interpretation.  The main point of the Court was that the Religion Clauses add to the mix when considering freedom of association. *See also id.* at 712–13 (Alito, J., concurring) ("As the Court notes, the First Amendment 'gives special solicitude to the rights of religious organizations,' *but our expressive-association cases are nevertheless useful* in pointing out what . . . essential rights are [held by religious organizations]." (emphasis added)).  But it

does not follow that because religious organizations obtain protections through the Religion Clauses, all entities not included in the definition of religious organization are accorded *no* rights.

And, by relying on this language from *Hosanna-Tabor*, the government appears to concede that the for-profit/non-profit distinction is actually immaterial even under its own theory of the case. Under the government's position, only "religious organizations" receive Free Exercise rights. Any other organization, non-profit or for-profit, could not receive such protection. But *Hosanna-Tabor* was not deciding for-profit corporations' Free Exercise rights, and it does not follow that the Congress which enacted RFRA would have understood the First Amendment to contain such a bright-line rule.

The district court, nonetheless, saw incongruence between Free Exercise rights and the corporate form: "General business corporations . . . do not pray, worship, observe sacraments or take other religiously-motivated actions separate and apart from the intention and direction of their individual actors." *Hobby Lobby*, 870 F. Supp. 2d at 1291. But this is equally true of churches or other entities that exercise religion. The Church of Lukumi Babalu Aye, Inc., for example, did not *itself* pray, worship, or observe sacraments—nor did the sect in

*O Centro*. But both certainly have Free Exercise rights. *See O Centro*, 546 U.S. at 423; *Lukumi*, 508 U.S. at 525.[11]

The government nonetheless raises the specter of future cases in which, for example, a large publicly traded corporation tries to assert religious rights under RFRA. That would certainly seem to raise difficult questions of how to determine the corporation's sincerity of belief. But that is not an issue here. Hobby Lobby and Mardel are not publicly traded corporations; they are closely held family businesses with an explicit Christian mission as defined in their governing principles. The Greens, moreover, have associated through Hobby Lobby and Mardel with the intent to provide goods and services while adhering to Christian standards as they see them, and they have made business decisions according to those standards. And the Greens are unanimous in their belief that the contraceptive-coverage requirement violates the religious values they attempt to follow in operating Hobby Lobby and Mardel. It is hard to compare them to a large, publicly traded corporation, and the difference seems obvious. Thus, we do

---

[11] This is not a special case of associational standing. Associational standing requires, among other things, that all members of the association "would otherwise have standing to sue in their own right." *S. Utah Wilderness Alliance v. Office of Surface Mining Reclamation & Enforcement*, 620 F.3d 1227, 1246 (10th Cir. 2010). Although this may often be true for religious organizations, we are aware of no case in which it has been set forth as a requirement. When a religious organization sues in its own right, we do not ask, for example, whether every member of the religious group shares the same belief and therefore faces the same infringement on his or her belief. We accept the entity for what it claims to represent, regardless of unity among the individuals that associate through that entity.

not share any concerns that our holding would prevent courts from distinguishing businesses that are not eligible for RFRA's protections.

We need not decide today whether any of these factors is necessary, but we conclude that their collective presence here is sufficient for Hobby Lobby and Mardel to qualify as "persons" under RFRA.[12]

## B. Substantial Burden

The next question is whether the contraceptive-coverage requirement constitutes a substantial burden on Hobby Lobby and Mardel's exercise of religion.

The government urges that there can be no substantial burden here because "[a]n employee's decision to use her health coverage to pay for a particular item or service cannot properly be attributed to her employer." Aple. Br. at 13. There

---

[12] The dissenters refer to this analysis as a departure from First Amendment law. *See* Briscoe Op. at 16; Matheson Op. at 10–11. Not so. Where did Hobby Lobby and Mardel lose their Free Exercise rights? Was it when they incorporated? This alone cannot be the relevant trigger because religions may incorporate as well. Was it when they began operating for-profit? Again, this alone cannot be the relevant event because the Supreme Court in *Lee* and *Braunfeld* recognized Free Exercise rights in a for-profit context. Is it because Hobby Lobby and Mardel do not have an explicitly religious purpose, like a church? Once again, this alone cannot be the relevant distinction. *Lee* and *Braunfeld* demonstrate that activities without an explicitly religious purpose still implicate Free Exercise rights.

In noting that the claim presented by Hobby Lobby and Mardel may differ from that of a publicly traded company, Chief Judge Briscoe also implies that we have created some sort of problematic multi-factor test for future RFRA claims. *See* Briscoe Op. at 18–22. But our holding simply reflects the facts presented here and explains their relevance to the statutory analysis.

are variations on this same theme in many of the amicus briefs supporting the government's position, all of which stand for essentially the same proposition: one does not have a RFRA claim if the act of alleged government coercion somehow depends on the independent actions of third parties.

This position is fundamentally flawed because it advances an understanding of "substantial burden" that presumes "substantial" requires an inquiry into the theological merit of the belief in question rather than the *intensity of the coercion* applied by the government to act contrary to those beliefs. In isolation, the term "substantial burden" could encompass either definition, but for the reasons explained below, the latter interpretation prevails. Our only task is to determine whether the claimant's belief is sincere, and if so, whether the government has applied substantial pressure on the claimant to violate that belief.

No one disputes in this case the sincerity of Hobby Lobby and Mardel's religious beliefs. And because the contraceptive-coverage requirement places substantial pressure on Hobby Lobby and Mardel to violate their sincere religious beliefs, their exercise of religion is substantially burdened within the meaning of RFRA.

### 1. The Substantial Burden Test

Our most developed case discussing the substantial burden test is *Abdulhaseeb v. Calbone*, 600 F.3d 1301 (10th Cir. 2010). In *Abdulhaseeb*, we were required to resolve a RFRA claim brought by Madyun Abdulhaseeb, a

Muslim prisoner who raised a religious objection to the prison's failure to provide him a halal diet. Abdulhaseeb alleged that the prison cafeteria's failure to serve halal food violated his rights under the Religious Land Use and Institutionalized Persons Act (RLUIPA), a statute that adopts RFRA's "substantial burden" standard.[13]

In analyzing Abdulhaseeb's claim, we held that a government act imposes a "substantial burden" on religious exercise if it: (1) "requires participation in an activity prohibited by a sincerely held religious belief," (2) "prevents participation in conduct motivated by a sincerely held religious belief," or (3) "places substantial pressure on an adherent . . . to engage in conduct contrary to a sincerely held religious belief." *Id*. at 1315. Our analysis in *Abdulhaseeb* only concerned the third prong of this test, related to "substantial pressure." As we will explain below, the same is true here.

The substantial pressure prong rests firmly on Supreme Court precedent, in particular: *Thomas v. Review Board of the Indiana Employment Security Division*, 450 U.S. 707 (1981), and *United States v. Lee*, 455 U.S. 252 (1982).

The plaintiff in *Thomas* was a Jehovah's Witness who had worked for a company that owned both a foundry and factory. The foundry processed sheet steel for a variety of industrial purposes. The factory manufactured turrets for

---

[13] Congress intended the substantial burden tests in RFRA and RLUIPA to be interpreted uniformly. *See Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 661 (10th Cir. 2006).

military tanks. The plaintiff started working at the foundry but was transferred to the factory. Although he had no objection to working in the foundry, he raised a religious objection to his factory job, claiming that "he could not work on weapons without violating the principles of his religion." *Thomas*, 450 U.S. at 710. He quit his job and was eventually denied unemployment benefits. He then challenged this decision as improperly burdening his right to exercise his religion, a claim which ultimately reached the Supreme Court.

In considering the Free Exercise claim, the Court noted that the plaintiff could not clearly articulate the basis for the difference between processing steel that might be used in tanks and manufacturing the turrets themselves. *Id*. at 715. But that was not relevant to resolving the plaintiff's claim. Rather, the Court observed, "the judicial process is singularly ill equipped to resolve such differences in relation to the Religion Clauses." *Id.* Further, "[p]articularly in this sensitive area, it is not within the judicial function and judicial competence to inquire whether the petitioner . . . correctly perceived the commands of [his] faith. Courts are not arbiters of scriptural interpretation." *Id.* at 716 (internal quotation marks omitted).

As to the distinction between factory and foundry work, the Court reasoned that "[the plaintiff's] statements reveal no more than that he found work in the . . . foundry sufficiently insulated from producing weapons of war. We see, therefore, that [the plaintiff] drew a line, and it is not for us to say that the line he

-48-

drew was an unreasonable one." *Id.* at 715. In other words, the distinction that

the plaintiff drew was not as important as the fact that he made it based upon his

religious beliefs. Once the plaintiff drew this line, it did not matter whether the

line was "acceptable, logical, consistent, or comprehensible to others in order to

merit First Amendment protection." *Id.* at 714.

Accepting the plaintiff's religious beliefs as sincere, the Court then

examined "the coercive impact" upon him of being "put to a choice between

fidelity to religious belief or cessation of work." *Id.* at 717. On that score, the

Court found a substantial burden:

> Where the state conditions receipt of an important
> benefit upon conduct proscribed by a religious faith, or
> where it denies such a benefit because of conduct
> mandated by religious belief, thereby putting *substantial
> pressure* on an adherent to modify his behavior and to
> violate his beliefs, a *burden upon religion exists*. While
> the compulsion may be *indirect,* the infringement upon
> free exercise is *nonetheless substantial.*

*Id.* at 717–18 (emphasis added).

*United States v. Lee* similarly demonstrates that the burden analysis does

not turn on whether the government mandate operates directly or indirectly, but

on the coercion the claimant feels to violate his beliefs. The question in *Lee* was

"whether the payment of social security taxes and the receipt of benefits interferes

with the free exercise rights of the Amish." 455 U.S. at 256–57. The Court first

identified the religious belief at issue, namely, that "it [is] sinful [for the Amish]

not to provide for their own elderly and needy," and it is concomitantly sinful to pay into the social security system and thereby enable other Amish to shirk their duties toward the elderly and needy. *Id.* at 255 & n.3. Thus, the belief at issue in *Lee* turned in part on a concern of facilitating others' wrongdoing.

In responding to Lee's claims, the government did not question the sincerity of the plaintiff's belief, but it did raise a direct/indirect argument, *i.e.*, "that payment of social security taxes will not threaten the integrity of the Amish religious belief or observance." *Id.* at 257. As in *Thomas*, the Court in *Lee* would not indulge the government on this point, reasoning simply that "[i]t is not within the judicial function and judicial competence . . . to determine whether" a plaintiff "has the proper interpretation of [his] faith." *Id.* (internal quotation marks omitted).

The Court in *Lee* found "a conflict between the Amish faith and the obligations imposed by the social security system." *Id.* But, it said, "[n]ot all burdens on religion are unconstitutional." *Id.* The Court concluded, under the circumstances, that the burden was justified by "the Government's interest in assuring mandatory and continuous participation in and contribution to the social security system"—an interest which the Court described as "very high." *Id.* at 258–59. The Court determined that this interest justified the acknowledged

burden on religious belief. *Id.*[14] But again, the analysis did not turn on whether the Amish faced direct or indirect coercion or whether the supposed violations of their faith turned on actions of independent third parties. The Court recognized the belief for what it was, accepted that the government was imposing a burden, and then analyzed the strength of the government's interest.

Given the foregoing, our first step in *Abdulhaseeb* was to identify the belief in question—the immorality of a non-halal diet—and to determine if the belief was sincerely held. Finding it was, we stated that "the issue is not whether the lack of a halal diet that includes meats substantially burdens the religious exercise of any Muslim practitioner, but whether it substantially burdens *Mr. Abdulhaseeb's* own exercise of his sincerely held religious beliefs." 600 F.3d at 1314 (emphasis in original). We concluded that the prison cafeteria's "failure to provide a halal diet either prevents Mr. Abdulhaseeb's religious exercise, or, at the least, places substantial pressure on Mr. Abdulhaseeb not to engage in his religious exercise by presenting him with a Hobson's choice—either he eats a non-halal diet in violation of his sincerely held beliefs, or he does not eat." *Id*. at 1317. Thus, the plaintiff faced a substantial burden.

---

[14] The Free Exercise interest in *Lee* would today be described in the RFRA context as a "substantial burden on religious exercise," albeit one justified by a compelling government interest. *See O Centro*, 546 U.S. at 421. Further, the government agreed at oral argument that it is correct to view *Lee* as a case in which the Court found a "substantial burden" for purposes of the framework in RFRA.

## 2. *Applying the Substantial Burden Test*

The claims of Hobby Lobby and Mardel are similar to those raised in *Thomas*, *Lee*, and *Abdulhaseeb*, and the framework provided in those cases guides our analysis.

First, we must identify the religious belief in this case. The corporate plaintiffs believe life begins at conception. Thus, they have what they describe as "a sincere religious objection to providing coverage for Plan B and Ella since they believe those drugs could prevent a human embryo . . . from implanting in the wall of the uterus, causing the death of the embryo." JA 35a. And they allege a "sincere religious objection to providing coverage for certain contraceptive [IUDs] since they believe those devices could prevent a human embryo from implanting in the wall of the uterus, causing the death of the embryo." *Id.* Further, Hobby Lobby and Mardel object to "participating in, providing access to, paying for, training others to engage in, or otherwise supporting" the devices and drugs that yield these effects. Aplt. Br. at 27 (citing JA 14a).

Second, we must determine whether this belief is sincere. The government does not dispute the corporations' sincerity, and we see no reason to question it either.[15]

---

[15] "One can, of course, imagine an asserted claim so bizarre, so clearly nonreligious in motivation, as not to be entitled to protection under the Free Exercise Clause; but that is not the case here . . . ." *Thomas*, 450 U.S. at 715. The assertion that life begins at conception is familiar in modern religious

(continued...)

Third, we turn to the question of whether the government places substantial pressure on the religious believer. Here, it is difficult to characterize the pressure as anything but substantial. To the extent Hobby Lobby and Mardel provide a health plan, they would be fined $100 per employee, per day the plan does not meet the contraceptive-coverage requirement. 26 U.S.C. § 4980D(b)(1). With over 13,000 employees, that comes to more than $1.3 million per day, or close to $475 million per year. And if Hobby Lobby and Mardel simply stop offering a health plan—dropping health insurance for more than 13,000 employees—then the companies must pay about $26 million per year, *see id*. § 4980H(c)(1) (fining employer $2,000 per employee per year), and put themselves "at a competitive disadvantage in [their] efforts to recruit and retain employees," JA 40a.

With this dilemma created by the statute, we believe that Hobby Lobby and Mardel have made a threshold showing regarding a substantial burden. Ordinarily, the question of substantial burden would involve subsidiary factual issues. *See Kikumura*, 242 F.3d at 961; *id*. at 966 (Holloway, J., concurring in part and dissenting in part); *id*. at 966–67 (Ebel, J., concurring). But in the district court, the government did not question the significance of the financial burden. And, the government has not done so in this appeal. Thus, the district court record leaves only one possible scenario: Hobby Lobby and Mardel

---

[15](...continued)
discourse, although of course not universally held. Moral culpability for enabling a third party's supposedly immoral act is likewise familiar.

incurred a substantial burden on their ability to exercise their religion because the

law requires Hobby Lobby and Mardel to:

- compromise their religious beliefs,

- pay close to $475 million more in taxes every year, or

- pay roughly $26 million more in annual taxes and drop health-insurance benefits for all employees.

This is precisely the sort of Hobson's choice described in *Abdulhaseeb*, and

Hobby Lobby and Mardel have established a substantial burden as a matter of

law.

### 3. The Government's Arguments

The government resists this conclusion, contending the regulations place no

burden on Hobby Lobby or Mardel. It insists the insurance coverage at issue is

just another form of non-wage compensation—supposedly the equivalent of

money—and therefore should not present problems under RFRA.

Such reasoning cannot be squared with the Supreme Court's holding in

*Thomas*. The Supreme Court emphasized that when the plaintiff drew a moral

line between foundry and factory work, it was not the Court's prerogative to

determine whether the line he drew "was an unreasonable one." *Thomas*, 450

U.S. at 715.

Just so here: Hobby Lobby and Mardel have drawn a line at providing

coverage for drugs or devices they consider to induce abortions, and it is not for

us to question whether the line is reasonable. This is especially so given that Hobby Lobby and Mardel stand in essentially the same position as the Amish carpenter in *Lee*, who objected to being forced to pay into a system that enables someone else to behave in a manner he considered immoral. That is precisely the objection of Hobby Lobby and Mardel. It is not the employees' health care decisions that burden the corporations' religious beliefs, but the government's demand that Hobby Lobby and Mardel enable access to contraceptives that Hobby Lobby and Mardel deem morally problematic. As the Supreme Court accepted the religious belief in *Lee*, so we must accept Hobby Lobby and Mardel's beliefs.[16]

For similar reasons, the government's reliance on *Zelman v. Simmons-Harris*, 536 U.S. 639 (2002), and *Board of Regents v. Southworth*, 529 U.S. 217 (2000), is misplaced. First, in *Zelman*, the Supreme Court addressed an

---

[16] At oral argument, the concern was raised whether our ruling here would permit Hobby Lobby and Mardel to withhold wages on religious grounds if they knew the wages would be used to purchase the objected-to contraceptives. This argument ignores the fact that the government can justify a substantial burden on religious exercise by demonstrating a compelling interest, and uniform enforcement of labor laws such as the Fair Labor Standards Act, which governs the payment of wages, would give rise to such an interest. *See, e.g.*, *Dole v. Shenandoah Baptist Church*, 899 F.2d 1389, 1397–99 (4th Cir. 1990). In a similar vein, Chief Judge Briscoe's dissent suggests that this opinion has "opened the floodgates to RFRA litigation challenging any number of federal statutes that govern corporate affairs." Briscoe Op. at 25; *see also* Matheson Op. at 6 n.3. This argument similarly fails to acknowledge both RFRA's allowance that a narrowly tailored compelling interest can justify a substantial burden and RFRA's requirement that the belief be sincere. *Cf. United States v. Quaintance*, 608 F.3d 717 (10th Cir. 2010) (rejecting an argument that RFRA barred the prosecution of members of a marijuana distribution conspiracy who claimed that use of the drug was central to their religious beliefs).

Establishment Clause challenge to a school voucher program where an overwhelming majority of the students were using vouchers to enroll at religious schools. 536 U.S. at 647. The Court concluded that such a program did not violate the Establishment Clause in part because "the perceived endorsement of a religious message[] is reasonably attributable to the individual recipient, not to the government," *id*. at 652, and in part because "*no reasonable observer* would think a neutral program of private choice, where state aid reaches religious schools solely as a result of the numerous independent decisions of private individuals, carries with it the imprimatur of government endorsement," *id*. at 655 (emphasis added).

*Southworth* involved a similar claim brought by university students who challenged a mandatory fee that would be used in part to fund other student groups that produced speech the plaintiffs found objectionable. 529 U.S. at 230. The Court concluded that because funds for student activities were distributed to student groups on a viewpoint-neutral basis, this system prevented "any mistaken impression that the student [groups] speak for the University" or for the plaintiffs. *Id*. at 233 (internal quotation marks omitted).

The government attempts to analogize these Free Speech and Establishment Clause cases to the question here. The government suggests that because it was not possible to attribute the offensive speech to the students in *Southworth* and

-56-

the support for religious schools to the state in *Zelman*, it is also impossible to attribute an employee's independent choice to the employer.

We reject this position because it assumes that moral culpability for the religious believer can extend no further than the government's legal culpability in the Establishment or Free Speech contexts. Again, *Thomas* teaches that the plaintiff is not required to articulate a legal principle for the line he draws, let alone point to an analog from potentially related fields of constitutional law. And the question here is not whether the reasonable observer would consider the plaintiffs complicit in an immoral act, but rather how the plaintiffs themselves measure their degree of complicity.[17]

Hobby Lobby and Mardel have therefore established a substantial burden to their sincerely held religious beliefs. We now turn to the final question: whether the government has presented a compelling interest implemented through the least restrictive means available.[18]

---

[17] At oral argument, the government relied upon language from *Doremus v. Bd. of Ed. of Borough of Hawthorne*, 342 U.S. 429 (1952), a taxpayer standing case. The Supreme Court denied the taxpayer standing to bring the claims, reasoning in part that "the interests of a taxpayer in the moneys of the federal treasury are too indeterminable, remote, uncertain and indirect to furnish a basis for an appeal to the preventive powers of the Court over their manner of expenditure." *Id.* at 433. *Doremus* does not apply here because Hobby Lobby and Mardel do not bring their claims as taxpayers but rather as entities alleging injury from coercive government regulation. Thus, the taxpayer standing concerns animating the court's *Doremus* decision are not implicated here.

[18] The district court relied on a test for substantial burden applied by the

(continued...)

## C. *Compelling Interest and Least Restrictive Means*

As noted above, even at the preliminary injunction stage, RFRA requires *the government* to demonstrate that mandating a plaintiff's compliance with the contraceptive-coverage requirement is "the least restrictive means of advancing a compelling interest." *O Centro*, 546 U.S. at 423 (citing 42 U.S.C. § 2000bb-1(b)). As the Supreme Court emphasized, this standard requires that we "look[] beyond broadly formulated interests justifying the general applicability of government mandates and scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants." *Id*. at 431.

The interest must also be narrowly tailored. "RFRA requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—*the particular claimant* whose sincere exercise of religion is being substantially burdened." *Id*. at 430 (quoting 42 U.S.C. § 2000bb-1(b)) (emphasis added). Thus, the government must show with "particularity how [even] admittedly strong interest[s]" "would be adversely affected by granting [the] exemption" specifically requested by Hobby Lobby and Mardel. *Wisconsin v. Yoder*, 406 U.S. 205, 236 (1972).

---

[18](...continued)
Seventh Circuit in *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752 (7th Cir. 2003). As the district court noted, the Seventh Circuit used *Civil Liberties* to change the test for what constitutes "inhibition" of religious practice by defining inhibition as any government act that "bears direct, primary, and fundamental responsibility for rendering religious exercise . . . effectively impracticable." *Id*. at 761. But *Abdulhaseeb* does not accept this formulation.

### 1. *Compelling Interest*

The government asserts two interests here: "the interests in [1] public health and [2] gender equality." Aple. Br. at 34. We recognize the importance of these interests. But they nonetheless in this context do not satisfy the Supreme Court's compelling interest standards.

First, both interests as articulated by the government are insufficient under *O Centro* because they are "broadly formulated interests justifying the general applicability of government mandates." 546 U.S. at 431. And the government offers almost no justification for not "granting specific exemptions to particular religious claimants." *Id.*

Second, the interest here cannot be compelling because the contraceptive-coverage requirement presently does not apply to tens of millions of people. As noted above, this exempted population includes those working for private employers with grandfathered plans, for employers with fewer than fifty employees, and, under a proposed rule, for colleges and universities run by religious institutions. As the Supreme Court has said, "a law cannot be regarded as protecting an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited." *Lukumi*, 508 U.S. at 547; *see also O Centro*, 546 U.S. at 433 (citing *Lukumi* as instructive in determining whether exemptions undermine a compelling government interest for purposes of RFRA). The exemptions at issue here would yield precisely this result: they would leave

unprotected all women who work for exempted business entities.

On this question, *O Centro* is particularly instructive. In that case, a religious group sought an exemption for the sacramental use of hoasca, a hallucinogen classified as a Schedule I(c) controlled substance under the Controlled Substances Act. The question in *O Centro* was limited to whether the government could show a compelling governmental interest under RFRA to justify what was indisputably a substantial burden on the plaintiffs' exercise of religion. The government in part relied on its interest in promoting public health and safety and upon Congress's determination that hoasca "'has a high potential for abuse,' 'has no currently accepted medical use,' and has 'a lack of accepted safety for use . . . under medical supervision.'" *O Centro*, 546 U.S. at 433 (quoting 21 U.S.C. § 812(b)(1)).

The Supreme Court refused to credit this argument, however, in part because the CSA and related regulations contained an exemption for the religious use of another substance categorized as a Schedule I hallucinogen, peyote. As the Court reasoned, "Everything the Government says about the [dangerous chemicals] in hoasca . . . applies in equal measure to the [dangerous chemicals] in peyote." *Id*. Because both the Executive Branch and Congress had decreed a religious exemption for Native American use of peyote, the Court concluded that "it [was] difficult to see how" those same concerns could "preclude any consideration of a similar exception for" the religious use of hoasca. *Id*. If the

-60-

peyote exemption in *O Centro*, which applied to "hundreds of thousands of Native Americans," *id.*, was enough to undermine the government's compelling interest argument in that case, we conclude the exemption for the millions of individuals here must dictate a similar result.

### 2. Least Restrictive Means

Even if the government had stated a compelling interest in public health or gender equality, it has not explained how those larger interests would be undermined by granting Hobby Lobby and Mardel their requested exemption. Hobby Lobby and Mardel ask only to be excused from covering four contraceptive methods out of twenty, not to be excused from covering contraception altogether. The government does not articulate why accommodating such a limited request fundamentally frustrates its goals.[19]

### 3. Hobby Lobby and Mardel Employees

Finally, we note a concern raised both at oral argument and in the government's briefing that Hobby Lobby and Mardel are, in effect, imposing their religious views on their employees or otherwise burdening their employees' religious beliefs. But Hobby Lobby and Mardel do not prevent employees from using their own money to purchase the four contraceptives at issue here.

---

[19] The government suggests on appeal that a limited number of women can only use the four contraceptives to which Hobby Lobby and Mardel object. The government did not raise this argument below nor has it provided any factual support for this claim. It is free to raise this argument below in permanent injunction proceedings.

Of course, employees of Hobby Lobby and Mardel seeking any of these four contraceptive methods would face an economic burden not shared by employees of companies that cover all twenty methods. But the government must show why the employees' burden creates a compelling interest that can only be met by requiring the corporations to conform to a mandate.

Accommodations for religion frequently operate by lifting a burden from the accommodated party and placing it elsewhere. The government itself has even taken this step with the contraceptive-coverage requirement by accommodating certain religious employers, at the expense of their employees. That is part of accommodating religion—and is RFRA's basic purpose.

\* \* \*

In sum, for all of these reasons, Hobby Lobby and Mardel have established they are likely to succeed on their RFRA claim.

## VI. Remaining Preliminary Injunction Factors[20]

Having concluded that Hobby Lobby and Mardel are likely to succeed on the merits, we turn to the remaining preliminary injunction factors: whether Hobby Lobby and Mardel face irreparable harm; whether the balance of equities tips in Hobby Lobby and Mardel's favor; and whether an injunction is in the public interest. *Att'y Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 776 (10th Cir. 2009). The district court did not analyze these factors (having disposed of

---

[20] Judge Bacharach joins only Section VI(B)(1) of this Part.

the question on the likelihood-of-success prong) but Hobby Lobby and Mardel nonetheless ask that we reach them.

## A. *Propriety of Reaching the Remaining Factors*

"If the district court fails to analyze the factors necessary to justify a preliminary injunction, this court may do so [in the first instance] if the record is sufficiently developed." *Westar Energy*, 552 F.3d at 1224. The record we have is the record the parties chose to create below—it is the record they deemed sufficient for the district court to decide the preliminary injunction question. For each element, we believe this record suffices for us to resolve each of the remaining preliminary injunction factors.[21]

In addition, "in First Amendment cases, the likelihood of success on the merits will often be the determinative factor." *ACLU of Illinois v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012), *cert. denied*, 133 S. Ct. 651 (2012). That is because:

---

[21] In many First Amendment cases, courts of appeal have weighed these additional factors in the first instance after having determined that the district court had erroneously denied the preliminary injunction on the likelihood-of-success element. *See, e.g.*, *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 178 (3d Cir. 2002) (so holding in the context of a Free Exercise Claim); *Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) (same in the context of Free Speech claim); *ACLU of Illinois v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012) (same), *cert. denied*, 133 S. Ct. 651 (2012); *see also Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1191 (10th Cir. 2003) (addressing—in the context of an affirmance of a denial of a preliminary injunction on a Free Exercise claim—all the preliminary injunction factors, even though the district court seemed to only address likelihood of success).

- "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1190 (10th Cir. 2003) (internal quotation marks omitted);

- "when [a] law . . . is likely unconstitutional, the[] interests [of those the government represents, such as voters] do not outweigh [a plaintiff's interest] in having [its] constitutional rights protected," *Awad v. Ziriax*, 670 F.3d 1111, 1131–32 (10th Cir. 2012); and

- "it is always in the public interest to prevent the violation of a party's constitutional rights," *id.* at 1132.

This is likewise true here since RFRA is no ordinary statute: "Federal statutory law adopted after November 16, 1993 is subject to [RFRA] unless such law explicitly excludes such application by reference to this chapter." 42 U.S.C. § 2000bb-3(b). Congress thus obligated itself to *explicitly exempt* later-enacted statutes from RFRA, which is conclusive evidence that RFRA trumps later federal statutes when RFRA has been violated. That is why our case law analogizes RFRA to a constitutional right. *Kikumura*, 242 F.3d at 963 (stating, in analyzing a RFRA claim, that "[w]hen an alleged *constitutional right* is involved, most courts hold that no further showing of irreparable injury is necessary" (emphasis added; internal quotation marks omitted)); *see also* Michael Paulsen, *A RFRA Runs Through It: Religious Freedom and the U.S. Code*, 56 Mont. L. Rev. 249, 253 (1995) (characterizing RFRA as a "super-statute" given its binding nature on subsequent federal action). Congress did not exempt the ACA from RFRA, nor

did it create any sort of wide-ranging exemption for HHS and other agencies charged with implementing the ACA through the regulations challenged here.

Finally, the government nowhere contested the *factual* adequacy or accuracy of Hobby Lobby and Mardel's allegations, and given that those allegations were established through a verified complaint, they are deemed admitted for preliminary injunction purposes. *IDS Life Ins. Co. v. SunAmerica Life Ins. Co.*, 136 F.3d 537, 542 (7th Cir. 1998) (noting that "[v]erified complaints[ are] the equivalent of affidavits"); 11A Charles Alan Wright et al., Fed. Prac. & Proc. § 2949 (2d ed., Apr. 2013 update) ("[T]he written evidence [in a preliminary injunction proceeding] is presumed true if it is not contradicted.").

In short, the record before us is enough to resolve the remaining preliminary injunction factors. Given Hobby Lobby and Mardel's July 1 deadline, prudence strongly counsels in favor of reaching those factors. Thus, we would reach them and find that they favor Hobby Lobby and Mardel. Indeed, as we discuss next, even if likelihood of success was not enough to settle the question, we would find in favor of Hobby Lobby and Mardel.

### B. Analysis of Remaining Factors

#### 1. Irreparable Harm

Hobby Lobby and Mardel have established a likely violation of RFRA. We have explicitly held—by analogy to First Amendment cases—that establishing a likely RFRA violation satisfies the irreparable harm factor. *See Kikumura*, 242

F.3d at 963 ("a plaintiff satisfies the irreparable harm analysis by alleging a violation of RFRA"); *see also O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 342 F.3d 1170, 1187 (10th Cir. 2003) (same). Hobby Lobby and Mardel have therefore demonstrated irreparable harm.

### 2. Balance of Equities

Nor is there any question about the balance of equities. A preliminary injunction would forestall the government's ability to extend all twenty approved contraceptive methods to Hobby Lobby and Mardel's 13,000 employees. But Hobby Lobby and Mardel will continue to provide sixteen of the twenty contraceptive methods, so the government's interest is largely realized while coexisting with Hobby Lobby and Mardel's religious objections. And in any event, the government has already exempted health plans covering millions of others. These plans need not provide *any* of the twenty contraceptive methods.

By contrast, Hobby Lobby and Mardel remain subject to the Hobson's choice between catastrophic fines or violating its religious beliefs. Accordingly, the balance of equities tips in Hobby Lobby and Mardel's favor.

### 3. Public Interest

Finally, as stated above, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Awad*, 670 F.3d at 1132. Again, as already noted, although RFRA violations are not constitutional violations, Congress has given RFRA similar importance by subjecting all subsequent

congressional enactments to a strict scrutiny standard of review unless those enactments explicitly exclude themselves from RFRA. *See* 42 U.S.C. § 2000bb-3(b). And accommodating the two companies in this case does not undermine the application of the contraceptive-coverage requirement to the vast number of employers without religious objections. Because Hobby Lobby and Mardel have demonstrated a likely violation of their RFRA rights, an injunction would be in the public interest.

In sum, all preliminary injunction factors tip in favor of Hobby Lobby and Mardel, and we would therefore remand to the district court with instructions to enter a preliminary injunction.

# VII. Conclusion

For the reasons set forth above, we reverse the district court's denial of the plaintiffs' motion for a preliminary injunction and remand with instructions that the district court address the remaining two preliminary injunction factors and then assess whether to grant or deny the plaintiffs' motion. The Clerk is directed to issue the mandate forthwith.

12-6294 - *Hobby Lobby Stores, Inc., et al. v. Sebelius, et al.*

**HARTZ**, Circuit Judge, concurring:

I join Judge Tymkovich's opinion but write separately to explain why I think (1) that all corporations come within the protection of the Free Exercise Clause and RFRA and (2) that the substantial-burden analysis here is a simple one.

## I.   CORPORATIONS AS PERSONS

To analyze whether corporations have civil rights, one must begin by recognizing what they are.  For our purposes, two characteristics are the most important.  First, ordinarily they are a means of organizing group activity, for social or business reasons.  Second, the personal liability of owners is limited, thereby encouraging investment in the enterprise.  The sole aim of a corporation may be to maximize profit or long-term value to shareholders.  But no law requires a strict focus on the bottom line, and it is not uncommon for corporate executives to insist that corporations can and should advance values beyond the balance sheet and income statement.  *See* ALI Principles of Corporate Governance: Analysis and Recommendations § 2.01(b) (2012) ("Even if corporate profit and shareholder gain are not thereby enhanced, the corporation, in the conduct of its business:  . . . (2) May take into account ethical considerations that are reasonably regarded as appropriate to the responsible conduct of business; and (3) May devote a reasonable amount of resources to public welfare, humanitarian, educational and philanthropic purposes.") .

Those who argue that a for-profit corporation does not have a right to the free exercise of religion point to three features of such an entity: (1) it is for profit, (2) it has adopted a corporate form, and (3) it is a group activity. It is unclear which of these features is thought to be the one that disqualifies corporations from the free-exercise right. In my view, however, none of these features can justify denial of rights protected under the First Amendment, including the right to free exercise of religion.

The first feature is the easiest to address because the Supreme Court has already recognized that profit-seekers have a right to the free exercise of religion. In *Braunfeld v. Brown*, 366 U.S. 599, 601 (1961), the Court entertained a free-exercise challenge to Sunday blue laws by Jewish merchants "engage[d] in the retail sale of clothing and home furnishings." And in *United States v. Lee*, 455 U.S. 252, 254 (1982), an Amish farmer and carpenter was permitted to object on religious grounds to paying Social Security taxes for his employees. Perhaps profit-making is not a religious enterprise, but those who engage in profit-making enterprises can still have religious convictions that require them to do or refrain from doing certain things in their businesses. The Constitution does not require compartmentalization of the psyche, saying that one's religious persona can participate only in nonprofit activities. As Justice Brennan wrote, "[A] State may [not] put an individual to a choice between his business and his religion." *Braunfeld*, 366 U.S. at 611 (Brennan, J., dissenting).

Also, there is no principled reason why an individual who uses the corporate form in a business must thereby sacrifice the right to the free exercise of religion. Rabbi

Manischewitz starts a business preparing kosher matzo. A city ordinance prohibits certain kosher practices. No one could doubt that he can challenge the ordinance under the Free Exercise Clause or RFRA. But, some say, he can no longer raise such a challenge if he decides to limit his personal liability arising from the business by converting it to a sole-shareholder corporation. Why? True, the government may impose special duties on those who use a corporate form, such as a duty to produce corporate records, and those duties may require limitations on constitutional rights. *See Wilson v. United States*, 221 U.S. 361, 383–85 (1911) (no Fifth Amendment privilege to refuse to produce corporate records). But surely the limitations must relate to use of the corporate form. Does it make sense to say, "Since you have acted to reduce your personal financial risk, you can now be required to stop making kosher matzo."? What does limiting financial risk have to do with choosing to live a religious life? Although a corporation takes on a legal identity distinct from the sole shareholder, First Amendment jurisprudence is based on the substance of the constitutional protections, not matters of form. *See Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 667, 679–80 (1996) (citing cases); *Bd. of Educ. v. Grumet*, 512 U.S. 687, 698 (1994) (plurality opinion) ("In the circumstances of these cases, the difference between thus vesting state power in the members of a religious group as such instead of the officers of its sectarian organization is one of form, not substance."). Indeed, as Judge Tymkovich's opinion recites, use of the corporate form has not disqualified nonprofit corporations from invoking the protections of the Free Exercise Clause and RFRA. And for-profit corporations have been protected

-3-

by rights to freedom of speech and freedom of the press. *See, e.g.*, *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105 (1991); *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964).

What about the group-activity feature of corporations? No one suggests that organizations, in contrast to their members, have souls. But it does not follow that people must sacrifice their souls to engage in group activities through an organization. Working with others through an organization can often be advantageous in many respects. Of course, one who acts through a group loses a measure of personal autonomy and privacy. The group may say something that is anathema to one of its members or do something contrary to the religious faith of a member. Thus, the civil liberties of an organization—say, to exercise religion or to speak—must be considered distinct from the civil liberties of any particular member. Its speech or conduct may reflect the view of only a bare majority of the members, or even just the view of the members' delegate—such as the editor of a newspaper or the pastor of a congregation. It suffices that the speech or conduct represents an "official position." *See Boy Scouts of Am. v. Dale*, 530 U.S. 640, 655 (2000) ("[T]he First Amendment simply does not require that every member of a group agree on every issue in order for the group's policy to be 'expressive association.' The Boy Scouts takes an official position . . . and that is sufficient for First Amendment purposes.") But the advantages of acting through an organization may still be attractive to the individual. One who wants to have a prosperous business, but a business that still does nothing contrary to one's faith, can reasonably decide that the best way to

-4-

accomplish this is to join with like-minded persons, perhaps as partners, perhaps as fellow shareholders. Is that desire to be thwarted because the government can require the organization to engage in sins that could not be required of any of the members individually? Rabbi Manischewitz need not comply with an ordinance prohibiting the baking of kosher matzo, but when he obtains investors and the business is incorporated as Manischewitz, Inc., the anti–kosher law can be enforced against it? Must he reorganize the business as a  sole proprietorship to continue to make and sell kosher matzo?[1]

As noted in Judge Tymkovich's opinion, the Supreme Court has recognized that civil liberties are preserved for those who work through groups. "An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed." *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984); *cf. Grumet*, 512 U.S. at 698 ("religious people (or *groups of religious people*) cannot be denied the opportunity to exercise the rights of citizens simply because of their religious affiliations or commitments, for such a disability would violate the right to religious free exercise"

---

[1] Judge Matheson suggests that it is not necessary for the corporation to have a RFRA claim because the rabbi himself could raise a claim as an individual. *See* Matheson Op. at 20–21 n.15. But I do not share his confidence that a shareholder, director, or officer can have a personal free-exercise claim (under the First Amendment or RFRA) to challenge a law that commands only the corporation.

(emphasis added)).[2] There is no reason why that group should lose constitutional protection if it is organized in corporate form. *Cf. United States v. Int'l Union UAW-CIO*, 352 U.S. 568, 597 (1957) (Douglas, J., dissenting, joined by C. J. Warren and J. Black) ("Some may think that one group or another should not express its views in an election because it is too powerful, because it advocates unpopular ideas, or because it has a record of lawless action. But these are not justifications for withholding First Amendment rights from any group—labor or corporate.").

Perhaps in certain circumstances the use of the corporate form can be a proper ground for limiting (but not eliminating) First Amendment rights. The reasons argued for restricting political expenditures by corporations include the asserted inclinations and advantages of corporations in corrupting officeholders. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 447–75 (Stevens, J., dissenting). But no such concern has been raised here, and I fail to see how such a concern could arise. A corporation exercising religious beliefs is not corrupting anyone. Nor do I see how it would have any special inclination or advantage in exercising religious beliefs to the public detriment.

In short, those arguing that for-profit corporations cannot be "persons" under RFRA can find no support in any principles established in Supreme Court First

_____

[2] To be entitled to First Amendment protection, the group's speech or conduct need not be the purpose for forming the group. *See Boy Scouts of Am. v. Dale*, 530 U.S. 640, 655 (2000) ("[A]ssociations do not have to associate for the 'purpose' of disseminating a certain message in order to be entitled to the protections of the First Amendment. An association must merely engage in expressive activity that could be impaired to be entitled to protection.").

-6-

Amendment jurisprudence. They must resort to pointing out that the Supreme Court has never ruled that a for-profit corporation has a right to the free exercise of religion. But neither has it ruled to the contrary. The fact of the matter is that it has never had to decide the issue. Interestingly, the issue was raised by the government in *Gallagher v. Crown Kosher Super Market of Massachusetts, Inc.*, 366 U.S. 617 (1961), one of the associated cases challenging Sunday blue laws on various grounds. Because the Court had already rejected the free-exercise claim in another decision, it said that it did not have to decide whether the corporation, its customers, or the rabbis who supervised the condition of kosher meat had standing to bring a free-exercise challenge. *See id.* at 631. But the three dissenters, Justices Douglas, Brennan, and Stewart, implicitly found standing.

Of course, a corporation is protected only in its sincere religious beliefs. Chief Judge Briscoe's opinion expresses concern about "how easily an 'exercise of religion' could now be asserted by a corporation to avoid or take advantage of any governmental rule or requirement." Briscoe Op. at 4. This is certainly a proper concern, just as courts can properly be concerned about the sincerity of prisoners who convert to Judaism and demand kosher meals. But sincerity questions with respect to corporations should not be unmanageable. It should not be hard to determine who has authority to speak or act for the corporation. And sincerity can be measured by consistency of the present stated belief with the history of the enterprise. Unlike prisoners, for example, corporations are not known to have epiphanies or sudden conversions.

-7-

Insofar as Chief Judge Briscoe's opinion is concerned about "open[ing] the floodgates to RFRA litigation challenging any number of federal statutes that govern corporate affairs," *id.* at 25, it does not explain why that danger is any greater than the possibility of litigation on behalf of sole proprietors, or perhaps partnerships and other business organizations. But in any event, it makes no sense under RFRA to refuse to grant a merited exemption just because others may also seek it. How ironic if a burden on religious objectors can be justified because "too many" objectors find a law repugnant. The fears expressed are reminiscent of what the Supreme Court wrote almost a quarter-century ago:

> The government's ability to enforce generally applicable prohibitions of socially harmful conduct, like its ability to carry out other aspects of public policy, cannot depend on measuring the effects of a governmental action on a religious objector's spiritual development. To make an individual's obligation to obey such a law contingent upon the law's coincidence with his religious beliefs, except where the State's interest is compelling—permitting him, by virtue of his beliefs, to become a law unto himself, contradicts both constitutional tradition and common sense. . . . Any society adopting such a system would be courting anarchy, but that danger increases in direct proportion to the society's diversity of religious beliefs, and its determination to coerce or suppress none of them.

*Emp't Div. v. Smith*, 494 U.S. 872, 885, 888 (1990) (citations and internal quotation marks omitted). Accordingly, the Court held that a "neutral law of general applicability" cannot be challenged on free-exercise grounds. *Id.* at 879; *see id.* at 888–89 (listing civic obligations, such as paying taxes and minimum wages, that could otherwise be subject to "constitutionally required" exemptions). That view, of course, was soundly rejected when Congress enacted RFRA.

## II.     SUBSTANTIAL BURDEN

I would also add a few words on the meaning of "substantial burden."  It is important to distinguish between two types of laws that may violate the right to free exercise of religion.  Some laws require a person to do something contrary to the person's religious beliefs or to refrain from doing something required by those beliefs.  Other laws do not order the violation of a religious duty but simply make it more difficult for a person to obey that duty.  As I understand Supreme Court precedent, the first type of law imposes a substantial burden on free exercise, whatever the penalty imposed for violating the law.  Measuring coercive impact to determine whether the law imposes a "substantial" burden is necessary only for the second type of law.  For example, in *Lee* the law required the Amish businessman to pay social security taxes, which his faith prohibited him from doing.  The substantial-burden discussion in *Lee* is short and sweet:  "Because the payment of the taxes or receipt of benefits violates Amish religious beliefs, compulsory participation in the social security system interferes with their free exercise rights."  455 U.S. at 257.  And in *Thomas*, which required the payment of unemployment benefits to a worker who was fired for refusing to engage in work contrary to his religious beliefs, the Court turned to an analysis of the burden on the worker only after noting that "the Indiana [unemployment-compensation] law does not *compel* a violation of conscience."  450 U.S. at 717.  Later cases that examined whether there was a substantial burden similarly pointed out that compliance with the law would not itself violate the person's religious views.  *See Jimmy Swaggart Ministries v. Bd. of Equalization*, 493 U.S. 378, 391 ("There

-9-

is no evidence in this case that collection and payment of the tax violates appellant's sincere religious beliefs."); *Hernandez v. Comm'r*, 490 U.S. 680, 699 ("Neither the payment nor the receipt of taxes is forbidden by the Scientology faith generally, and Scientology does not proscribe the payment of taxes in connection with auditing or training sessions specifically.").  The law we address today compels the corporations to act contrary to their religious beliefs.  They therefore suffer a substantial burden.  I see no need to examine how damaging the sanctions for noncompliance would be or how difficult it would be for the corporations to rearrange their present manner of operating their businesses to avoid violating the law.

12-6294, *Hobby Lobby Stores, Inc., et al. v. Sebelius, et al.*

**GORSUCH,** joined by **KELLY** and **TYMKOVICH**, Circuit Judges, concurring.

Judge Tymkovich explains why Hobby Lobby and Mardel are entitled to a preliminary injunction. I write to explain why the Greens themselves, as individuals, are also entitled to relief and why the Anti-Injunction Act does not preclude us from supplying that relief.

\* \* \*

All of us face the problem of complicity. All of us must answer for ourselves whether and to what degree we are willing to be involved in the wrongdoing of others. For some, religion provides an essential source of guidance both about what constitutes wrongful conduct and the degree to which those who assist others in committing wrongful conduct themselves bear moral culpability. The Green family members are among those who seek guidance from their faith on these questions. Understanding that is the key to understanding this case.

As the Greens explain their complaint, the ACA's mandate requires them to violate their religious faith by forcing them to lend an impermissible degree of assistance to conduct their religion teaches to be gravely wrong. No one before us disputes that the mandate compels Hobby Lobby and Mardel to underwrite payments for drugs or devices that can have the effect of destroying a fertilized human egg. No one disputes that the Greens' religion teaches them that the use

of such drugs or devices is gravely wrong.[1]  It is no less clear from the Greens'

uncontested allegations that Hobby Lobby and Mardel cannot comply with the

mandate unless and until the Greens direct them to do so — that they are the

human actors who must compel the corporations to comply with the mandate.

And it is *this* fact, the Greens contend, that poses their problem.  As they

understand it, ordering their companies to provide insurance coverage for drugs or

devices whose use is inconsistent with their faith *itself* violates their faith,

representing a degree of complicity their religion disallows.  In light of the

crippling penalties the mandate imposes for failing to comply with its dictates —

running as high as $475 million per year — the Greens contend they confront no

less than a choice between exercising their faith or saving their business.

No doubt, the Greens' religious convictions are contestable.  Some may

even find the Greens' beliefs offensive.  But no one disputes that they *are*

sincerely held religious beliefs.  This isn't the case, say, of a wily businessman

---

[1] *See* Gov't Br. at 9 n.6 (acknowledging that some of the drugs referenced in the ACA mandate can "inhibit[] implantation"); Plaintiffs' Complaint ¶ 95 (suggesting same and citing an FDA publication).  The dissent takes issue with the government's concession and asserts that the *drugs* referenced in the ACA mandate do not have the effect of preventing the implantation of a fertilized egg. *See* Briscoe Op. at 3, 31.  But the dissent also acknowledges that the *devices* referenced in the mandate *do* have this effect.  *Id.* at 3.  Given this, there is no dispute from any quarter that the ACA forces Hobby Lobby and Mardel to underwrite *something* (be it drug or device) that offends the Greens' religious beliefs, and of course the only relief the corporations or Greens seek is relief sufficient to protect those beliefs.  *See* Tymkovich Op. at 13 n.3.

seeking to use an insincere claim of faith as cover to avoid a financially burdensome regulation. *See United States v. Quaintance*, 608 F.3d 717 (10th Cir. 2010) (an example of just that). And to know this much is to know the terms of the Religious Freedom Restoration Act apply. The Act doesn't just apply to protect popular religious beliefs: it does perhaps its most important work in protecting unpopular religious beliefs, vindicating this nation's long-held aspiration to serve as a refuge of religious tolerance.

The Greens' claim in this case closely parallels claims the Supreme Court vindicated in *Thomas* and *Lee*. In *Thomas*, the plaintiff, a faithful Jehovah's Witness, was willing to participate in manufacturing sheet steel he knew might find its way into armaments, but he was unwilling to work on a fabrication line producing tank turrets. *Thomas v. Review Bd. of the Ind. Employment Sec. Div.*, 450 U.S. 707, 711 (1980). That's the line he understood his faith to draw when it came to complicity in war-making, an activity itself forbidden by his faith. The Supreme Court acknowledged this line surely wasn't the same many others would draw, and that it wasn't even necessarily the same line other adherents to the plaintiff's own faith might always draw. But the Court proceeded to hold that it was not, is not, the place of courts of law to question the correctness or the consistency of tenets of religious faith, only to protect the exercise of faith. *Id.* at 714-16. No different result can reasonably follow here.

In *Lee*, a devout Amish employer refused to pay social security taxes on

behalf of his employees. *See United States v. Lee*, 455 U.S. 252, 254-55 (1982).

The employer's faith taught that it is sinful to accept governmental assistance.

By being forced to pay social security taxes on behalf of his employees, the

employer argued, he was being forced to create for his employees the possibility

of accepting governmental assistance later. This much involvement or

complicity, the employer argued, was itself sinful under the teachings of his

religion. The government argued there — much as the government argues here —

that the enforcement of its mandate on the employer would "not threaten the

integrity of the [employer's] religious belief" because the employer didn't have to

accept social security benefits himself and his employees could choose for

themselves whether to do so. *See Lee*, 455 U.S. at 257; Brief for Gov't, *Lee* (No.

80-767), 1981 WL 389829 at *10 (June 5, 1981). The Supreme Court squarely

rejected this argument in language no less applicable to our case, explaining that

it is not within "the judicial function and competence . . . to determine whether

the Government has the proper interpretation of the Amish faith." 455 U.S. at

257.

The district court reached a different result only because it mistook the

nature of the Greens' objection. As the district court described it, "the particular

burden of which plaintiffs complain is that funds, which plaintiffs will contribute

to a group health plan, might, after a series of independent decisions by health

care providers and patients covered by Hobby Lobby's plan, subsidize *someone*

*else's* participation in an activity that is condemned by plaintiff's religion." Order at 23 (Nov. 19, 2012), ECF No. 45 (emphasis added). The dissent proceeds along the same lines today, asserting that the Greens have no claim because they do not "become a party to, or otherwise encourage, an individual employee's decision to use a particular drug or device." Briscoe Op. at 34. All this, however, mistakes or rewrites the Greens' sincerely held religious convictions. As the Greens describe it, it is their *personal involvement* in facilitating access to devices and drugs that can have the effect of destroying a fertilized human egg that their religious faith holds impermissible. And as we have seen, it is not for secular courts to rewrite the religious complaint of a faithful adherent, or to decide whether a religious teaching about complicity imposes "too much" moral disapproval on those only "indirectly" assisting wrongful conduct. Whether an act of complicity is or isn't "too attenuated" from the underlying wrong is sometimes itself a matter of faith we must respect. *Thomas* and *Lee* teach no less.[2]

---

[2] The primary authority the dissent relies on for its reading of the Greens' religious objection turns out to be another circuit dissent that itself fails to account for *Thomas* or *Lee*. *See Grote v. Sebelius*, 708 F.3d 850, 856-57 (7th Cir. 2013) (Rovner, J., dissenting). The only other authority the dissent relies on has nothing to do with RFRA, let alone the degree to which we must defer to a sincerely held religious belief about complicity. It concerns instead the degree of assistance the government (not a religious person) may afford religious activities before running afoul of the Constitution's Establishment Clause (not an article of religious faith). *See* Briscoe Op. at 34 (citing *Zelman v. Simmons-Harris*, 536

(continued...)

With that much in mind, it is beyond question that the Greens have Article III standing to pursue their claims individually. This is so not simply because the company shares of which they are the beneficial owners would decline in value if the mandate's penalties for non-compliance were enforced, though that alone would satisfy Article III. *See Franchise Tax Bd. of Cal. v. Alcan Aluminium Ltd.*, 493 U.S. 331, 336 (1990); *Grubbs v. Bailes*, 445 F.3d 1275, 1280 (10th Cir. 2006). It is also because the mandate infringes the Greens' religious liberties by requiring them to lend what their religion teaches to be an impermissible degree of assistance to the commission of what their religion teaches to be a moral wrong. This sort of governmental pressure to compromise an article of religious faith is surely sufficient to convey Article III standing to the Greens, as it was for the plaintiffs in *Thomas* and *Lee* and in so many other religious liberty cases. Certainly our sister circuits have had no trouble finding Article III standing in similar cases where, say, individual pharmacists sought to contest regulations requiring their employers to dispense some of the same drugs or devices challenged here, *see Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1121 (9th Cir. 2009), or where individual soldiers sought to challenge military rules prohibiting their on-base day-care providers from including religious practices in their programs, *see Hartmann v. Stone*, 68 F.3d 973, 979 n.4 (6th Cir. 1995). Indeed, I

-----

[2](...continued)
U.S. 639, 652 (2002)).

-6-

do not understand the government or any of my colleagues to dispute the Greens' Article III standing.[3]

But what of prudential standing doctrines, and perhaps most especially the shareholder standing rule? Prudential standing doctrines are not jurisdictional: they may be forfeited or waived. *Finstuen v. Crutcher*, 496 F.3d 1139, 1147 (10th Cir. 2007). In this case, the government did not raise prudential standing as a defense in the district court; the district court did not raise the issue for itself but proceeded to address the Greens' claim on the merits; and the government did not mention any prudential standing concern in its principal brief to this court. To be sure, the government finally took up that cudgel when we *asked* for supplemental briefing on the issue. But even then it left critical questions unaddressed.

Take this one. Under the plain text of RFRA, standing is "governed by the general rules of standing *under article III*." 42 U.S.C. § 2000bb-1(c) (emphasis added). Congress's directive seems clear on its face — the text expressly tells us to apply the rules of standing under Article III and makes no mention of

---

[3] The dissent emphasizes the fact that the Greens are the beneficial owners of Hobby Lobby and Mardel through trusts rather than the corporation's direct owners, *see* Briscoe Op. at 32, but I do not take this discussion as going so far as to suggest the Greens lack Article III standing. *See generally Gollust v. Mendell*, 501 U.S. 115, 125-27 (1991) (indirect ownership of one corporation through another found sufficient for standing under federal securities laws); Fed. R. Civ. P. 17(a)(1)(E) (allowing a trustee to sue in her own name on behalf of a trust).

prudential (non-Article III) standing rules.  In this way, the plain language seems to suggest prudential standing doctrine failed to make its way into RFRA.  The government never confronts this possibility, let alone suggests the statute's language is fairly susceptible to an alternative reading that might suffice to suggest an ambiguity about its meaning.  In fact, the government's supplemental brief on prudential standing doesn't even cite RFRA's text.

That's not all.  Judicially importing prudential standing doctrine into RFRA would appear not only to defy the statute's plain text, it would also appear to run the risk of rendering the text surplusage.  After all, Congress could hardly suspend Article III standing rules even if it wished to do so, and Congress had no need to speak if it wished to leave existing prudential rules in place.  *See Bennett v. Spear*, 520 U.S. 154, 163 (1997) (Congress "legislates against the background of . . . prudential standing doctrine, which applies unless it is expressly negated").  So if Congress's directive in § 2000bb-1(c) cannot curb the operation of *constitutional* standing rules, and if Congress's directive is not needed to perpetuate *prudential* standing rules, what work is left for it to accomplish?  The most obvious candidate is to rule out the use of *prudential* standing restrictions and, as we've seen, the text is certainly sufficient to that task.  Again, however, the government fails to consider, let alone refute, this complication.

To be sure, at oral argument the government finally directed us to *Jackson v. Dist. of Columbia*, 254 F.3d 262 (D.C. Cir. 2001), and suggested that case

endorsed the use of prudential standing doctrine in RFRA cases. But it turns out that *Jackson* discussed only the interaction of exhaustion (not standing) doctrine and RFRA. *See id.* at 266-67. Moreover, when *Jackson* briefly mentioned standing in the course of addressing the plaintiffs' exhaustion argument, it proceeded to consult the legislative history without first identifying an ambiguity in the text, as it was obliged to do. *See Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete." (citations and internal quotation marks omitted)).

At the end of the day, then, and even after inviting supplemental briefing, we are left with almost no help from the government on the critical question of the statutory text's receptivity to prudential standing doctrine. Without that assistance, without as well some meaningful adversarial engagement on the question, we run a serious risk of reaching "an improvident or ill-advised opinion," not to mention causing unfairness to the individual plaintiffs who cannot now respond to the government's eleventh-hour oral argument reference to *Jackson*. *See Hill v. Kemp*, 478 F.3d 1236, 1250-51 (10th Cir. 2007) (citing *Headrick v. Rockwell Int'l Corp.*, 24 F.3d 1272, 1277-78 (10th Cir. 1994) (White, J.)). Applying our normal forfeiture rules in these circumstances is both more

-9-

prudent and more just. We should bypass questions of prudential standing and reach the merits of the Greens' claims, just as the district court did and both parties have.

That said, even if we were to entertain prudential standing questions at this late stage and assume the doctrine applies to RFRA despite the gaping questions the government left unaddressed, it's far from clear the doctrine bars the Greens' claim on its own terms. The government points us in the general direction of the shareholder standing rule, a feature of prudential standing doctrine barring corporate owners from asserting claims belonging to the corporation. *See Alcan*, 493 U.S. at 336. But that prudential rule does not bar corporate owners from bringing suit if they have "a direct, personal interest in a cause of action . . . even if the corporation's rights are also implicated." *Id.* And in our case the Greens contend that they, as the controlling owners and operators of Hobby Lobby and Mardel, are the human beings who must direct the corporations to comply with the mandate and do so in defiance of their faith. They contend the ACA prevents them as individuals from owning and managing a corporation of the size of Hobby Lobby and Mardel — from practicing their traditional trade — without violating their religious beliefs. That much would seem to qualify as a quintessentially "direct" and "personal" interest protected even under the shareholder standing rule. *See Heart of Am. Grain Inspection Serv., Inc. v. Missouri Dep't of Agriculture*, 123 F.3d 1098, 1102 (8th Cir. 1987) (both

-10-

employee grain inspectors and their corporate employer had standing to sue to enjoin law preventing employer from weighing grain because not only would the corporation be injured but the inspectors themselves would be "*prevented from practicing their trade by virtue of the state's actions*") (emphasis added)); *Grubbs*, 445 F.3d at 1280. On this score, we find ourselves in full agreement with Judge Matheson.[4]

Turning finally to the merits, they are by this point clear enough. Unlike Hobby Lobby and Mardel, there can be no colorable question that the Greens are "persons" entitled to RFRA's protections. Neither can there be any colorable question that the Greens face a "substantial burden" on their "exercise of religion." This statutory threshold is met when, among other things, the government presents a plaintiff with a "Hobson's choice — an illusory choice where the only realistically possible course of action trenches on an adherent's sincerely held religious belief." *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1315 (10th Cir. 2010). As we have already seen, the Greens face precisely that — a choice between abiding their religion or saving their business. With respect to

---

[4] Whether other individuals with lesser claims to involvement in a company or effecting a governmental mandate could lay claim to such a direct and personal interest is, no doubt, an important question, but it is one for a different case with different facts, not the one we confront today. Ours simply is not the case of "managers" seeking standing, *see* Briscoe Op. at 34, it is one involving individuals who are the beneficial owners, as well as the directors and officers, of privately held companies.

the remaining statutory and equitable factors, Judge Tymkovich shows why they all favor granting rather than withholding the requested relief, and none of that discussion warrants repetition here. Here it is enough to observe simply that the Greens, no less than Hobby Lobby and Mardel, merit the court's protection while this case proceeds.

In many ways this case is the tale of two statutes. The ACA compels the Greens to act. RFRA says they need not. We are asked to decide which legislative direction controls. The tie-breaker is found not in our own opinions about good policy but in the laws Congress enacted. Congress structured RFRA to override other legal mandates, including its own statutes, if and when they encroach on religious liberty. When construing any "federal statutory law adopted after November 16, 1993," Congress told us in no uncertain terms we should deem it "subject to [RFRA] unless such law explicitly excludes such application." *See* 42 U.S.C. § 2000bb-3(b). In this way, RFRA is indeed something of a "super-statute." Michael Paulsen, *A RFRA Runs Through It: Religious Freedom and the U.S. Code*, 56 Mont. L. Rev. 249, 253 (1995). And because the government identifies no explicit exclusion in the ACA to its dictates, it is RFRA's legislative direction that must prevail in the end. Indeed, though our opinions today may be many and the routes we follow various, no fewer than six of us agree that the district court's holding failed to give sufficient attention to RFRA's powerful voice.

-12-

* * *

We could not, of course, reach the merits of the RFRA question if we thought the Anti-Injunction Act barred our way. The AIA precludes our consideration of suits seeking to "restrain the assessment or collection of any [federal] tax." 26 U.S.C. § 7421(a). Though they agree on little else, both sides before us insist this lawsuit doesn't meet that description. But a non-trivial argument could be made that they are all wrong: the plaintiffs, after all, seek to restrain the government's use of *any* of the ACA's enforcement mechanisms, including one that is expressly labeled a "tax." *See* 26 U.S.C. § 4980D(a). And Congress's decision to label something a tax usually is enough for it to trigger the AIA, "even where that label [is] inaccurate." *See NFIB v. Sebelius*, 132 S. Ct. 2566, 2583 (2012).

I write to emphasize that, even if the parties are wrong and the AIA *does* apply to this case, it *still* wouldn't allow us to avoid reaching the merits. It wouldn't because the government has expressly waived any reliance on the AIA: not only did it fail to raise the AIA as a defense in the district court, it discouraged us from applying the statute when we invited additional briefing on the matter. So long as the AIA affords the government only a *waivable defense* — so long as it doesn't impose on the courts a *jurisdictional limit* on our statutory authority to entertain this case — we are bound to reach the merits. And a waivable defense, we are persuaded, is all the AIA provides.

-13-

The Supreme Court has cautioned that "[j]urisdiction . . . is a word of many, too many, meanings." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90 (1998) (internal quotation marks omitted). As a result, the Court has instructed us against relying on "drive-by jurisdictional rulings" that do not properly grapple with the distinctions between procedural requirements, claim elements, and bona fide jurisdictional limits on a court's power. *See Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 161 (2010); *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 510-11 (2006); *Steel Co.*, 523 U.S. at 91. To rein in courts' "profligate use of the term jurisdiction," the Supreme Court has recently adopted "a readily administrable bright line for determining whether to classify a statutory limitation as jurisdictional." *Sebelius v. Auburn Reg'l Med. Ctr.*, 133 S. Ct. 817, 824 (2013) (alterations omitted) (internal quotation marks omitted). That rule requires us to "inquire whether Congress has clearly stated that the rule is jurisdictional; absent such a clear statement . . . courts should treat the restriction as nonjurisdictional in character." *Id.*; s*ee also Gonzalez v. Thaler*, 132 S. Ct. 641, 648-49 (2012); *Arbaugh*, 546 U.S. at 515–16. Statutes that speak clearly to "the courts' statutory or constitutional *power* to adjudicate the case" must of course be treated as jurisdictional and given their full effect. *Steel Co.*, 523 U.S. at 89 (emphasis in original). But statutes that speak to the rights or obligations of parties to a lawsuit establish "claim-processing rules," are not and should not be treated as "jurisdictional prescriptions." *Reed Elsevier*, 559 U.S. at 161. In addition to the

-14-

consulting statutory text, we may when necessary consider as well "context, including [the Supreme] Court's interpretation of similar provisions in many years past." *Id.* at 168.

When it comes to the AIA, all of these considerations point in the same direction.

First and most importantly, the AIA's text dictates merely that "[e]xcept as provided in [other provisions inapplicable here] no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court *by any person*." 26 U.S.C. § 7421(a). Similar to other claims processing rules, the statute does not apply its prohibition to the *court* (let alone more specifically to the court's *power* or *jurisdiction*) but applies its prohibition instead to a *person*. Indeed, the AIA's language is nearly identical to the language of the copyright statute analyzed in *Reed Elsevier* — and we know with certainty *that* language "says nothing about whether a federal court has subject-matter jurisdiction." 559 U.S. at 1664. *Compare* 26 U.S.C. § 7421(a) (AIA: "no suit . . . shall be maintained"), *with* 17 U.S.C. § 411(a) (copyright statute: "no civil action . . . shall be instituted").

Second, the AIA does not even appear in the same *title* of the Code as most statutes bearing on federal courts' jurisdiction. *See* 28 U.S.C. § 1330 *et seq.* Instead, Congress chose to place the AIA in Title 26, in a chapter of the tax code discussing claims processing rules in proceedings brought by "Taxpayers and

-15-

Third Parties."  On at least two occasions, the Supreme Court has found

Congress's decision to locate a statute "separate" from jurisdictional provisions

suggestive contextual evidence that the statute in question was non-jurisdictional.

*See Reed Elsevier*, 559 U.S. at 164-65; *Arbaugh*, 546 U.S. at 514.  Precisely the

same sort of suggestive contextual evidence exists here.

Third, in both of these respects (in both its language and placement) the

AIA contrasts sharply with its cousin, the Tax Injunction Act (TIA), a provision

controlling federal jurisdiction over suits seeking to enjoin *state* rather than

*federal* tax collection.  The TIA speaks directly to courts rather than to the

parties.  *See* 28 U.S.C. § 1341 (*"The district courts shall not enjoin, suspend or

restrain* the assessment, levy or collection of any tax under State law . . . ."

(emphasis added)).  And the TIA is located within the same chapter of the same

title of the U.S. Code as the other principal statutes governing federal jurisdiction.

*See id.*  Facts like these suggest Congress could have easily made the AIA

jurisdictional if it wished and that it "would have spoken in clearer terms [in the

AIA] if it intended" to do so.  *Gonzalez*, 132 S. Ct. at 649.  Neither is it insensible

to think Congress might wish to protect state taxes even more than its own from

federal lawsuits:  comity and federalism concerns lurk there, while federal taxes

and the lower federal courts are equally creations of Congress itself.

Finally, there is the Supreme Court's treatment of the AIA in past cases.  It

is settled that the courts have "no authority to create equitable exceptions to

jurisdictional requirements." *Bowles v. Russell*, 551 U.S. 205, 214 (2007). Yet the Supreme Court has repeatedly recognized equitable exceptions to the AIA's application. *See, e.g.*, *Bob Jones Univ. v. Simon*, 416 U.S. 725, 742-46 (1974); *Enochs v. Williams Packing*, 370 U.S. 1, 7 (1962). In fact, the Supreme Court has expressly indicated that the predecessor to the AIA — containing substantially the same language — is non-jurisdictional, going so far as to allow the Solicitor General to proffer a "waiver of a defense" so the Court could reach the merits of the case before it. *See Helvering v. Davis*, 301 U.S. 619, 639 (1937) (discussing Rev. Stat. § 3224). All of these results would seem impossible if the AIA really were jurisdictional. Admittedly, both the Supreme Court and this court have on *other* occasions referred to the statute as jurisdictional. *See, e.g.*, *Enochs v. Williams Packing & Nav. Co.*, 370 U.S. 1, 5 (1962); *Sterling Consulting Corp. v. United States*, 245 F.3d 1161, 1167 (10th Cir. 2001). But these cases employ the jurisdictional label with little or no analysis — amounting to exactly the sort of "drive-by jurisdictional rulings" the Court tells us to view with a jaundiced eye. And more recently the Supreme Court has approached the AIA much more gingerly, taking care to avoid the jurisdictional epithet. *See NFIB v. Sebelius*, 132 S. Ct. 2566, 2582 (2012) (holding that the AIA didn't apply in that case by its own terms).

In the end, the AIA shows none of the hallmarks of a jurisdictional restriction, and has many features that collectively indicate otherwise. The

government can waive its application, and it has done so before us. Given that, we can be sure, perhaps doubly sure, that reaching the merits of this case is appropriate and indeed our duty.

12-6294, *Hobby Lobby Stores, Inc., et al. v. Sebelius, et al.*

**BACHARACH**, J., concurring.

I join Parts I, II, III, IV, V, and VI(B)(1) of Judge Tymkovich's thorough, finely-crafted opinion. Like Judge Tymkovich, I believe that Hobby Lobby Stores, Inc. and Mardel, Inc. are "persons" under the Religious Freedom Restoration Act. I write separately to:

- discuss the need for a remand so that the district court can address the balancing elements of the preliminary-injunction inquiry and

- address prudential standing and conclude that we should instruct the district court to dismiss the Greens' claims.

I. <u>The Need for Remand to the District Court on the Balancing Elements</u>

I respectfully decline to join Parts VI(A), (B)(2), and (B)(3) of the plurality opinion because I believe that the required balancing of interests should be conducted by the district court rather than the court of appeals. Because we convene as an appellate tribunal, rather than a front-line court of equity, our only function is to determine whether the district court committed legal error.

The district court did err, as the plurality concludes, by holding that Hobby Lobby and Mardel are unlikely to succeed on the merits. Still, Hobby Lobby and Mardel can obtain a preliminary injunction only if they persuade a court of three additional elements: (1) irreparable injury; (2) avoidance of injury to the public interest; and (3) greater injury to themselves, if a preliminary injunction were to be denied, than to the defendants if a preliminary injunction were to be granted.

*See* Plurality Op., Part VI; *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (identifying the equitable elements for a preliminary injunction). These elements have not been addressed by the district court.

I agree with the plurality that Hobby Lobby and Mardel have demonstrated irreparable injury, for the government argued in the district court that the elements involving irreparable injury and likelihood of success had merged.

The remaining issue is whether the district court should be allowed to engage in the balancing required by the other two elements or whether, as the plurality proposes, we should undertake that task ourselves. Unlike the plurality, I think the equitable balancing should be performed by the district court.

As the Supreme Court has recognized, "the decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 394 (2006). Thus, when a district court has not addressed one or both of the balancing elements because of a legal error involving some other part of the inquiry, the general practice is to remand the case to the district court for initial consideration of the public interest and balancing of the potential harm to the parties.[1] Our court ordinarily follows

---

[1] *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 394 (2006) (vacating the decision of the court of appeals and ordering a remand so that the district court could address the equitable elements of a preliminary injunction); *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 811 (Fed. Cir. 2007) (remanding a case to the district court and explaining that "[i]f we were to weigh the evidence ourselves to reach a conclusion on injunctive relief, we would effectively be
(continued...)

this practice.  *See Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) (remanding for consideration of the public interest and balancing of interests because the district court had not discussed them).

The reasons for this practice are sound.  As the Seventh Circuit Court of Appeals observed, the "cold record" before the appellate court may not reflect the district judge's sense of the equities.  *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.3d 1429, 1437-38 (7th Cir. 1986).  Thus, it is hard to imagine why an appellate tribunal would be better than the district court at balancing the relevant interests.  *Id.*

Now that we have decided the issues of likelihood of success on the merits and irreparable harm, a court must weigh the competing equities, such as the public interest in ensuring access to emergency contraceptives and the interests of Hobby Lobby and Mardel in exercising their religious beliefs.  In my view, this weighing process is more properly suited to the institutional expertise and function of the district court.

In its own weighing of interests, the plurality does not mention the public interest that the government had relied on at the preliminary-injunction hearing:

---

¹(...continued)
exercising our own discretion as if we were the first-line court of equity," a role belonging "exclusively to the district court"); *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1437-38 (7th Cir. 1986) (remanding to the district court for consideration of the equitable elements of a preliminary injunction because "the appellate process is not well suited to an appreciation of the subtle shadings of a case" involved in the balancing of equities).

the health reasons for promoting employee access to emergency contraceptives. JA 158a. A court of equity might ultimately decide that this interest is outweighed by the public interest in extending RFRA protection to Hobby Lobby and Mardel. But whichever court does the balancing must at least consider the government's stated interest and weigh it against the public interest in religious freedom.

As Judge Tymkovich notes, we have occasionally balanced the equities in the first instance when "the record is sufficiently developed to allow for an analysis of the equitable factors on appeal." *Westar Energy, Inc. v. Lake*, 552 F.3d 1215, 1224 (10th Cir. 2009); *see* Plurality Op., Parts IV, VI. But here, the record does not contain any evidence. Thus, I do not believe the record was sufficiently developed for us to do the balancing in the first instance.

The plurality suggests that balancing of statutory public interests is unnecessary because: (1) RFRA supersedes other statutes, and (2) rights under RFRA should be treated as if they are constitutional rights. I respectfully disagree. Public interests can arise from non-statutory sources, and the rights under RFRA and the Constitution are distinct.

First, public interests are found in a variety of places, often outside of statutes. *See, e.g.*, *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009) (discussing the public interest in ensuring access to "Plan B" for sexually active women of childbearing age without citing statutes that support that interest).

Thus, even if a court of equity were to find that the public interest in RFRA always outweighs other statutory interests, it could also find that the non-statutory public interest in access to emergency contraceptives outweighs the public interest under RFRA for Hobby Lobby and Mardel to exercise religion.

Second, RFRA and the First Amendment are distinct and the scope of the protections are different. And when we address the likelihood of success, we are doing so in the context of the RFRA claims — not the constitutional claims.

In an effort to equate RFRA and the First Amendment, the plurality relies on *Kikumura v. Hurley*, 242 F.3d 950 (10th Cir. 2001). But *Kikumura* compared RFRA to the Constitution in the context of only one equitable element: irreparable injury. *Kikumura v. Hurley*, 242 F.3d at 963. In that context, we simply applied the general rule that an injury is irreparable when the court would be unable to grant an adequate remedy at law. *Id.* With regard to the remaining equitable elements, however, we declined to conduct the initial balancing of the public interests and the equities. *Id.* Instead, we remanded for the district court to consider the applicable public interests even if the plaintiff were to show likelihood of success on the merits. *Id.* Thus, *Kikumura* does not support balancing of the public interests and equities on appeal even when the plaintiff is likely to succeed under RFRA. Indeed, by remanding in *Kikumura*, we did precisely the opposite of what the plurality would have us do here.

In urging that we allow the district court to balance the remaining elements, I am mindful of the time pressures on the courts – and on Hobby Lobby and Mardel – as the deadline of July 1, 2013, approaches.  Still, I do not think these time pressures should induce us to step outside of our institutional limits and usurp a role better suited to the district court.

II.    The Greens' Standing to Sue in their Personal Capacities

In footnote 4, the plurality opinion states that we need not address the Greens' standing.  I believe, however, that we should do so.  In addressing the Greens' standing, we should consider whether Congress abrogated prudential restrictions in RFRA and, if not, whether the Greens' alleged injuries derive solely from the injuries sustained by Hobby Lobby and Mardel.

In my view, Congress did not abrogate prudential-standing restrictions in RFRA, and the Greens' claims derive solely from the alleged injuries sustained by Hobby Lobby and Mardel.  As a result, I would direct the district court to dismiss the Greens' claims based on the shareholder-standing rule.

A.    Waiver

Prudential-standing limitations are subject to waiver.  *See Finstuen v. Crutcher*, 496 F.3d 1139, 1147 (10th Cir. 2007).  But this court has discretion to address prudential standing *sua sponte*.  *Adams ex rel. D.J.W. v. Astrue*, 659 F.3d 1297, 1299-1301 (10th Cir. 2011) (addressing a prudential-standing restriction *sua sponte*).  We should invoke this discretion here, for we have raised the issue,

-6-

obtained briefs on the parties' positions, and learned that the Defendants object to the Greens' claims based on prudential-standing limitations.

## B. Abrogation by Congress

If this Court were to address standing, we would need to consider whether Congress abrogated prudential-standing limitations in RFRA. The Greens argue that Congress abrogated these limitations by stating that standing under RFRA "shall be governed by the general rules of standing under article III of the Constitution." 42 U.S.C. § 2000bb-1(c) (2006). In my view, this language does not eliminate prudential-standing restrictions.

The restrictions apply unless they are expressly abrogated by Congress. *Bennett v. Spear*, 520 U.S. 154, 163-64 (1997). In § 2000bb-1(c), Congress never mentioned prudential restrictions or said that the standing rules under Article III would be exclusive. Instead, Congress simply said that Article III would govern standing issues under RFRA. At best, this language is ambiguous regarding Congress's intent to modify prudential-standing rules.

Notwithstanding the potential ambiguity in the text, Congress clarified its intent in the legislative history. There Congress stated that the language in RFRA is designed only to preserve the existing body of case law on article III limitations when taxpayers sue to challenge the tax-exempt status of religious institutions. *See* S. Rep. No. 103-111, at 12-13 (1993), *reprinted in* 1993 U.S.C.C.A.N. 1892, 1902-03; H.R. Rep. 103-88 (1993), 1993 WL 158058. Though Congress rarely

includes language solely to emphasize its intention to keep standing limitations, "that appears to be precisely what Congress did here." *Jackson v. District of Columbia*, 254 F.3d 262, 267 (D.C. Cir. 2001). Indeed, in explaining the cited statutory language, the House Judiciary Committee noted that "[t]he Act would not provide a basis for standing in situations where standing to bring a free exercise claim is otherwise absent." H.R. Rep. 103-88 (1993), 1993 WL 158058. As a result, I do not believe that Congress has expressly abrogated the prudential-standing requirements through RFRA.

    C.    <u>Application of the Shareholder-Standing Rule</u>

With this conclusion, I believe we should instruct the district court to dismiss the Greens' claims under the shareholder-standing rule.

One prudential limit on standing is the general restriction against asserting the legal rights and interests of third parties. *See, e.g.*, *Warth v. Seldin*, 422 U.S. 490, 499-500 (1975). This restriction frequently applies when shareholders bring claims deriving solely from their relationship to the corporation. In such situations, courts generally apply the "shareholder-standing rule," which "prohibits shareholders from initiating actions to enforce the rights of the corporation unless the corporation's management has refused to pursue the same action for reasons other than good-faith business judgment." *Franchise Tax Bd. of Cal. v. Alcan Aluminium Ltd.*, 493 U.S. 331, 336 (1990). This rule is designed

to "limit access to the federal courts to those litigants best suited to assert a particular claim." *Gladstone Realtors v. Bellwood*, 441 U.S. 91, 100 (1979).

But sometimes shareholders and their corporations suffer distinct injuries. In these cases, courts have carved out an exception to the shareholder-standing rule, allowing shareholders to sue when they have "a direct, personal interest in a cause of action." *Franchise Tax Bd. of Cal. v. Alcan Aluminium Ltd.*, 493 U.S. 331, 336 (1990). Thus, the issue of standing turns on whether the Greens claim an injury from the Affordable Care Act that is direct and personal or merely derivative of the injury to Hobby Lobby and Mardel.

In my view, the Greens' injury stemming from the Affordable Care Act is purely derivative of the corporations' injury. The mandate does not require anything of the Greens; the obligation falls solely on the corporations.

In oral argument, the Greens argue that they incurred a direct injury from their duty to implement the contraceptive mandate for Hobby Lobby and Mardel. But the Greens are implementing these decisions as officers and directors of the corporations, not as individuals acting in their personal capacities.

The Greens must subordinate their own religious beliefs to fulfill their fiduciary duties under Oklahoma law as officers and directors of Hobby Lobby and Mardel. *See Fields v. Victor Bldg. & Loan Co.*, 175 P. 529, 531 (Okla. 1918) (per curiam). As fiduciaries, the Greens must implement corporate decisions by

setting aside their own religious beliefs and advancing the best interests of the corporations. *See id.*

In advancing the best interests of Hobby Lobby and Mardel, the Greens face a difficulty because the mandate creates conflicting interests for Hobby Lobby and Mardel: the financial interest in complying with the mandate and the religious interest in not covering insurance for certain contraceptives. But this Hobson's choice falls solely on the two corporations, and the Greens' injury is not directly or personally created by the Affordable Care Act. Instead, the Greens' injury stems derivatively from their fiduciary duties under Oklahoma law to advance the conflicting financial and religious interests of Hobby Lobby and Mardel. As a result, I do not believe the Greens can avoid the shareholder-standing rule based on a "direct" or "personal" injury created by the Affordable Care Act.

Accordingly, I would remand with instructions to dismiss the Greens' claims for lack of prudential standing under the shareholder-standing rule.

No. 12-6294, <u>Hobby Lobby Stores, Inc., et al. v. Sebelius, et al.</u>

**BRISCOE,** Chief Judge, concurring in part and dissenting in part, joined by **LUCERO,** Circuit Judge.


In its eagerness to afford rights under the Religious Freedom Restoration Act (RFRA) and the Free Exercise Clause of the First Amendment to Hobby Lobby and Mardel, the majority ignores the fundamental components upon which sound judicial decisionmaking is grounded: evidence, of which plaintiffs presented none; burdens of persuasion, which indisputably rest on the plaintiffs but which the majority effectively imposes on the defendants; and precedent, of which there is none to support the plaintiffs' novel claims under RFRA, or the new class of corporations effectively recognized by the majority. I therefore dissent from the majority's conclusion that Hobby Lobby and Mardel have established a substantial likelihood of success on the merits of their RFRA claims, and the majority's concomitant decision to reverse the district court's denial of plaintiffs' motion for preliminary injunctive relief.

## I. The Anti-Injunction Act

Regarding the threshold question of the applicability of the Anti-Injunction Act (AIA), three judges would have us take the unnecessary step of concluding that the AIA is not jurisdictional, but instead a waivable, non-jurisdictional "claims processing rule." Gorsuch Op. at 14, 15. In my view, it is sufficient

simply to conclude, as everyone agrees, that the AIA does not apply to the RFRA claims asserted by Hobby Lobby and Mardel, and to leave the jurisdictional/non-jurisdictional question (which neither side has raised) for another case in which it matters. See generally Nat'l Fed'n of Indep. Bus. v. Sebelius, 132 S. Ct. 2566 (2012) (Scalia, J., dissenting) ("The values that should have determined our course today are caution [and] minimalism . . . ."). I therefore concur in the conclusion that the AIA does not bar the RFRA claims at issue in this appeal.

## II. *The Record on Appeal*

Section I of the majority opinion purports to outline the "Background & Procedural History" of this case, including a description of the plaintiffs and their businesses, and the types of drugs and devices mandated under the challenged contraceptive-coverage regulation. Reading this section, one would think either that the government had admitted all of the allegations in plaintiffs' complaint, or, more likely, that the plaintiffs had presented a wealth of evidence at the preliminary injunction hearing to support those allegations. But as it turns out, neither is true. At the hearing on plaintiffs' motion for preliminary injunction, plaintiffs presented no evidence of any kind. And, although the government opposed plaintiffs' motion for preliminary injunction, it never had an opportunity to file an answer to plaintiffs' complaint. That is because, shortly after the district court denied plaintiffs' motion for preliminary injunction, the district court proceedings were stayed pending the outcome of this appeal.

-2-

As a result, we know very little about any of the important facts of this case. For example, although the allegations in plaintiffs' complaint touch on certain aspects of the structure and operation of the two corporate plaintiffs, we do not know, even assuming the truth of those allegations, precisely how each corporation was established, how it is structured, or how it is operated. Relatedly, plaintiffs presented no evidence attempting to demonstrate whether or how Hobby Lobby and Mardel hold religious beliefs, and whether or how these corporate plaintiffs, which collectively operate hundreds of retail stores and employ thousands of employees, exercise religion. In turn, plaintiffs presented no evidence indicating how the contraceptive-coverage regulation would burden Hobby Lobby's and Mardel's religious beliefs. Lastly, there is no evidentiary support in the record for plaintiffs' allegations that the objected-to contraceptive drugs and devices actually have the potential to prevent implantation of fertilized eggs. To be sure, a review of the briefs filed in this case suggests there is agreement among the parties and amici that intrauterine devices have such potential. But the same cannot be said about the challenged contraceptive drugs (e.g., Plan B and Ella). See Tummino v. Hamburg, — F. Supp. 2d —, 2013 WL 1348656 at *1 (E.D.N.Y. Apr. 5, 2013) (finding that levonorgestrel-based emergency contraception, such as Plan B and Plan B One-Step, interfere with prefertilization events and have not been shown to interfere with implantation of a fertilized egg).

In light of these evidentiary deficiencies, I fail to see how plaintiffs could reasonably be said to have carried their burden of establishing their entitlement to a preliminary injunction. And, relatedly, I am concerned, given these evidentiary deficiencies, about the majority's eagerness to issue seemingly definitive rulings on the merits of plaintiffs' novel claim that for-profit corporations are entitled to coverage under RFRA. See generally Kennedy v. Silas Mason Co., 334 U.S. 249, 256-57 (1948) ("noting that "summary procedures, however salutary where issues are clear-cut and simple, present a treacherous record for deciding issues of far-flung import, on which this Court should draw inferences with caution from complicated courses of legislation").

### III. Are Hobby Lobby and Mardel Persons Exercising Religion Under RFRA?

In the first part of its merits analysis, the majority addresses the question of whether Hobby Lobby and Mardel qualify as "persons exercising religion for purposes of RFRA." Maj. Op. at 25. As I shall outline below, the majority makes a number of critical mistakes in doing so. And its ultimate holding, which is unprecedented, is sufficiently ambiguous that neither the majority nor anyone else can confidently predict where it may lead, particularly when one considers how easily an "exercise of religion" could now be asserted by a corporation to avoid or take advantage of any governmental rule or requirement.

### A.

The majority begins its analysis by suggesting that Hobby Lobby has a

"religious mission." Id. The majority also notes, and effectively adopts, the plaintiffs' characterization of the two corporations as "faith-based compan[ies]." Id. at 10.

These characterizations, however, find meager support in the factual record, and virtually no support in federal or state law. The certificates of incorporation for both Hobby Lobby and Mardel were submitted to the district court as exhibits to the defendants' brief in opposition to plaintiffs' motion for preliminary injunction and are now part of the joint appendix in this appeal. Notably, there is not a single reference to religion in either certificate. Instead, the certificates state simply that Hobby Lobby and Mardel were created for the purpose of "engag[ing] in any lawful act or activity for which corporations may be organized under the Oklahoma General Corporation Act." JA at 162a, 166a. Consistent with these certificates, the plaintiffs' complaint concedes that both Hobby Lobby and Mardel are "privately held, for-profit corporations[s] . . . organized under Oklahoma law." Id. at 18a. More specifically, the complaint alleges that Hobby Lobby operates approximately 514 craft stores in the United States, selling "a variety of art and craft supplies, home decor, and holiday decorations." Id. at 20a. As for Mardel, the complaint alleges that it is "a bookstore and educational supply company that specializes in Christian materials, such as Bibles, books, movies, apparel, church and educational supplies, and homeschool curricula." Id. at 21a. Assuming the truth of these allegations,

Hobby Lobby and Mardel are, in a nutshell, for-profit businesses focused on selling merchandise to consumers.

To be sure, plaintiffs allege in their complaint that "Hobby Lobby's statement of purpose reads:

> In order to effectively serve our owners, employees, and customers the Board of Directors is committed to:
>
> > Honoring the Lord in all we do by operating the company in a manner consistent with Biblical principles.
> >
> > Offering our customers an exceptional selection and value.
> >
> > Serving our employees and their families by establishing a work environment and company policies that build character, strengthen individuals, and nurture families.
> >
> > Providing a return on the owners' investment, sharing the Lord's blessings with our employees, and investing in our community.
> >
> > We believe that it is by God's grace and provision that Hobby Lobby has endured. He has been faithful in the past, we trust Him for our future."

Id. at 22a-23a. The complaint also alleges that "[t]he Green family's business practices . . . reflect their Christian faith in unmistakable and concrete ways." Id. at 14a. For example, they allege that "[t]hey give millions of dollars from their profits to fund missionaries and ministries around the world," and "they close all their stores on Sundays, even though they lose millions in annual sales by doing so." Id.

But these alleged facts, though perhaps establishing a sincerity of purpose on the part of the Green family that is rooted in their faith, cannot alter the basic for-profit status of the two corporations, or otherwise place these corporations into a unique class for purposes of RFRA in particular, or federal or state law in general. Significantly, the majority, despite employing the unique characterizations of "faith-based companies" and businesses with "a religious mission," does not cite to a single source in support of this new legal category of for-profit corporation.

That is because it cannot. As far as I can determine, neither the United States Supreme Court nor any federal circuit court, until now, has ever used the phrase "faith-based company," let alone recognized such a distinct legal category of for-profit corporations. Nor, as far as I can tell, has the United States Supreme Court or any federal circuit court, until now, recognized a for-profit corporation as having a "religious mission." Finally, Oklahoma state law, under which Hobby Lobby and Mardel were formed and currently exist, does not recognize any such unique class of corporation.

B.

The majority concludes that Hobby Lobby and Mardel are "persons" for purposes of RFRA. Maj. Op. at 25-35. In reaching this conclusion, the majority correctly notes that "RFRA contains no special definition of 'person.'" Id. at 27. The majority thus turns to "the Dictionary Act, which instructs: 'In determining

-7-

the meaning of any Act of Congress, unless the context indicates otherwise * * * the word[] "person" . . . include[s] corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals.'" Id. (quoting 1 U.S.C. § 1). The majority then cites Gonzalez v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418 (2006), which involved RFRA claims raised by a New Mexico-based religious sect organized as a non-profit corporation. Relying on O Centro, the majority asserts that "the Supreme Court has affirmed the RFRA rights of corporate claimants, notwithstanding the claimants' decision to use the corporate form." Maj. Op. at 27. Proceeding on the assumption that "at least some types of corporate entities can bring RFRA claims," the majority then asks "whether Congress intended to exclude for-profit corporations, as opposed to non-profit corporations, from RFRA's scope." Id. at 28. Ultimately, the majority concludes that Congress "chose not to do so in RFRA," id., and that, instead, "Congress meant 'person' in RFRA to [carry] . . . its default meaning in the Dictionary Act—which includes corporations regardless of their profit-making status," id. at 34-35.

The problem, however, is that the majority fails to properly recognize that "the context [of RFRA, including its legislative history,] indicates otherwise," 1 U.S.C. § 1, and thus it is unreasonable to assume from Congress's silence that Congress anticipated that for-profit corporations would be covered as "persons" under RFRA. RFRA, as the majority notes, was enacted by Congress in response

-8-

to the Supreme Court's decision in Employment Division v. Smith, 494 U.S. 872 (1990), which construed the Free Exercise Clause of the First Amendment to hold that "neutral, generally applicable laws may be applied to religious practices even when not supported by a compelling governmental interest." City of Boerne v. Flores, 521 U.S. 507, 514 (1997). In Congress's view, "the compelling interest test as set forth in [pre-Smith] Federal court rulings [wa]s a workable test for striking sensible balances between religious liberty and competing prior governmental interests." 42 U.S.C. § 2000bb(a)(5). Thus, RFRA was intended "to restore the compelling interest test . . . and to guarantee its application in all cases where free exercise of religion is substantially burdened." Id. § 2000bb(b)(1). In short, the purpose of RFRA was restoration of pre-Smith free exercise jurisprudence, not expansion of the scope of the Free Exercise Clause. See O Centro, 546 U.S. at 1216 (noting that Congress, by way of RFRA, "adopt[ed] a statutory rule comparable to the constitutional rule rejected in Smith."); Vill. of Bensenville v. Fed. Aviation Admin., 457 F.3d 52, 62 (D.C. Cir. 2006) ("[W]ith RFRA Congress intended to 'restore' the standard by which federal government actions burdening religion were to be judged, not to expand the class of actions to which the standard would be applied.").

The relevant context, then, is the body of free exercise case law that existed at the time of RFRA's passage. See Bruesewitz v. Wyeth LLC, 131 S. Ct. 1068, 1082 (2011) ("When all (or nearly all) of the relevant judicial decisions have

-9-

given a term or concept a consistent judicial gloss, we presume Congress intended

the term or concept to have that meaning when it incorporated it into a later-

enacted statute.") (internal quotation marks omitted); <u>Stewart v. Dutra Constr.</u>

<u>Co.</u>, 543 U.S. 481, 490 (2005) (examining "[t]he context surrounding the . . .

enactment" of the statute at issue); <u>Rowland v. Calif. Men's Colony</u>, 506 U.S.

194, 199 (1993) (holding that context includes "the texts of other related

congressional Acts").[1]  And the proper inquiry is whether, at the time of RFRA's

passage, the Supreme Court had said anything about for-profit corporations

possessing and exercising rights under the Free Exercise Clause of the First

Amendment.[2]  Plaintiffs, who carry the burden on this inquiry, provide us with no

---

[1] Obviously, there were no "related congressional Acts" that existed at the time of RFRA's passage.  Because, however, RFRA was intended to effectively overrule <u>Smith</u> and supplement the existing body of free exercise case law, <u>City of Boerne</u>, 521 U.S. at 531 (noting that RFRA was intended "to attempt a substantive change in constitutional protections"), it is precisely that existing body of free exercise case law that provides the proper context for understanding the text of RFRA.

[2] The majority ignores this inquiry and instead concludes, after discussing religious exemptions contained in Title VII, the Americans with Disabilities Act, and the National Labor Relations Act, that "Congress knows how to craft a corporate religious exemption, but chose not to do so in RFRA."  Maj. Op. at 28. But those statutes, all of which address the relationship between an employer and an employee, are significantly different than RFRA and, in my view, do not support the majority's assumption that Congress anticipated that for-profit corporations would be deemed "persons" under RFRA.  Indeed, I believe we must assume just the opposite since, at the time of RFRA's passage, Congress had never exempted for-profit corporations, on the basis of religious reasons, from any of these employment-related laws.  As I discuss in greater detail below, affording for-profit corporations rights under RFRA effectively creates a

(continued...)

-10-

persuasive authority.[3]  Indeed, they don't even directly address this question.  Not because they have overlooked precedent.  But rather because none exists.  At the time of RFRA's passage, the Supreme Court had never addressed whether, let alone recognized that, a for-profit corporation possessed free exercise rights under the First Amendment.  In other words, during the 200-year span between the adoption of the First Amendment and RFRA's passage, the Supreme Court

---

[2](...continued)
religious-based exemption to any number of federal statutes, including all of those that impact the employer-employee relationship.  Because, however, Congress has never expressly created any such exemption in any employment-related laws, it is improper for us to effectively create such exemptions based upon Congress's silence in employing the term "person" in RFRA.

[3] The majority properly acknowledges, as it must, that the plaintiffs carry two related burdens at this stage of the proceedings.  First, to establish their entitlement to a preliminary injunction.  Maj. Op. at 24.  Second, to prove that there is a substantial likelihood that they will establish "a prima facie case under RFRA by showing that the government substantially burdens a sincere religious exercise."  Id. at 19.  But in addressing whether Hobby Lobby and Mardel "can take advantage of RFRA's protections," Maj. Op. at 31, the majority quite clearly places the burden of persuasion on the defendants, rather than on the plaintiffs who, as the parties seeking relief under RFRA and the movants seeking preliminary injunctive relief, properly carry that burden.  In particular, the majority, rather than examining what precedents, if any, the plaintiffs can muster in support of their position, focuses almost exclusively on the defendants' arguments in opposition to the plaintiffs' RFRA claims.  E.g., at 26 ("The government makes two arguments for why this is not the case."), id. ("We reject both of these arguments."), 32 ("we do not see what the government sees in Amos"), id. ("Nor do the other post-RFRA circuit cases on which the government relies provide more guidance."), 34 ("to the extent the government sees Spencer and Great Falls as following principles laid down in Amos . . . we disagree."), id. ("In conclusion, the government has given us no persuasive reason to think that Congress meant 'person' in RFRA to mean anything other than its default meaning in the Dictionary Act").

-11-

consistently treated free exercise rights as confined to individuals and non-profit religious organizations. E.g., Jimmy Swaggart Ministries v. Bd. of Equalization of Calif., 493 U.S. 378 (1990) (addressing free exercise claims asserted by religious organization); Sch. Dist. of Abington Twp. v. Schempp, 374 U.S. 203, 223 (1963) (holding that the purpose of the Free Exercise Clause is "to secure religious liberty in the individual by prohibiting any invasions thereof by civil authority.") (emphasis added). And, in United States v. Lee, 455 U.S. 252 (1982), decided approximately a decade prior to RFRA's enactment, the Supreme Court emphasized that "[w]hen followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity." Id. at 261. In light of this body of precedent, the only reasonable conclusion we can draw is that Congress, in employing the term "person" in RFRA, anticipated that it would encompass only individuals and non-profit religious organizations.

The limitation of RFRA's applicability to individuals and non-profit religious organizations is reinforced by examining the legislative history of RFRA. In discussing the "BACKGROUND AND NEED" for RFRA, Congress noted "that the right to observe one's faith, free from Government interference, . . . is enshrined in the free exercise clause of the first amendment." Religious Freedom Restoration Act of 1993, S. Rep. 103-111 (1993), reprinted in 1993

U.S.S.C.A.N. 1892, 1893-94 (emphasis added). In turn, Congress recognized that "[t]his fundamental constitutional right may be undermined . . . by governmental rules of general applicability which operate to place substantial burdens on individuals' ability to practice their faiths." Id. at 1894 (emphasis). Congress further stated that "[t]he extent to which the Free Exercise Clause requires government to refrain from impeding religious exercise defines nothing less than the respective relationships in our constitutional democracy of the individual to government and to God." Id. at 1897 (emphasis added). Later, in discussing the intended purpose of RFRA and its impact on other areas of the law, Congress made explicit reference to "religious institutions" and "religious organizations." Id. at 1898 ("The act thus would not require such a justification for every government action that may have some incidental effect on religious institutions."), 1902 ("the courts have long adjudicated cases determining the appropriate relationship between religious organizations and government."). Entirely absent from the legislative history, however, is any reference to for-profit corporations. In short, Congress clearly recognized that individuals and religious organizations enjoy free exercise rights, and thus it anticipated that RFRA's reach would extend to them. But nowhere is there any suggestion that Congress foresaw, let alone intended that, RFRA would cover for-profit corporations.

Consequently, it comes as no surprise that not a single case, until now, has extended RFRA's protections to for-profit corporations. Although the majority

-13-

finds significance in the Supreme Court's <u>O Centro</u> decision, <u>see</u> Maj. Op. at 27 ("the Supreme Court has affirmed the RFRA rights of corporate claimants"), the fact of the matter is that the plaintiff in <u>O Centro</u> was a New Mexico non-profit corporation, specifically "[a] religious sect with origins in the Amazon Rainforest." 546 U.S. at 423. Thus, <u>O Centro</u> is entirely consistent with pre-RFRA free exercise precedent and tells us nothing about RFRA's application to for-profit corporations.

The same can be said for <u>Citizens United v. FEC</u>, 558 U.S. 310 (2010). In <u>Citizens United</u>, the Supreme Court held that corporations have free speech rights under the First Amendment. But that holding has no bearing on our assessment of RFRA's "context" because it was issued nearly twenty years after RFRA's enactment, and it dealt with a different provision of the First Amendment than the one Congress was concerned with in RFRA. <u>See generally</u> <u>Conestoga Wood Specialities Corp. v. Sebelius</u>, — F.Supp.2d —, 2013 WL 140110 at *7(E.D. Pa. Jan. 11, 2013) ("Although [the Free Speech and Free Exercise Clauses] reside within the same constitutional amendment, these two provisions have vastly different purposes and precedents, and we decline to make the significant leap Plaintiffs ask of us without clear guidance from Congress or the Supreme Court."). In short, a 2010 Supreme Court decision concerning the First Amendment free speech rights of a corporation cannot, in retroactive fashion, impact our determination of what Congress intended when it enacted RFRA in

-14-

1993.[4]

In sum, "there is no plausible basis for inferring that Congress intended or could have anticipated" that for-profit corporations would be covered by RFRA. McQuiggin v. Perkins, 133 S. Ct. 1924, 1942 (2013) (Scalia, J., dissenting). The majority's conclusion to the contrary thus "amounts to a pure judicial override of the statute Congress enacted." Id.

## C.

Having concluded that Hobby Lobby and Mardel qualify as "persons" for purposes of RFRA, the majority in turn concludes, "as a matter of constitutional law, [that] Free Exercise rights may extend to some for-profit organizations." Maj. Op. at 26. In doing so, the majority purports to rely on the precise body of case law that it ignored in assessing the "context" of RFRA, i.e., pre-RFRA "jurisprudence regarding who can bring Free Exercise claims." Maj. Op. at 36. And, despite the fact that, as I have explained, this jurisprudence does not include a single case extending free exercise rights to for-profit corporations, the majority

---

[4] To the extent the majority means to suggest that RFRA can incorporate evolving free exercise or First Amendment case law, that view is simply wrong. Although RFRA originally defined free exercise as "the exercise of religion under the First Amendment to the Constitution, 42 U.S.C. § 2000bb-2(4) (1999), Congress subsequently amended this part of RFRA to instead provide a fixed statutory definition of religious exercise for both RFRA and the Religious Land Use and Institutionalized Persons Act of 2000. This fixed statutory definition makes no reference to the First Amendment and instead provides that "religious exercise" includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A).

concludes, remarkably, that at least some for-profit corporations enjoy free exercise rights.

How does the majority arrive at this conclusion? It first asserts, correctly, that the Supreme Court has recognized "'a right to associate for the purpose of . . . exercis[ing] . . . religion,'" Maj. Op. at 37 (quoting Roberts v. U.S. Jaycees, 468 U.S. 609, 618 (1984) (addressing claim brought by non-profit civic and service organization)), and that, consequently, "the Free Exercise Clause at least extends to associations like churches—including those that incorporate," id.[5] It then asserts, again correctly, that "the Supreme Court has settled that *individuals* have Free Exercise rights with respect to their *for-profit businesses,*" i.e., sole proprietorships. Id. at 38 (emphasis in original; citing Lee and Braunfeld v. Brown, 366 U.S. 599 (1961)).

From there, however, the majority abandons its purported examination of pre-RFRA jurisprudence and "wander[s] into uncharted areas of the law with no compass other than [its] own opinions about good policy." Denver Area Educ. Telecomm. Consortium, Inc. v. F.C.C., 518 U.S. 727 (1996) (Kennedy, J., concurring in part and dissenting in part). To begin with, the majority, noting

---

[5] In doing so, the majority cites to, but does not place significant reliance on, the Supreme Court's decision in Citizens United. Maj. Op. at 37. As I have already explained, I agree that Citizens United, which held that corporations have free speech rights under the First Amendment, has no bearing on the outcome of this appeal.

that the First Amendment was intended by Congress to protect not only belief but conduct, suggests that "religious conduct includes religious expression . . . communicated by . . . for-profit corporations," Maj. Op. at 39, such as the alleged efforts by Hobby Lobby and Mardel to "proselytize by purchasing hundreds of newspaper ads to 'know Jesus as Lord and Savior,'" id. at 40 (quoting JA at 24a). But the majority cites to no authority suggesting that Congress, either at the time of the First Amendment's adoption or the passage of RFRA, remotely considered, let alone firmly believed, that for-profit corporations, as entities separate from the individuals that form them, could "exercise religion."

Indeed, at the time of RFRA's passage, the law had long distinguished between categories of corporations based upon "the specific purposes of their creation." Bank of Augusta v. Earle, 38 U.S. 519, 580 (1839); see Lankford v. Menefee, 145 P. 375, 378 (Okla. 1914) ("Every such corporation must be organized or incorporated for a particular purpose."). In particular, "corporations [we]re, from the particular purposes to which they [we]re devoted, denominated spiritual, and some lay; and the latter . . . again divided into civil and eleemosynary corporations."[6] Trustees of Dartmouth College v. Woodward, 17

_____

[6] In this case, it is quite clear even from the little we know about Hobby Lobby and Mardel that, notwithstanding the intentions of the Green family to operate them in a manner consistent with Biblical principles, they were created for the specific purpose of selling goods and making a profit. In other words, nothing in the record on appeal remotely suggests that Hobby Lobby and Mardel

(continued...)

-17-

U.S. 518, 668 (1819).  And, quite logically, only those "spiritual" corporations, i.e., non-profit religious organizations, had been recognized as having the ability to "exercise religion."

In turn, the majority, citing Citizens United, asserts there is "no reason [why] the Supreme Court would recognize constitutional protection for a corporation's political expression but not its religious expression."  Maj. Op. at 40.  But, as I have already noted, there are a number of reasons why we must not allow Citizens United to impact our assessment of what Congress anticipated or intended when it enacted RFRA: Citizens United was issued nearly twenty years after RFRA; it dealt with the Free Speech Clause rather than the Free Exercise Clause of the First Amendment; and "mark[ed] a dramatic break from" the Court's prior Free Speech precedents.  Citizens United, 558 U.S. at 394 (Stevens, J., dissenting).

The majority next states that it "cannot see why an individual operating for profit retains Free Exercise protections but an individual who incorporates—even as the sole shareholder—does not, even though he engages in the exact same activities as before."  Maj. Op. at 40.  The obvious response to this is that, in the latter situation, a new entity separate from the natural individual has been formed.

---

[6](...continued)
were created primarily to function as a vehicle through which a group of believers could associate and collectively exercise their religion.

The Supreme Court has clearly stated that "incorporation's basic purpose is to create a distinct legal entity, with legal rights, obligations, powers, and privileges different from those of the natural individuals who created it, who own it, or whom it employs." Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 163 (2001). Consistent with these principles, Oklahoma law, under which Hobby Lobby and Mardel were created and continue to exist, provides that "even a family corporation is a separate and distinct legal entity from its shareholders." Sautbine v. Keller, 423 P.2d 447, 451 (Okla. 1966); see Fanning v. Brown, 85 P.3d 841, 846 (Okla. 2004) ("Generally, a corporation is regarded as a legal entity, separate and distinct from the individuals comprising it.").[7] And, as I have noted, the specific purpose for which this new entity is created matters greatly to how it will be categorized and treated under the law.

The majority, obviously aware of these legal distinctions, asserts that "[t]his cannot be about the protections of the corporate form, such as limited liability and tax rates," because "[r]eligious associations can incorporate, gain those protections, and nonetheless retain their Free Exercise rights." Maj. Op. at 40. In turn, the majority asserts, with no support other than its own view of public policy, that "sincerely religious persons could find a connection between

---

[7] Given the apparent ownership structure of the two corporate plaintiffs in this case, the majority would apparently have us disregard two organizational structures: first, the corporate structure of Hobby Lobby and Mardel; second, the organizational structure of the trusts that actually own Hobby Lobby and Mardel.

the exercise of religion and the pursuit of profit." Id. at 41. Finally, the majority suggests, most remarkably and again with no support other than its own views, that the operation of a successful for-profit corporation can reasonably be viewed as a "form of evangelism" on the part of its owners. Id. Consequently, the majority concludes, such businesses, which it has effectively deemed "faith-based businesses" or businesses with a "religious mission," are entitled to free exercise rights.

This is nothing short of a radical revision of First Amendment law, as well as the law of corporations. But whatever one might think of the majority's views, the fact remains that they are wholly unsupported by the language of the Free Exercise Clause or the Supreme Court's free exercise jurisprudence, and are thus, at best, "considerations for the legislative choice." North Dakota State Bd. of Pharmacy v. Snyder's Drug Stores, Inc., 414 U.S. 156, 167 (1973). Adhering to the Supreme Court's holdings, as we must, there is, as I have explained, literally no support for the proposition that for-profit corporations enjoy free exercise rights.

Finally, the majority poses a series of hypothetical questions intended to call into question what it refers to as "the for-profit/non-profit distinction." E.g., Maj. Op. at 41-42 ("What if Congress eliminates the for-profit/non-profit distinction in tax law? Do for-profit corporations then gain Free Exercise rights? Or do non-profits lose Free Exercise rights?"). But that purported distinction is

-20-

not entirely accurate. As I have explained, the Supreme Court's free exercise jurisprudence tells us two key things: non-profit religious organizations, including those that have assumed the corporate form, enjoy free exercise rights; for-profit corporations have never been recognized as enjoying free exercise rights. Whatever theoretical distinctions might be raised by the majority concerning categories of non-profit corporations are immaterial for purposes of this appeal because it is undisputed that Hobby Lobby and Mardel are for-profit corporations focused on selling merchandise to consumers. Under the Supreme Court's free exercise jurisprudence, there is no basis for concluding that they enjoy free exercise rights.

### D.

Having concluded that RFRA's protections may, at least in some instances, extend to for-profit corporations, the majority proceeds to conclude that Hobby Lobby and Mardel in particular are entitled to RFRA's protections. In doing so, the majority lists, but does not otherwise explain, four factors that it considers relevant to that determination: (1) "Hobby Lobby and Mardel are not publicly traded corporations"; (2) "they are closely held family businesses with an explicit Christian mission as defined in their governing principles"; (3) "[t]he Greens . . . have associated through Hobby Lobby and Mardel with the intent to provide goods and services while adhering to Christian standards as they see them, and they have made business decisions according to those standards"; and (4) "the

Greens are unanimous in their belief that the contraceptive-coverage requirement violates the religious values they attempt to follow in operating Hobby Lobby and Mardel." Maj. Op. at 44.

In my view, these factors are problematic. To begin with, the first and second factors emphasize the fact that Hobby Lobby and Mardel are closely held corporations. But the majority offers no explanation as to why that factor is key in affording Hobby Lobby and Mardel rights under RFRA. And, in turn, the majority fails to explain whether (or why) registration as a publicly held corporation deprives a for-profit corporation of rights under RFRA.

As I see it, the publicly-held/closely-held distinction identified in the first and second factors, as well as the "unanimity of belief" mentioned in the fourth factor, are relevant only to the extent that they allow the majority to take into account the personal religious beliefs of the corporations' founders and owners — although, as I have noted, the Greens apparently do not directly own Hobby Lobby or Mardel, but rather these corporations are owned by trusts that are not named as party plaintiffs. Indeed, the majority's stated third and fourth factors make that clear by emphasizing the Greens' religious beliefs in general, and their beliefs regarding the contraceptive-coverage requirement in particular. But by doing so, the majority disregards the legal distinctions between the corporate entities and the individual founders/owners. Nothing that I am aware of in federal or Oklahoma state law allows the majority to do so. To be sure, "Oklahoma has

long recognized the doctrine of disregarding the corporate entity in certain circumstances." Fanning, 85 P.3d at 846. In particular, Oklahoma "[c]ourts may disregard the corporate entity and hold stockholders personally liable for corporate obligations or corporate conduct under the legal doctrines of fraud, alter ego and when necessary to protect the rights of third persons and accomplish justice." Id. Neither the plaintiffs nor the majority, however, cite to a single case that would allow us to employ these doctrines in a situation such as this. Moreover, as some of the defendants' amici have noted, it is simply unreasonable to allow the individual plaintiffs in this case to benefit, in terms of tax and personal liability, from the corporate/individual distinction, but to ignore that distinction when it comes to asserting claims under RFRA.

Although the plaintiffs have argued that Hobby Lobby and Mardel may bring RFRA claims on behalf of the individual plaintiffs in a representative capacity, there is no indication that the majority agrees with that argument or is otherwise relying on the doctrine of associational standing. Indeed, the majority appears to recognize that the doctrine of associational standing does not apply to the alleged facts of this case. Maj. Op. at 44 n.11 ("This is not a special case of associational standing."); see United Food and Comm. Workers Union Local 751 v. Brown Group, Inc., 517 U.S. 544, 552 (1996) (discussing "[t]he modern doctrine of associational standing, under which an organization may sue to redress its members' injuries, even without a showing of injury to the association

-23-

itself"); <u>Harris v. McRae</u>, 448 U.S. 297, 321 (1980) (holding that a non-profit religious organization lacked associational standing to assert the free exercise rights of its members). But, notwithstanding its apparent rejection of plaintiffs' associational standing argument, the majority nevertheless looks to the religious beliefs of the individual plaintiffs in assessing whether the corporate plaintiffs, Hobby Lobby and Mardel, are entitled to protection under RFRA.

To be sure, the second factor listed by the majority emphasizes the purported "explicit Christian mission" of the two corporate plaintiffs. But all we know at this point, based upon the limited record, is that Hobby Lobby's statement of purpose allegedly includes a reference to "Biblical principles." JA at 22a. Precisely why that is sufficient to accord Hobby Lobby rights under RFRA is unexplained by the majority. Indeed, the majority dodges several related questions: (1) whether a corporation can "believe" at all, <u>see</u> <u>Citizens United</u>, 130 S. Ct. at 972 ("It might also be added that corporations have no consciences, no beliefs, no feelings, no thoughts, no desires.") (Stevens, J., concurring in part and dissenting in part); (2) if so, precisely how courts are to go about determining a for-profit corporation's religious beliefs, and (3) whether a for-profit corporation has "cognizable religious liberties independent of the people who animate" it, <u>Grote v. Sebelius</u>, 708 F.3d 850, 856 (7th Cir. 2013) (Rovner, J., dissenting).

Curiously, the majority declines to indicate whether the four factors it mentions are intended to be exclusive, or even controlling. Maj. Op. at 45 ("We

need not decide today whether any of these factors is necessary."). Likewise, it refuses to address concerns raised by the defendants concerning how the factors might translate to "a large publicly traded corporation [seeking] to assert religious rights under RFRA." Id. at 44. Thus, the precise scope of the majority's holding remains unclear. That said, however, it is difficult to imagine why the majority's holding would not apply to any number of large, closely-held corporations that employ far more employees, and generate substantially more revenue, than Hobby Lobby and Mardel.

And, if all it takes for a corporation to be categorized as a "faith based business" for purposes of RFRA is a combination of a general religious statement in the corporation's statement of purpose and more specific religious beliefs on the part of the corporation's founders or owners, the majority's holding will have, intentionally or unwittingly, opened the floodgates to RFRA litigation challenging any number of federal statutes that govern corporate affairs (e.g., Title VII of the Civil Rights Act of 1964, the Fair Labor Standards Act).[8] See City of Boerne,

---

[8] Americans United for Separation of Church and State assert in their amicus brief, and I agree, that the majority's holding
> would transcend the provision of coverage for contraception. A Jehovah's Witness could choose to exclude blood transfusions from his corporation's health-insurance coverage. Catholic-owned corporations could deprive their employees of coverage for end-of-life hospice care and for medically necessary hysterectomies. Scientologist-owned corporations could refuse to offer their employees coverage for antidepressants or emergency psychiatric

(continued...)

-25-

521 U.S. at 532 (noting that RFRA's "[s]weeping coverage" has the potential to "displac[e] laws and prohibit[] official actions of almost every description and regardless of subject matter."); id. at 534 (noting the potential of RFRA to exact "substantial costs . . . , both in practical terms of imposing a heavy litigation burden on the [government] and in terms of curtailing [its] traditional general regulatory power").  In short, the majority's holding threatens to entangle the government in the impermissible business of determining whether for-profit corporations are sufficiently "religious" to be entitled to protection under RFRA from a vast array of federal legislation.  See Snyder v. Murray City Corp., 159 F.3d 1227, 1243 (10th Cir. 1998) (Lucero, J., concurring) ("[A]s Madison recognized, 'religion flourishes in greater purity, without than with the aid of Government.'"  (alteration omitted) (quoting James Madison, Memorial and Remonstrance against Religious Assessments (1785), in The Complete Madison 309 (S. Padover ed. 1953))).

E.

For all of these reasons, I reject the majority's conclusion that Hobby

---

[8](...continued)
treatment.  And corporations owned by certain Muslims, Jews, or Hindus could refuse to provide coverage for medications or medical devices that contain porcine or bovine products – including anesthesia, intravenous fluids, prostheses, sutures, and pills coated with gelatin.

Br. of Amici Curiae Am. United for Separation of Church and State, Inc., at 35.

-26-

Lobby and Mardel are "persons" exercising religion for purposes of RFRA. And, consequently, I conclude on that basis that Hobby Lobby and Mardel have failed to carry their burden of establishing a likelihood of success on the merits of their RFRA claims.

*IV. Substantial Burden*

In the second part of its merits analysis, the majority addresses the question of "whether the contraceptive-coverage requirement constitutes a substantial burden on plaintiffs' exercise of religion." Maj. Op. at 45. At the outset, the majority purports to "identify the religious belief in this case." Id. at 52. But it commits two errors in doing so.

To begin with, the majority once again conflates the alleged beliefs of the individual and corporate plaintiffs. In particular, the majority states that "[t]he corporate plaintiffs believe life begins at conception." Id. To be sure, the complaint reasonably alleges that the individual plaintiffs possess this belief. But nothing in the plaintiffs' complaint suggests that Hobby Lobby or Mardel have ever taken an official stance on this particular topic. Instead, the complaint alleges only that Hobby Lobby's statement of purpose makes reference to "Biblical principles." JA at 22a. Consequently, the majority is left to treat the religious beliefs of the individual plaintiffs as those of Hobby Lobby and Mardel, even though doing so violates basic principles of corporation law.

The majority also fails to carefully parse, and thus overstates, the nature of

the plaintiffs' religious beliefs. It is undisputed that the individual plaintiffs believe, as part of their religion, that "life begins at conception." Maj. Op. at 52. But, in addition to erroneously treating these beliefs as belonging to the corporate plaintiffs, the majority erroneously concludes that these beliefs encompass the plaintiffs' views regarding the contraceptive drugs Plan B and Ella, as well as certain intrauterine devices.

I agree that the clear offshoot of plaintiffs' belief that life begins at conception is their belief, also religious in nature, that any action that threatens to harm a fertilized egg, including by preventing it from implanting in the uterus, is immoral. But what is the connection between these religious beliefs and plaintiffs' opposition to Plan B, Ella, and certain intrauterine devices? According to plaintiffs' complaint and their motion for preliminary injunction, it is statements from the Food and Drug Administration (FDA), in particular an "FDA birth control guide," suggesting "that Plan B and Ella may work by preventing 'attachment (implantation)' of a fertilized egg to a woman's uterus." JA at 33a (complaint); see id. at 50a (allegation in complaint that "[s]ome FDA-approved 'contraceptives' cause abortions.") and 70a (reference in motion for preliminary injunction to "FDA Birth Control Guide"). In other words, the connection is not one of religious belief, but rather of purported scientific fact, i.e., how the challenged contraceptives operate to prevent pregnancy. Consequently, rather than being off limits to examination, plaintiffs' allegations regarding the abortion-

-28-

causing potential of the challenged drugs are subject not only to examination but evidentiary proof. In short, they must be proven by plaintiffs on the basis of sufficient evidence.

As I have noted, however, plaintiffs presented no evidence at all during the hearing on their motion for preliminary injunction. That failure is not entirely fatal to their claims, because there appears to be agreement among the parties and amici that certain intrauterine devices actually have, as a matter of scientific fact, the potential to prevent implantation of a fertilized egg. But there is no such consensus with respect to the contraceptive drugs challenged by the plaintiffs. E.g., Br. of Amici Curiae Physicians for Reprod. Health, et al., at 8-15 (discussing the current scientific evidence regarding how the challenged contraceptive drugs function to prevent pregnancy and asserting that the FDA labels for these drugs do not reflect this evidence). Consequently, plaintiffs' tactical decision to present no evidence on this point appears, to me, to prevent them from establishing that the regulatory requirement to provide healthcare coverage encompassing these drugs substantially burdens their exercise of religion.

*V. Remaining Preliminary Injunction Factors*

I also believe that the plurality errs in its consideration of the three remaining preliminary injunction factors, i.e., whether Hobby Lobby and Mardel face irreparable harm, whether the balance of equities tips in favor of Hobby

Lobby and Mardel, and whether an injunction is in the public interest. The plurality suggests it is proper for this court to address each of those factors in the first instance because "[t]he record we have is the record the parties chose to create below," Maj. Op. at 63, "this record suffices for us to resolve each of the remaining preliminary injunction factors," id., RFRA is analogous to constitutional law and thus plaintiffs' likelihood of success on the merits of their RFRA claims should be considered a determinative factor, id. at 63-64, and the government did not "contest[] the *factual* adequacy or accuracy of Hobby Lobby's allegations," all of which were contained in "a verified complaint," id. at 65.

Surely, however, the plaintiffs, as the parties who unsuccessfully moved for a preliminary injunction and now appeal from the district court's decision, must be required to present some evidence to establish the remaining three preliminary injunction factors. Although the plurality suggests that the existing record is sufficient to resolve the remaining factors, the plaintiffs presented literally no evidence at the preliminary injunction hearing. And, although it is true that plaintiffs filed a verified complaint, defendants have not yet had an opportunity to file an answer to the complaint. Thus, we do not yet know which of the plaintiffs' allegations might be admitted by the defendants. Finally, we must not forget that the district court denied plaintiffs' motion for preliminary injunction based solely on its conclusion that plaintiffs failed to demonstrate a probability of success on the merits of their RFRA claims. JA at 228a-229a. Consequently, the

-30-

district court concluded "it [wa]s unnecessary to determine whether the three other [preliminary injunction] factors tip[ped] in [plaintiffs'] favor." Id. at 229a n.19. It is thus completely understandable why the defendants in this appeal have focused their arguments on the likelihood of success factor: that, as I have noted, was the sole basis for the district court's decision. And, presumably, the defendants believed, and reasonably so, that if we disagreed with the district court's conclusion, we would remand the case to the district court for further consideration of the remaining three preliminary injunction factors (all of which the defendants vigorously disputed in opposing plaintiffs' motion for preliminary injunction in the district court proceedings, see id. at 156a-158a).

## VI. The Individual Plaintiffs' Standing to Sue under RFRA

As a final matter, I believe it necessary to briefly address several points raised by Judge Gorsuch and Judge Matheson regarding the Article III standing of the individual plaintiffs.

At the outset of his concurring opinion, Judge Gorsuch asserts that "[n]o one before us disputes that the [regulation] compels Hobby Lobby and Mardel to underwrite payments for drugs or devices that can have the effect of destroying a fertilized human egg." Gorsuch Op. at 1. As I have already explained, however, there are, indeed, factual disputes regarding the actual potential of the challenged drugs to destroy a fertilized human egg. And because the plaintiffs collectively failed to present any evidence to support their allegations regarding these

challenged drugs, there is no basis upon which a preliminary injunction could be issued that relieves Hobby Lobby and Mardel from offering its employees coverage for those drugs.

Judge Gorsuch proceeds to suggest that there are two bases upon which the individual plaintiffs have Article III standing. First, he suggests the individual plaintiffs have Article III standing "because the company shares of which they are the beneficial owners would decline in value if the mandate's penalties for non-compliance were enforced." Id. at 6. Although there is no disputing the principle that "shareholders suffer injury in the Article III sense when the corporation incurs significant harm, reducing the return on their investment and lowering the value of their stockholdings," Grubbs v. Bailes, 445 F.3d 1275, 1280 (10th Cir. 2006), the problem in this case is that, as far as we know, the individual plaintiffs are not the shareholders of Hobby Lobby and Mardel. Rather, plaintiffs' complaint alleges that both corporations are owned by trusts. JA at 13a. Thus, there is no basis in the limited record on appeal for concluding that the individual plaintiffs can rely on this principle of Article III standing. And even if we were to assume otherwise, I agree with the views expressed in Section II of Judge Bacharach's concurring opinion that Congress did not abrogate prudential-standing restrictions in RFRA and that the shareholder standing rule would prevent the individual plaintiffs from asserting distinct claims under RFRA.

Judge Gorsuch and Judge Matheson, in their separate concurring opinions, also suggest that the individual plaintiffs have Article III standing on the basis of a novel "management standing" rule. As Judge Gorsuch describes it in his concurring opinion, the individual plaintiffs, "as the exclusive and controlling owners of Hobby Lobby and Mardel, are the human beings who must direct the corporations to comply with the [contraceptive-coverage regulation] and do so in defiance of their faith." Gorsuch Op. at 10. On this point, I agree with Judge Bacharach that the so-called "choice" that results from the contraceptive-coverage regulation "falls solely on the two corporations, and the [individual plaintiffs]' injury is not directly or personally created by the Affordable Care Act." Bacharach Op. at 10.

In addition, to the extent the individual plaintiffs in this case are involved in the corporate decisionmaking of Hobby Lobby and Mardel, I am not persuaded that the contraceptive-coverage regulation imposes a substantial burden on the exercise of their religion. The contraceptive-coverage regulation requires employers such as Hobby Lobby and Mardel to provide to their employees health insurance coverage for the full range of FDA-approved contraceptive drugs and devices. Period. Although the plaintiffs, and in turn Judge Matheson, artfully suggest that compliance with the regulation "would assist others in using particular contraceptives," Matheson Op. at 15, the fact of the matter is that the regulation is drug/device-neutral. And the decision of a female employee as to

which contraceptive drug or device to use remains a private matter of individual choice. Thus, neither an employer, nor its officers and directors, by choosing to comply with the contraceptive-coverage regulation, become a party to, or otherwise encourage, an individual employee's decision to use a particular drug or device. See Grote, 708 F.3d at 865 (Rovner, J., dissenting) ("No individual decision by an employeer and her physician—be it to sue contraception, treat an infection, or have a hip replaced—is in any meaningful sense the [employer's or company owner's] decision or action."); cf. Zelman v. Simmons-Harris, 536 U.S. 639, 652 (2002) (upholding a state school voucher program on the ground that "[t]he incidental advancement of a religious mission . . . is reasonably attributable to the individual [voucher] recipient, not to the government, whose role ends with the disbursement of benefits."). But, by recognizing a new "management standing" rule applicable to the individual plaintiffs, Judge Gorsuch and Judge Matheson "upend th[is] traditional understanding" and effectively conclude "that when a company insures its employees' health care, a company owner indeed is a party to that care, with a cognizable religious interest in what services are made available to the employee." Grote, 708 F.3d at 865 (Rovner, J., dissenting). In my view, "[h]olding that a company [owner]'s religious beliefs and practices are implicated by the autonomous health care decisions of company employees, such that the obligation to insure those decisions, when objected to by [the owner], represents a substantial burden on that [owner]'s religious liberties [is] an

-34-

[unduly] expansive understanding of what acts in the commercial sphere meaningfully interfere with an individual's religious beliefs and practices." Id. at 866.

No. 12-6294, *Hobby Lobby Stores, Inc., et al. v. Sebelius, et al.*

**MATHESON**, J., concurring in part and dissenting in part.

## INTRODUCTION

The plaintiffs in this case are two corporations—Hobby Lobby and Mardel—and the owners and managers of those corporations—the Greens. Asserting claims under the Religious Freedom Restoration Act ("RFRA") and the Free Exercise Clause, these corporate and individual plaintiffs challenge a federal regulation requiring employers to provide employee health insurance that covers certain contraceptives. The challenged regulation ("the Regulation") was promulgated under the 2010 Patient Protection and Affordable Health Care Act and applies to Hobby Lobby and Mardel. The Greens allege that it burdens their religious beliefs to manage their corporations in compliance with the Regulation by providing health insurance coverage for the contraceptives at issue.

The plaintiffs seek a preliminary injunction to bar the enforcement of the Regulation. In addressing this request for "an extraordinary remedy never awarded as of right," *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), we cannot forget that the corporate and individual plaintiffs are not on common legal and factual ground. Each faces a unique set of problems that must be overcome to obtain a preliminary injunction.

Hobby Lobby and Mardel face a distinct and formidable challenge: a dearth of legal precedent that for-profit, secular corporations have rights under RFRA or the Free Exercise Clause. To overcome this obstacle, the plaintiffs attribute the beliefs of the Greens to the corporations and ignore the corporate form.

In contrast, the Greens start on more solid ground with respect to RFRA and the Free Exercise Clause. No one disputes that, as natural persons, the Greens have free exercise rights. Their distinct challenge is to demonstrate that the Regulation imposed on the corporations also burdens *the Greens'* exercise of religion. To do so, they must first show they have standing to assert their free exercise rights and, if they do, demonstrate that the Regulation substantially burdens their exercise of religion.

Each set of plaintiffs must show that the district court abused its discretion when it denied their request for a preliminary injunction because they could not meet their burden to demonstrate a substantial likelihood of success on the merits. *See Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007). With the plaintiffs' burden in mind, I conclude that the district court did not abuse its discretion as to the corporate plaintiffs, Hobby Lobby and Mardel, but would remand for further consideration of the Greens' request for a preliminary injunction on their RFRA claim.

As to the corporate plaintiffs, I agree with Chief Judge Briscoe that they did not meet their burden to show that RFRA applies to them. Their briefs lack adequate supporting precedent, and the record lacks evidence of how Hobby Lobby and Mardel hold and exercise religious beliefs in conflict with the Regulation. Also, I am thus far unconvinced that for-profit, secular corporations can so easily seize upon the religious beliefs of their owners to demonstrate a corporate religious conviction. The structural barriers of corporate law give me pause about whether the plaintiffs can have their corporate veil and pierce it too.

In contrast to Chief Judge Briscoe, however, I am not prepared to conclude once and for all that RFRA or the Free Exercise Clause provides no protection to any for-profit corporation. The legal and factual arguments have not been sufficiently developed to provide a definitive answer. Up until the recent court challenges to the Regulation, there is little or no case authority on whether a for-profit corporation has free exercise rights. We should not attempt a final answer on such a novel and significant question until we have to, and we do not have to at this early stage of this case. The circumstances in which this issue of first impression comes to us counsel against deciding it, other than to say that the plaintiffs have not met their burden at this point.

As to the Greens, the threshold issue is whether they have standing to assert their rights under RFRA and the Free Exercise Clause. I think they do. I also agree with the Greens that the district court failed to address their precise burden under RFRA. It should do so on remand.

In accordance with the foregoing, my analysis of the district court's preliminary injunction ruling begins with the corporate plaintiffs' RFRA claim and then proceeds to the Greens' RFRA claim. I end with a brief discussion of why the plaintiffs have not shown they are entitled to a preliminary injunction on their Free Exercise Clause claim.[1]

_____

[1] I address whether the plaintiffs should receive preliminary relief on their Free Exercise Clause claim for two reasons. First, because I would affirm on Hobby Lobby's and Mardel's RFRA claim and remand the Greens' RFRA claim, the district court would need to know where we stand on its earlier Free Exercise Clause preliminary injunction ruling. Second, consistent with avoidance of novel constitutional questions, *see Three Affiliated Tribes of the Fort Berthold Reservation v. Wold Engineering*, 467 U.S. 138, 157 (1984), we need not decide whether the Free Exercise Clause applies to for-profit corporations, an issue of first impression, by instead addressing the more conventional

## DISCUSSION

## I.  THE CORPORATIONS' RFRA CLAIM

Hobby Lobby and Mardel seek a preliminary injunction, asserting that the

Regulation violates their rights under RFRA.  I agree with much of Sections I and II in

Chief Judge Briscoe's separate opinion, in which she raises serious concerns about the

corporations' entitlement to RFRA protection.  In addition, I do not think the corporate

plaintiffs have demonstrated they can so easily disregard the corporate form and assume

the Greens' religious beliefs.  Accordingly, I do not think the district court abused its

discretion in holding that Hobby Lobby and Mardel failed to show they are substantially

likely to succeed on the merits of their RFRA claim.

Nevertheless, I would stop at concluding that the plaintiffs have not met their

preliminary injunction burden and would not foreclose the issue of RFRA coverage for

secular, for-profit corporations from future consideration.  Prudential considerations of

judicial restraint take me to this position.

A. *Plaintiffs' Failure to Meet Preliminary Injunction Burden on Law and Facts*

Chief Judge Briscoe raises serious concerns about the majority's analysis and

conclusions.  These concerns are sufficient to conclude that the district court did not

abuse its discretion in denying a preliminary injunction to Hobby Lobby and Mardel.

I agree with the district court that our usual preliminary injunction standard applies

because the plaintiffs seek relief that would "stay governmental action taken in the public

---

question of whether the Regulation is neutral, generally applicable, and rationally based.
*See* Section III, *infra*.

interest pursuant to a statutory or regulatory scheme." *Nova Health Sys. v. Edmondson*, 460 F.3d 1295, 1298 n.6 (10th Cir. 2006). Accordingly, the plaintiffs "must show that four factors weigh in [their] favor: (1) [they are] substantially likely to succeed on the merits; (2) [they] will suffer irreparable injury if the injunction is denied; (3) [their] threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction would not be adverse to the public interest." *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012) (quotations omitted). The district court focused on the "substantially likely to succeed" factor.

RFRA itself contains no express indication that it covers secular, for-profit corporations. *See generally* 42 U.S.C. §§ 2000bb-2000bb-4. The majority relies on the Dictionary Act, which provides that corporations are persons "unless the context indicates otherwise." 1 U.S.C. § 1. At least some of the context surrounding RFRA's enactment does indicate otherwise: (1) no court decision recognizing free exercise rights for secular, for-profit corporations, *see* Briscoe Op. at 9-12;[2] (2) no federal statute recognizing for-profit corporations as religious organizations; and (3) no

---

[2] "Context" for purposes of the Dictionary Act includes "the text of the Act of Congress surrounding the word at issue, or the texts of other related congressional Acts." *Rowland v. Cal. Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 199 (1993). In considering statutory text, if "the plain meaning . . . is unclear, we turn to the 'legislative environment' . . . searching for an indicia of congressional intent at the time the statute was enacted." *United States v. Doe*, 572 F.3d 1162, 1169 (10th Cir. 2009) (quotations omitted). RFRA itself guides us to consider free exercise case law decided before its enactment. The text refers to Supreme Court decisions, including in the statute's description of findings and purpose. *See, e.g.*, § 2000bb(a)-(b). Indeed, "Congress enacted RFRA in direct response to the Court's decision in *Employment Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990)." *City of Boerne v. Flores*, 521 U.S. 507, 512 (1997).

acknowledgement that granting for-profit corporations such coverage could allow them to challenge a wide swath of federal laws governing employers' obligations to employees.[3]

To obtain a preliminary injunction "the right to relief must be clear and unequivocal." *Nova Health Sys.*, 460 F.3d at 1298 (quotations omitted). Given the uncertainty regarding whether the corporate plaintiffs are covered by RFRA, they have not met their burden to clearly and unequivocally show that they are substantially likely to succeed on the merits.

I also share Chief Judge Briscoe's concerns that the plaintiffs have provided almost no evidence to support many of the allegations in their complaint. In particular, they have not provided sufficient facts about specific alleged religious beliefs of the corporations with respect to the contraceptives at issue here or how those beliefs are defined and exercised by the corporations. The plaintiffs also provided few detailed facts and no supporting evidence concerning their employee health care policies and practices,

---

[3] As Chief Judge Briscoe notes, granting RFRA coverage to for-profit corporations opens the door to challenges to federal statutes such as Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and various immigration laws. If the majority is correct that Congress intended to grant free exercise rights to for-profit corporations under RFRA, we would expect to find evidence in the legislative record that Congress addressed, or at least discussed, these consequences. The legislative record contains no such evidence. *See* Briscoe Op. at 12-13.

The majority attempts to answer this concern, in part, by suggesting that the government has a compelling interest in uniform enforcement of the FLSA. Maj. Op. at 55 n.16. But the answer to this question is far from clear. Neither the Supreme Court nor this circuit has held that uniform enforcement of FLSA is a compelling government interest or that its application would satisfy the least restrictive alternative requirement in a RFRA challenge. Moreover, many of the reasons the majority cites for concluding that the Regulation fails strict scrutiny would apply equally to the FLSA and to other federal laws, including those mentioned above.

including how they are managed and precisely how they affect the corporations' religious beliefs.[4]

This evidence vacuum may explain why the plaintiffs paint their RFRA claim with a broad brush, pressing us to provide expansive answers to abstract legal questions. The allegations in the complaint suggest that Hobby Lobby and Mardel have features that could set them apart from other for-profit businesses and even from each other, but the plaintiffs provide no evidence in support. The record does not allow meaningful consideration of whether RFRA applies to either of the two plaintiff corporations.

### B. *Disregarding the Corporate Form*

A threshold question is how Hobby Lobby and Mardel hold and exercise religious beliefs, including the specific beliefs at issue here. The majority and the plaintiffs attempt to bridge this gap by ignoring the corporate form and imputing the religious beliefs of the Greens to the corporations.[5] But they fail to contend with corporate law that recognizes legal distinctions between corporations and shareholders. *See New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 442 (1934) ("As a general rule a corporation

---

[4] The plaintiffs have failed, for example, to provide the district court with complete information about the financial strain they would bear if they did not provide health care insurance coverage to their employees. They allege that they would face a penalty of $26 million but do not allege or prove the offsetting expenses they would save. *See* Maj. Op. at 54. These facts are relevant to substantial burden and other preliminary injunction factors.

[5] For example, the majority asks, "Where did Hobby Lobby and Mardel lose their Free Exercise rights?" Maj. Op at 45 n.12. But this begs the question of whether these entities acquired such rights. Have Hobby Lobby and Mardel shown clearly and unequivocally that it is substantially likely they have such rights?

- 7 -

and its stockholders are deemed separate entities."); *Sipma v. Mass. Cas. Ins. Co.*, 256

F.3d 1006, 1010 (10th Cir. 2001) ("[A] corporation is treated as a legal entity separate

from its shareholders." (quotations omitted)).

Although courts generally recognize corporations and their shareholders as distinct

legal entities, in limited circumstances courts "disregard the corporate form" or "pierce

the corporate veil." *Floyd v. IRS*, 151 F.3d 1295, 1298 (10th Cir. 1998).[6] This is done

"only reluctantly and cautiously," *NLRB v. Greater Kan. City Roofing*, 2 F.3d 1047, 1051

(10th Cir. 1993), and the Supreme Court has called it a "rare exception." *Dole Food Co.*

*v. Patrickson*, 538 U.S. 468, 475 (2003). For instance, "Oklahoma has long recognized

---

[6] The issue of piercing the corporate veil has surfaced in other RFRA challenges to the Regulation. *See, e.g.*, *Grote v. Sebelius*, 708 F.3d 850, 858 (7th Cir. 2013) (Rovner, J., dissenting) (stating that individual plaintiffs did not make a "piercing the corporate veil" argument to attribute corporate expenditures for the health care plan to themselves); *Conestoga Wood Specialties, Inc. v. Sebelius*, No. 13-1144, 2013 U.S. Dist. LEXIS 2706, at *14-15 (3d Cir. Feb. 7, 2013) (Garth, J., concurring) (rejecting the corporate plaintiff's claim "that it should be construed as holding the religious beliefs of its owners," stating, "'It would be entirely inconsistent to allow [individual plaintiffs] to enjoy the benefits of incorporation, while simultaneously piercing the corporate veil for the limited purpose of challenging these regulations.'") (quoting *Conestoga Wood Specialties, Inc. v. Sebelius*, No. 12-6744, 2013 U.S. Dist. LEXIS 4449, 2013 WL 140110, at *8 (E.D. Pa. Jan. 11, 2013)); *Gilardi v. Sebelius*, No. 13-104(EGS), 2013 WL 781150, at *7 (D.D.C. Mar. 3, 2013) (using the same quote and agreeing with *Conestoga*); *Briscoe v. Sebelius*, No. 13-cv-00285-WYD-BNB, 2013 WL 755413, *6 (D. Colo. Feb. 27, 2013) (same); *Korte v. U.S. Dep't of Health & Human Servs.*, No. 3:12-CV-01072-MJR, 2012 WL 6553996, at *11 (S.D. Ill. Dec. 14, 2012) ("The fact that a 'corporate veil' (regardless of how thin) stands between the [individual owners] and [the corporation], and another legal 'veil' is between [the corporation] and the group health plan, cannot be ignored.") (denying motion for preliminary injunction), *injunction pending appeal granted by*, *Korte v. Sebelius*, No. 12-3841, 2012 WL 6757353 (7th Cir. Dec. 28, 2012). The court in *Gilardi* also said it was "troubled by plaintiffs' apparent disregard of the corporate form in this case" and "decline[d] to disregard the corporate form by imputing the religious belief of the Gilardis to the corporations they own." 2013 WL 781150, at *4, 6. In *Newland v. Sebelius*, 881 F. Supp. 2d 1287 (D. Colo. 2012), the court asked, "Is it possible to 'pierce the veil' and disregard the corporate form in this context?" *Id.* at 1296.

the doctrine of disregarding the corporate entity in certain circumstances[,] . . . under the legal doctrines of fraud, alter ego and when necessary to protect the rights of third persons and accomplish justice." *Fanning v. Brown*, 85 P.3d 841, 846 (Okla. 2004); *see also Luckett v. Bethlehem Steel Corp.*, 618 F.2d 1373, 1378-80 (10th Cir. 1980); *Smoot v. B & J Restoration Servs., Inc.*, 279 P.3d 805, 813 (Okla. Ct. Civ. App. 2012).

Many jurisdictions apply an alter ego theory in veil piercing cases. *See Skull Valley Band of Goshute Indians v. Nielson,* 376 F.3d 1223, 1251 (10th Cir. 2004) (applying Utah law to ordinary veil piercing claim); *Floyd*, 151 F.3d at 1298 (applying Kansas law to reverse veil piercing claim).[7] In analyzing whether an alter ego theory justifies veil piercing under federal law, this court asks (1) "was there such unity of interest and lack of respect given to the separate identity of the corporation by its shareholders that the personalities and assets of the corporation and the individual are indistinct," and (2) "would adherence to the corporate fiction sanction a fraud, promote injustice, or lead to an evasion of legal obligations." *Greater Kan. City Roofing*, 2 F.3d at 1052.

---

[7] Ordinary veil piercing occurs when *external* plaintiffs seek to hold shareholders liable for the corporation's debts. *See Floyd*, 151 F.3d at 1298. The plaintiffs' claims would likely involve so-called reverse veil piercing, in which the corporation itself or a controlling insider asks a court to disregard the corporate form to obtain some advantage, avoid liability, or claim legal protections not otherwise available. *See id.*; *Love v. Flour Mills of Am.*, 647 F.2d 1058 (10th Cir. 1981) (declining to apply reverse veil pierce under Oklahoma law but leaving open the possibility in other circumstances); *Cargill, Inc. v. Hedge*, 375 N.W. 2d 477 (Minn. 1985) (allowing reverse veil pierce in bankruptcy action to recognize homestead exception for home owned by a corporation but occupied by shareholder family); *see also* Gregory S. Crespi, *The Reverse Pierce Doctrine*, 16 J. Corp. L. 33, 37 (1991).

Perhaps Hobby Lobby, Mardel, and the Greens can make a successful argument for disregarding the corporate form and sharing religious beliefs. But courts require evidence to disregard the corporate form, and the plaintiffs have presented none. Yet they filed their suit and immediately asked the district court to relieve the corporations of their legal obligations to their employees under the Regulation, even when we have repeatedly said that "a preliminary injunction is an extraordinary remedy, and thus the right to relief must be clear and unequivocal." *Nova Health Sys.*, 460 F.3d at 1298 (alterations omitted) (quotations omitted).

C. *Judicial Restraint*

Although I conclude that the district court did not abuse its discretion in denying the corporate plaintiffs' RFRA claim, I do not think we need to decide as a final matter whether for-profit, secular corporations have RFRA or Free Exercise Clause rights. The corporate plaintiffs' failure to meet their burden of showing they are substantially likely to succeed on the merits is a sufficient basis to affirm the district court's order.

Moreover, this court is being asked to answer whether RFRA covers for-profit, secular corporations in an expedited process, at a preliminary stage of the case, and without the benefit of a full record, a final judgment from the district court, or prior consideration from a panel of this court. The Supreme Court has not addressed this question, and few courts have even considered it. The issue is complex and involves critical areas of statutory and constitutional law. The answer will profoundly affect the relationship between the government and potentially millions of business entities in our society in ways we can only begin to anticipate. These circumstances are far from

- 10 -

optimal to decide a heretofore unexplored question, yet the majority does so broadly and without hesitation.

To understand the meaning of RFRA requires delving into the scope and meaning of the Free Exercise Clause. *See* 42 U.S.C. §§ 2000bb (describing RFRA's purpose and meaning in terms of the Free Exercise Clause).[8] "If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable." *United States v. Cusumano*, 83 F.3d 1247, 1250-51 (10th Cir. 1996) (quoting *Spector Motor Serv., Inc. v. McLaughlin*, 323 U.S. 101, 105 (1944)). Because we are at the preliminary injunction stage, where emphasis should be on the plaintiffs' burden and the evidence presented, I do not think adjudication of the RFRA coverage issue is unavoidable. In these circumstances, we ought to exercise the "fundamental rule of judicial restraint." *Three Affiliated Tribes of the Fort Berthold Reservation v. Wold*

---

[8] The majority's attempt at using history to support its conclusion illustrates the uphill burden of showing clearly and unequivocally a substantial likelihood that RFRA covers for-profit corporations. Not surprisingly, opinions differ about the history surrounding the adoption of the Free Exercise Clause. The Supreme Court's limited attempts to explore that history have taken different directions. *See Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 575-77 & n.6 (1993) (Souter, J., concurring). Professor McConnell's article explores multiple possible explanations for the inclusion of "free exercise of religion" rather than "liberty of conscience" in the First Amendment. *See* Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1488-1500 (1990); *but see* Philip A. Hamburger, *A Constitutional Right of Religious Exemption: A Historical Perspective*, 60 Geo. Wash. L. Rev. 915 (1992) (reviewing and criticizing Professor McConnell's general conclusions regarding original meaning of the Free Exercise Clause). If history is to be our guide, neither the plaintiffs nor the majority have marshaled the evidence or fully canvassed the scholarship.

*Engineering*, 467 U.S. 138, 157 (1984). I am therefore reluctant to hold that all, some, or no for-profit corporations are entitled to RFRA or Free Exercise Clause protection.

\* \* \*

Chief Judge Briscoe should not have to remind us that the plaintiffs need to do more than file a complaint and a motion to receive a preliminary injunction. They must earn it by meeting their "clear and unequivocal" burden of persuasion. They have not done so as to Hobby Lobby and Mardel. I would therefore affirm the district court's denial of the preliminary injunction as to the corporate plaintiffs' RFRA claim.

## II. THE GREENS' RFRA CLAIM

Unlike Hobby Lobby and Mardel, the Greens do not have to convince us that they have RFRA rights. It is clear they do. The obstacle they must overcome is whether they can claim that the Regulation violates their RFRA rights even though the Regulation applies to the corporate plaintiffs.

I would hold that the Greens have standing to pursue their RFRA claim because they have shown the Regulation injures them in a direct, personal way. I would then remand to the district court with instructions to reconsider their request for a preliminary injunction in light of a proper understanding of the Greens' claim that the Regulation substantially burdens their religious beliefs.

### A. *The Greens Have Standing*

The Greens must first convince us they have standing to challenge the Regulation under RFRA.

- 12 -

The standing "inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin*, 422 U.S. 490, 498 (1975); *see also Valley Forge Christian Coll. v. Americans United for Separation of Church & State*, 454 U.S. 464, 471 (1982). As "[t]he party invoking federal jurisdiction," the Greens "bear[] the burden of establishing [their standing] . . . in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (citations omitted). Thus, "at the preliminary injunction stage, [the Greens] must make a 'clear showing'" that they have standing. *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).

1. **Article III Standing**

"[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan*, 504 U.S. at 560. This "irreducible constitutional minimum" is established by three elements. *Id.* The Greens must demonstrate "(1) that [they have] suffered an injury in fact; (2) that the injury is 'fairly traceable to the challenged [regulation];' and (3) that it is 'likely' that 'the injury will be redressed by a favorable decision.'" *Awad*, 670 F.3d at 1120 (quoting *Ariz. Christian Sch. Tuition Org. v. Winn*, 131 S. Ct. 1436, 1442 (2011)).

The crux of the Greens' Article III standing concerns the first element, injury in fact. An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*,

- 13 -

504 U.S. at 560 (citations omitted) (quotations omitted). Here, the Greens allege they are injured because by July 1, 2013, they must either manage their corporations to comply with the Regulation, and thereby violate their religious beliefs, or subject the corporations to fines for noncompliance. At the very least, they have shown their alleged injury is imminent. But they must also show they have suffered an injury that goes to a "legally protected" interest and that their injury is "concrete and particularized." *Id.*

"Determining whether a plaintiff has alleged a sufficient injury in fact is often not difficult," but when the alleged injury is neither physical nor economic, it may be more challenging. *Awad*, 670 F.3d at 1120.[9] Although "standing may be predicated on noneconomic injury," not every noneconomic injury is sufficient. *Valley Forge*, 454 U.S. at 486. For example, "the psychological consequence presumably produced by observation of conduct with which one disagrees is not a sufficient injury in fact." *Green v. Haskell Cnty. Bd. of Comm'rs*, 568 F.3d 784, 793 (10th Cir. 2009) (quotations omitted). A plaintiff's grievance must be more than a mere "'religious difference'" that is "'a generally available grievance about government,'" *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 601 (2007) (quoting *Doremus v. Bd. of Educ. of Borough of*

_____

[9] As Judge Gorsuch's concurrence notes, Hobby Lobby and Mardel face penalties if they do not comply with the Regulation. These penalties would reduce the corporations' value, and the resulting economic injury would affect the Greens as shareholders. Such an injury ordinarily satisfies Article III's injury requirement. *See Franchise Tax Bd. of Cal. v. Alcan Aluminium Ltd.*, 493 U.S. 331, 336 (1990); *Grubbs v. Bailes*, 445 F.3d 1275, 1280 (10th Cir. 2006). Even if the Greens were not shareholders, as Chief Judge Briscoe suggests, *see* Briscoe Op. at 32, no one disputes that the Greens are exposed to a *financial injury*, which is sufficient for Article III standing. *See Alcan*, 493 U.S. at 665 (analyzing whether injury to a corporation will cause "actual financial injury" to those with an ownership interest). Nevertheless, I understand the Greens' primary alleged injury to be interference with their religion.

- 14 -

*Hawthorne*, 342 U.S. 429, 434 (1952), and *Lujan*, 504 U.S. at 573-74), "hurt feelings,"

*Freedom from Religion Found., Inc. v. Obama*, 641 F.3d 803, 807 (7th Cir. 2011), or

even a "deep and genuine offense" to a particular law or conduct, *Catholic League for*

*Religious & Civil Rights v. City & Cnty. of San Francisco*, 624 F.3d 1043, 1062 (9th Cir.

2010) (en banc) (Graber, J., dissenting).[10]

The Greens assert an injury to their free exercise rights, which certainly constitute

a legally protected interest. *See Wisconsin v. Yoder*, 406 U.S. 205, 214 (1972). To

establish an injury to this legally protected interest, the Greens must show that the

challenged government action infringes on their "particular religious freedoms." *Sch.*

*Dist. of Abington Twp., Pa. v. Schempp*, 374 U.S. 203, 224 n. 9 (1963). They have done

so.

The Greens contend their religious beliefs require them to refrain from any

conduct or action that would assist others in using particular contraceptives.[11] The

Greens' roles as managers of Hobby Lobby and Mardel place them between two

---

[10] These examples come from cases involving claims brought under the Establishment Clause, while the Greens' claims involve religious exercise. We know from case law that requirements for standing under the Establishment Clause and the Free Exercise Clause differ, but these cases are nevertheless instructive.

[11] The Greens' statements in their verified complaint are sufficient evidence of *their* individual religious beliefs. *See Taft v. Vines*, 83 F.3d 681, 685 n.* (4th Cir. 1996) ("[A] verified complaint is the equivalent of an . . . affidavit . . . when the allegations . . . are based on personal knowledge."); *see also Sheinkopf v. Stone*, 927 F.2d 1259, 1263 (1st Cir. 1991) (verified complaint equivalent to affidavit to the extent it is based on matters of personal knowledge); *Runnels v. Rosendale*, 499 F.2d 733, 734, n.1 (9th Cir. 1974) (same). (We note that the complaint does not specify the corporations' alleged religious beliefs, but even if it did, there is no legal precedent to guide us in how a corporate entity could establish and define legally recognized religious beliefs.)

imminent, concrete, and particularized injuries: the Regulation requires them (1) to violate this religious obligation by implementing their corporations' compliance with the Regulation or (2) to disregard the Regulation and risk the financial future of the corporations they own and operate. The Regulation causes this injury, and an exemption under RFRA or the Free Exercise Clause would redress it.

The Government argues that the Greens have not shown an injury in fact because only the corporations are subject to the Regulation and its penalties for noncompliance. But this does not preclude the Greens' satisfaction of the injury requirement. Even an indirect injury may be an injury for Article III purposes. *See Warth*, 422 U.S. at 505 ("[T]he indirectness of the injury does not necessarily deprive the person harmed of standing to vindicate his rights."). And plaintiffs may suffer injury from the enforcement of a law or regulation even if it does not directly apply to them. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).

"'At bottom, the gist of the question of standing is whether petitioners have such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination." *Awad*, 670 F.3d at 1120 (quoting *Massachusetts v. E.P.A.*, 549 U.S. 497, 517, 127 (2007)). The Greens' RFRA and Free Exercise claims satisfy this requirement.

2. **Prudential Standing**

Even when Article III's standing requirements are satisfied, there are "other limits on the class of persons who may invoke [federal courts'] decisional and remedial powers." *Warth*, 422 U.S. at 499. Such prudential standing requirements include the

- 16 -

"shareholder standing rule," which provides that "conduct which harms a corporation confers standing on the corporation, not its shareholders." *Bixler v. Foster*, 596 F.3d 751, 756 (quoting *Franchise Tax Bd. of Cal. v. Alcan Aluminium Ltd.*, 493 U.S. 331, 336 (1990) ("*Alcan*")).  A shareholder may not bring claims for injuries that are "derivative" of, or indistinct from, the corporation's injury.  *Id.* at 758.

Because the Regulation applies to Hobby Lobby and Mardel, there is a question of whether the Greens' alleged injury is derivative.  This issue arises because the Greens emphasize their shareholder status, and the Greens do not help matters because they insist that their interests, burdens, and injuries are identical to the corporations'.[12]  Nonetheless, I do not believe the shareholder standing rule applies because the Greens have alleged an injury that is direct and personal.[13]

---

[12] The plaintiffs' appellate brief describes the corporations throughout as a "family business" and the Greens as "owners."  *See* Aplt. Br. at 1-2, 20, 22, 33-36.  The plaintiffs' complaint and arguments acknowledge no distinction between the corporate plaintiffs and the Greens, and they continuously attribute the Regulation's requirements and penalties and the religious beliefs at issue interchangeably to "the Greens," "Hobby Lobby," and "Plaintiffs."  *E.g.*, Complaint at 24, 27-39 (myriad references to the "Plaintiffs'" obligations under the Regulation and "Plaintiffs' religious beliefs"); *see also*, *e.g.*, Aplt. Br. at 5 (The Regulation "forces the Greens and Hobby Lobby to violate their religious beliefs…"); *id.* at 1 ("If the Greens do not comply . . . they face massive fines."); *id.* at 18, 22, 27.  As discussed earlier, this ignores that "a corporation is regarded as a legal entity, separate and distinct from the individuals comprising it." *Fanning*, 85 P.3d at 846.  The Greens have failed to develop a legal or factual basis to allow the court to disregard the corporate form.

[13] My conclusions on the Greens' standing are generally consistent with Judge Gorsuch's concurrence.  I do not join his concurrence for several reasons.  I do not believe we can conclude at this point that the Greens are entitled to relief.  Because this court raised the standing issue and asked the Government to brief it, I do not think we should decline to consider the Government's prudential standing arguments.  And I am

a. *Shareholder standing exception:  direct and personal injury*

A well-established exception to the shareholder standing rule is that "a shareholder with a direct, personal interest in a cause of action [may] bring suit even if the corporation's rights are also implicated." *Alcan*, 493 U.S. at 336; *see also Grubbs v. Bailes*, 445 F.3d 1275, 1280 (10th Cir. 2006).  Purely financial injuries to a shareholder's corporate investment are typically derivative and do not fall under this exception. *E.g.*, *Bixler*, 596 F.3d at 758 (alleged injury—financial loss from corporation's RICO violations—was derivative because it was based solely on plaintiffs' status and rights as shareholders).  This is true even when the defendant's alleged wrongdoing involves a civil rights violation. *E.g.*, *Diva's Inc. v. City of Bangor*, 411 F.3d 30, 42 (1st Cir. 2005) (shareholder's § 1983 claim barred because alleged injuries were purely financial and

---

not convinced that RFRA forecloses consideration of prudential standing for the reasons Judge Bacharach has raised in his concurring opinion.  Bacharach Op. at 7-8.

I disagree, however, with Judge Bacharach's conclusion that the shareholder standing rule prevents the Greens' claims, for reasons described in this section. Additionally, I do not agree that the Greens' fiduciary duties to the corporations as officers and directors determine whether their free exercise injury is derivative. Shareholders do not owe the same fiduciary duties to corporations that officers and directors do. *See, e.g.*, *In re Midway Games, Inc.*, 428 B.R. 303, 313, 319 (Bankr. Del. 2010) (officers and directors owe a duty of loyalty and good faith to advance the interests of the corporation, while shareholders are entitled to advance their own economic interests).  The fiduciary duties to which Judge Bacharach refers are separate from the Greens' shareholder status and cannot resolve the shareholder standing issue.  Even if these fiduciary duties were relevant to standing, assuming they place added pressure on the Greens to comply with the Regulation and thereby violate their religious obligations, this would strengthen the argument that their injury is direct and personal and not derivative of any injury to the corporations.

Chief Judge Briscoe suggests this analysis would create a "management standing" rule.  Briscoe Op. at 33.  No such rule is proposed.  The standing analysis in this section applies well-established Article III and prudential standing law to the facts of this case.

- 18 -

were identical to the corporation's); *Potthoff v. Morin*, 245 F.3d 710, 717-18 (8th Cir. 2001) (same); *Smith Stzer & Sons, Inc. v. South Carolina Procurement Review Panel*, 20 F.3d 1311, 317-18 (4th Cir. 1994) (same).

But even though shareholders may suffer derivative financial harm, they may also separately suffer a direct and personal injury. In *Alcan*, a foreign corporation challenged a state franchise tax imposed on its subsidiary corporation. 493 U.S. at 336-37. At issue was whether the plaintiff's injury was merely the "decline in the value of [the shareholder's] ownership interest," in which case it would have been derivative. *Id.* at 337. The Supreme Court dismissed the claim on other grounds, but it left open the possibility that a separate injury—namely, a burden on the shareholder's decisions about "participation in the American economy"—would satisfy prudential standing requirements. *Id.* at 338.

We applied *Alcan* in *Grubbs*, where the shareholder of a corporation that held land for shareholder use sued a sheriff's department for failing to protect the land against trespassers. 445 F.3d at 1277. The shareholder retained an individual leasehold in the property, giving him a state law right against trespass. *Id.* at 1280. His injury was to a "distinct legally recognized interest," and therefore was direct and personal and "sufficient to satisfy the prudential standing principles in *Alcan*." *Id.* at 1277, 1280.[14]

---

[14] Another case from this circuit came to a different conclusion. In *Guides Ltd. v. Yarmouth Group Property Management., Inc.*, 295 F.3d 1065 (10th Cir. 2002), a corporation brought a § 1981 claim for race discrimination, and the corporation's sole shareholder added an individual claim for emotional distress. We rejected the individual claim on prudential standing grounds. But *Guides* did not apply the *Alcan* rule. It relied on *In re Stat-Tech Int'l Corp.*, 47 F.3d 1054 (10th Cir. 1995), a Tenth Circuit case that

- 19 -

(As in *Alcan*, we ultimately rejected the claim on other grounds without "definitively resolv[ing]" the shareholder standing issue. *Id.* at 1280.)

   b. *Direct and personal injury exception applies to the Greens*

The Greens' injury is direct and personal regardless of whether the corporations are covered by RFRA. If the corporations have no RFRA rights, the Greens' alleged free exercise injury is not derivative of a corporate free exercise injury. If, on the other hand, the corporations do possess RFRA rights, a bit more analysis is required.

Although the Greens may suffer financial losses arising from non-compliance with the Regulation, their core alleged injury is religious. The Greens claim that the Regulation injures them directly and personally because it requires them to take *affirmative action* contrary to their religious beliefs: they must implement coverage for the contraceptives at issue.

The Greens are not only shareholders, they are also directors and officers of the corporations. They own and manage Hobby Lobby and Mardel and will be directly and personally involved in implementing the Regulation.[15] The situation might be different,

---

applied a "different shareholder standing exception" that "does not look for direct injury distinct from a shareholder's derivative harm; it looks for harm to the plaintiff *as a shareholder* but requires that it be unique in some way from that suffered by shareholders generally." *Grubbs*, 445 F.3d at1280 n.2 (10th Cir. 2006) (summarizing *Guides*); *see also In re Stat-Tech*, 47 F.3d at 1059. We have most often applied this second shareholder standing exception in cases arising under state law where minority shareholders claim financial injuries from actions of the corporation or a majority shareholder. *E.g.*, *Combs v. PriceWaterhouseCoopers LLP*, 382 F.3d 1196, 1199-1200 (10th Cir. 2004); *In re Stat-Tech*, 47 F.3d at 1059.

[15] This point answers Judge Hartz's hypothetical about the rabbi who owns a kosher-matzo business. The rabbi retains his RFRA rights when he incorporates his

- 20 -

for example, for a shareholder who has no role in managing the corporation and is unlikely to be involved in any of the details of the corporation's health plan. Conversely, a human resources manager who does not also serve as shareholder, officer, or director could be relieved of responsibility connected to the Regulation, perhaps by requesting accommodation under Title VII. *See Rodriguez v. City of Chicago*, 156 F.3d 771, 774-78 (7th Cir. 1998) (police officer's religious beliefs opposing abortion entitled him to reasonable accommodation under Title VII to be excused from assignment guarding health clinic where abortions were performed).

The Greens' injury is not purely financial. At its core, their injury is religious. Like the shareholder in *Grubbs*, they assert rights that are independent of their shareholder status. Whether or not their RFRA claim prevails, the Greens have standing to have the claim heard in federal court.

### B. *The Greens' RFRA Claim Should Be Remanded*

The next issue is whether the district court abused its discretion in concluding that the Greens failed to show a substantial likelihood of success on the merits of their RFRA claim. The court determined that the burden on their religious exercise was not substantial. Because I conclude the court misunderstood the nature of the Greens' burden, I would remand for reconsideration of their RFRA claim.

The district court concluded that the Greens' RFRA claim was not substantially likely to succeed because the burden on their religious exercise was "indirect and

business. Conversely, his corporation does not necessarily acquire his RFRA rights by virtue of his religious beliefs, though, as noted earlier, I would leave that question open for now.

attenuated" and therefore not substantial. *Hobby Lobby Stores, Inc. v. Sebelius*, 870 F. Supp. 2d 1278, 1294 (W.D. Okla. 2012). It defined the burden as the possibility that "funds, which plaintiffs will contribute to a group health plan, might, after a series of independent decisions by health care providers and patients covered by [their] plan, subsidize *someone else's* participation in an activity that is condemned by plaintiff's religion." *Id.* (quoting *O'Brien v. U.S. Dep't of Health & Human Servs.*, 894 F. Supp. 2d 1149, 1159 (E.D. Mo. 2012)). This statement misconstrues the Greens' religious objection.

The Greens acknowledge that their religious beliefs are not "even implicated" by their employees' independent medical choices. Aplt. Br. at 27. But they assert "that their faith demands they refrain from participating in, providing access to, paying for, training others to engage in, or otherwise supporting" the use of particular contraceptives. *Id.* (quotations omitted). The district court abused its discretion by applying its substantial burden analysis to an incorrectly understood religious burden. *See Korte v. Sebelius*, No. 12-3841, 2012 WL 6757353, at *3 (7th Cir. Dec. 28, 2012) ("The religious-liberty violation at issue here inheres in the *coerced coverage* of contraception . . . *not*—or perhaps more precisely, *not only*—in the later purchase or use of contraception or related services."). The burden would arise from having to provide coverage in contravention of the Greens' religious beliefs.

As previously explained, the alleged burden on the Greens' religious exercise constitutes an injury for standing purposes. But to prevail on the merits of a RFRA claim, the Greens must show a substantial burden. The district court did not conduct the

proper analysis due to its erroneous view of the burden on the Greens' exercise of religion. I therefore would remand to the district court to reconsider the substantial burden issue. Depending on the outcome of that analysis, the court may also need to address whether the Regulation satisfies strict scrutiny and also consider the remaining preliminary injunction factors with respect to the Greens' RFRA claim.

## III. FREE EXERCISE CLAUSE CLAIM

The district court did not abuse its discretion in denying a preliminary injunction for the plaintiffs' Free Exercise claim because they have not clearly and unequivocally shown that they are substantially likely to succeed on the merits.

"[T]he 'right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 132 S. Ct. 694, 706 (2012) (quoting *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 879 (1990)). For this reason, the Supreme Court has concluded that "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). Rather, "[g]overnment actions that stem from 'neutral' rules of 'general applicability' are subject to rational basis review." *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 52 (10th Cir. 2013) (quoting *City of Hialeah*, 508 U.S. at 531).

The Regulation is a neutral rule of general applicability "so long as its object is something other than the infringement or restriction of religious practices." *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 649-50 (10th Cir. 2006); *see also Corder v. Lewis Palmer Sch. Dist. No. 38,* 566 F.3d 1219, 1233 (10th Cir. 2009); *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1294 (10th Cir. 2004) ("A rule that is discriminatorily motivated and applied is not a neutral rule of general applicability."). The Regulation was enacted to promote women's access to health care—a purpose entirely unrelated to religion. And it applies generally to for-profit corporations based on criteria unrelated to its shareholders' religious views. *See Swanson ex rel. Swanson v. Guthrie Indep. Sch. Dist. No. I-L*, 135 F.3d 694, 698 (10th Cir. 1998) (law is generally applicable because it applies to an activity whether motivated by religious or secular purpose).

Under rational basis review, the Regulation survives a constitutional challenge if it is at least "rationally related to a legitimate government interest." *Corder*, 566 F.3d at 1232. The plaintiffs have not argued that the Government's stated purpose of promoting women's access to health care is not legitimate, nor have they suggested that the Regulation is not rationally related to this purpose.

The district court did not abuse its discretion in concluding that the plaintiffs have not shown that their Free Exercise Clause claim is substantially likely to succeed on the merits.

## CONCLUSION

I would (1) affirm the district court's denial of a preliminary injunction for Hobby Lobby and Mardel on their RFRA claim; (2) conclude that the Greens have standing to

- 24 -

assert their RFRA and Free Exercise claims; (3) reverse the district court's holding that the Greens' RFRA claim is not substantially likely to succeed and remand for reconsideration; and (4) affirm the district court's denial of a preliminary injunction on the plaintiffs' Free Exercise Clause claim.

Finally, I concur that the Anti-Injunction Act does not apply to this case.